1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARIO NAVARRO,

11           Plaintiff,                   No. 2:09-cv-1878 KJM KJN P

12      vs.

13   DEBRA HERNDON, et al.,

14           Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17           Plaintiff is a prisoner currently incarcerated at Ironwood State Prison in Blythe,

18   California.  Plaintiff proceeds, in forma pauperis and without counsel, in this civil rights action

19   filed pursuant to 42 U.S.C. § 1983.  This action proceeds on plaintiff's First Amended Complaint

20   ("complaint" or "FAC") (Dkt. No. 24), pursuant to order of this court filed August 10, 2010

21   (Dkt. No. 21).[1]  Presently pending before the court is defendants' motion to dismiss the

22

23

24   _____

25        [1]  The court ordered that the operative complaint consist of plaintiff's typed version of his
     original complaint (Dkt. Nos. 1, and 20 at 11-64 (Exh. B)), together with his typed list of exhibits
     (id. (Exh. E)), and his original exhibits (Dkt. No. 1).  These materials were consolidated as
26   plaintiff's First Amended Complaint filed August 10, 2010.  (Dkt. No. 24).

1  complaint and this action in its entirety.[2]  (Dkt. No. 38.)  Plaintiff has filed an opposition to the

2  motion.  (Dkt. Nos. 48, 49 (Request for Judicial Notice).)[3]  Defendants did not file a reply.  For

3  the reasons that follow, this court recommends that the motion to dismiss be granted in part and

4  denied in part.

5  II.  Background

6          On February 27, 2004, plaintiff was sentenced to a life term, "with a minimum

7  custody of 55 years."  (Dkt. No. 49 at 21-24.)[4]  Plaintiff entered the California Department of

8  Corrections and Rehabilitation ("CDCR") on April 21, 2004.  (Dkt. No. 24 at 7, 14.)  He was

9  initially received at the California Correctional Institution ("CCI"), in Tehachapi, California; then

10  transferred to California State Prison-Sacramento ("CSP-SAC") in July 2004.  Plaintiff was

11  transferred to California State Prison-Los Angeles County ("CSP-LAC") in March 2006.

12  Plaintiff was thereafter moved to California Men's Colony ("CMC") on December 29, 2008, then

13  to Ironwood State Prison ("ISP"), via Centinela State Prison, on February 18, 2009.

14          This action, commenced July 9, 2009, challenges the conditions of plaintiff's

15  confinement while housed at CSP-SAC.  Plaintiff alleges that he was forced to participate in

16  mental health programs and take psychotropic medications, and was improperly held in

17  administrative segregation.  Plaintiff further alleges that, while held in administrative

18  _____

19      [2]  The motion to dismiss was originally filed by defendants Baker, Baxter, Costa, Grannis,
   Johnson, Kelly, Kernan, Morrow, Nicholas, Sclafani, Soliman, Vasquez, and Walker.  (Dkt. No.
20  38.)  Subsequently served defendants have joined in the motion, viz., defendant Griffin (Dkt. No.
   51); defendant O'Brian (Dkt. No. 66); and defendants Shelton (now Rocke) and Frishman (Dkt.
21  No. 71).  All seventeen defendants have now appeared in this action and move for its dismissal.
   The court duly notes and overrules plaintiff's opposition to the joinder of defendants Griffin,
22  O'Brian, Frishman and Shelton in defendants' motion to dismiss.  (Dkt. Nos. 54, 72, 77.)

23      [3]  The court takes judicial notice of these exhibits, which include court records, and
   copies of administrative appeals.  Fed. R. Evid. 201 (court may take judicial notice of facts that
24  are capable of accurate determination by sources whose accuracy cannot reasonably be
   questioned); see also City of Sausalito v. O'Neill, 386 F.3d 1186, 1224 n.2 (9th Cir. 2004) (court
25  "may take judicial notice of a record of a state agency not subject to reasonable dispute").

26      [4]  Page references reflect the court's electronic pagination unless otherwise noted.

1  segregation, he was denied access to his legal property and to the prison law library; that many of

2  his legal documents were destroyed; that several of his administrative grievances were not

3  processed; and that he was retaliated against for attempting to exercise his First Amendment

4  rights.  Plaintiff contends that he has "suffer[ed] adverse physical, mental, emotional, and

5  spiritual permanent harms, which are atypical and significant hardships . . ." (Dkt. No. 24 at 14.)

6      When screening the complaint, pursuant to 28 U.S.C. § 1915A, this court

7  determined that it appears to state potentially cognizable claims under the First, Eighth and

8  Fourteenth Amendments to the United States Constitution.  (Dkt. No. 21 at 11-20).  Defendants

9  move to dismiss all of plaintiff's claims premised on their contentions that: (1) claims accruing

10 prior to July 9, 2005, are barred by the statute of limitations, and cannot be preserved by

11 application of the "continuing violation doctrine," and (2) claims accruing after July 9, 2005, fail

12 to state cognizable claims for relief.

13 II.  Legal Standards

14     A.  Statute of Limitations

15     Section 1983 contains no statute of limitations.  Federal courts apply the state's

16 personal injury statute of limitations, subject to any state tolling provisions that are not

17 inconsistent with federal law.  Wallace v. Kato, 549 U.S. 384, 387 (2007); Wilson v. Garcia, 471

18 U.S. 261, 277 (1985); Azer v. Connell, 306 F.3d 930, 935-36 (9th Cir. 2002).  Since January 1,

19 2003, the California statute of limitations for personal injury actions is two years.  Cal. Code Civ.

20 Proc. § 335.1; Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004).  In addition, the

21 statute of limitations is tolled for two years for prisoners serving less than a life sentence,

22 provided the plaintiff was incarcerated at the time the claim accrued.  Cal. Code Civ. Proc. §

23 352.1(a); Johnson v. State of California, 207 F.3d 650, 654 (9th Cir. 2000); Jones v. Blanas, 393

24 F.3d 918, 928 n.5 (9th Cir. 2004) (construing provision to include prisoners serving life

25 sentences).  Therefore, the effective statute of limitations for plaintiff's civil rights claims, which

26 accrued after January 1, 2003, is four years.

1    This statute of limitations is further tolled for the period in which a prisoner

2  administratively exhausted his underlying grievances, pursuant to the requirements of the Prison

3  Litigation Reform Act ("PLRA").  See Brown v. Valoff, 422 F.3d 926, 942-43 (9th Cir. 2005)

4  ("the applicable statute of limitations must be tolled while a prisoner completes the mandatory

5  exhaustion process").

6    The statute of limitations commences on the date when the underlying cause of

7  action accrues.  "Although state law determines the length of the limitations period, 'federal law

8  determines when a civil rights claim accrues.'"  Azer, 306 F.3d 936 (quoting Morales v. City of

9  Los Angeles, 214 F.3d 1151, 1153-54 (9th Cir. 2000).  "Under federal law, a claim accrues when

10  the plaintiff knows or has reason to know of the injury which is the basis of the action."

11  TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999).

12    These rules governing the timely filing of a prisoner civil rights action may in

13  some circumstances be further qualified by application of the "continuing violation doctrine," as

14  addressed by the parties herein.  The continuing violation doctrine is an equitable doctrine

15  designed "to prevent a defendant from using its earlier illegal conduct to avoid liability for later

16  illegal conduct of the same sort."  O'Loghlin v. County of Orange, 229 F.3d 871, 875 (9th Cir.

17  2000).  To establish a continuing violation, a plaintiff must show "a series of related acts against

18  a single individual ... that . . . are related closely enough to constitute a continuing violation."

19  Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1480-81 (9th Cir. 1989)

20  (citation and internal quotation marks omitted).

21    As articulated in the employment context, the Ninth Circuit has "recognized two

22  methods by which a plaintiff may establish a continuing violation.  First, the plaintiff may show a

23  serial violation by pointing to a series of related acts against one individual, of which at least one

24  falls within the relevant period of limitations. . . . Second, a plaintiff may show a systematic

25  policy or practice of discrimination that operated, in part, within the limitations period -- a

26  systemic violation."  Douglas v. California Dept. of Youth Authority, 271 F.3d 812, 822 (9th Cir.

4

2001) (footnote, citations and internal quotation marks omitted).  "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981) (citation omitted)).  Stated differently, "mere continuing impact" from a past violation is not actionable under the continuing violation doctrine.  Knox v. Davis, 260 F.3d 1009, 1013 (9th Cir. 2001) (citations and internal quotation marks omitted).  "[T]he critical distinction in the continuing violation analysis is whether the plaintiff complains of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." Brown v. Ga. Bd. of Pardons & Paroles, 335 F.3d 1259, 1261 (11th Cir. 2003) (citation omitted).

Although the Ninth Circuit has not applied the continuing violation doctrine to preserve a prisoner's civil rights claim, cf. Ngo v. Woodford, 539 F.3d 1108, 1109-10 (9th Cir. 2008) (rejecting application of doctrine to extend deadline for attorney's challenge to a prison decision), the doctrine has been so applied by courts within this circuit and by other circuits.  As recently summarized by one Magistrate Judge:

> Although the Ninth Circuit has not applied the continuing violation doctrine to Eighth Amendment deliberate indifference claims, several other circuits have.  See Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001) (finding that continuous violation doctrine applied to defendants' deliberate indifference for the span of time that prison officials were aware of plaintiff's injury and allegedly refused to treat it); Lavellee v. Listi, 611 F.2d 1129, 1132 (5th Cir. 1980) ("[T]he [arrestee's] allegation of a failure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided."); Neel v. Rehberg, 577 F.2d 262, 263-64 (5th Cir. 1978) (per curiam) (finding that where inmate alleged that jail officials failed to provide medical treatment over a three-month period, the continuous violation doctrine applied and the statute of limitations did not begin to run until the end of that period); see also Evans v. County of San Diego, No. 06-CV-0877 JM (RBB), 2008 WL 842459, at *12 (S.D. Cal. Mar. 27, 2008) (applying continuing violation doctrine to prisoner's Eighth Amendment medical treatment claim).

Martin v. Woodford, 2010 WL 2773235, at *5 (E.D. Cal. 2010); see also Watson v. Sisto, 2011 WL 533716, *11 (E.D. Cal. 2011) (applying continuing violation doctrine to find no statute of

1   limitations bar to prisoner's claim of ongoing inadequate medical care); Hall v. Pliler, 2009 WL

2   2043361, *12 (E.D. Cal. 2009) (noting possible application of continuing violation doctrine

3   provided that the specific acts challenged by the prisoner "are instances of some broader policy,"

4   such as "an alleged ongoing policy of discrimination"); Ashker v. Schwarzenegger, 2009 WL

5   801557, *16 n.9 and related text (N.D. Cal. 2009) (finding possible application of continuing

6   violation doctrine to prisoner's due process claim, provided that it was "premised on a systemic

7   policy or practice of discrimination . . .because such policy continually deters the plaintiff from

8   seeking full rights or threatens to adversely affect the plaintiff in the future"); K'Napp v.

9   Hickman, 2008 WL 495755, *6 (E.D. Cal. 2008) (applying continuing violation doctrine to find

10  no statute of limitations bar to prisoner's claims of "ongoing violations as the result of a

11  'campaign' or policy of retaliation that persists 'unabated'"); Bruce v. Woodford, 2010 WL

12  3036483, *5-7 (E.D. Cal. 2010) (finding that continuing violation doctrine preserved prisoner's

13  due process, retaliation, and Eighth Amendment claims).

14          In evaluating the timeliness of plaintiff's claims, this court considers each of the

15  factors noted above, including the continuing violations doctrine.

16      B.  Failure to State a Cognizable Claim

17          A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6)

18  challenges the sufficiency of the pleadings set forth in the complaint.  Vega v. JPMorgan Chase

19  Bank, N.A., 654 F. Supp. 2d 1104, 1109 (E.D. Cal. 2009).  Under the "notice pleading" standard

20  of the Federal Rules of Civil Procedure, a plaintiff's complaint must provide a "short and plain

21  statement" of plaintiff's claims showing entitlement to relief.  Fed. R. Civ. P. 8(a)(2); see also

22  Paulsen v. CNF, Inc., 559 F.3d 1061, 1071 (9th Cir. 2009).  "A complaint may survive a motion

23  to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state

24  a claim to relief that is plausible on its face.'"  Coto Settlement v. Eisenberg, 593 F.3d 1031,

25  1034 (9th Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)).  "'A claim has

26  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

6

reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Caviness v.
Horizon Cmty. Learning Ctr., Inc.</u>, 590 F.3d 806, 812 (9th Cir. 2010) (quoting <u>Iqbal</u>, 129 S. Ct. at
1949).  The court accepts "all facts alleged as true and construes them in the light most favorable
to the plaintiff."  <u>County of Santa Clara v. Astra USA, Inc.</u>, 588 F.3d 1237, 1241 n.1 (9th Cir.
2009).  The court is "not, however, required to accept as true conclusory allegations that are
contradicted by documents referred to in the complaint, and [the court does] not necessarily
assume the truth of legal conclusions merely because they are cast in the form of factual
allegations."  <u>Paulsen</u>, 559 F.3d at 1071 (citations and quotation marks omitted).

   In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court "may
generally consider only allegations contained in the pleadings, exhibits attached to the complaint,
and matters properly subject to judicial notice."  <u>Outdoor Media Group, Inc. v. City of
Beaumont</u>, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).  However,
under the "incorporation by reference" doctrine, a court may also review documents "whose
contents are alleged in a complaint and whose authenticity no party questions, but which are not
physically attached to the [plaintiff's] pleading."  <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1076 (9th
Cir. 2005) (citation omitted and modification in original).  The incorporation by reference
doctrine also applies "to situations in which the plaintiff's claim depends on the contents of a
document, the defendant attaches the document to its motion to dismiss, and the parties do not
dispute the authenticity of the document, even though the plaintiff does not explicitly allege the
contents of that document in the complaint."  <u>Id.</u>

III.  <u>Discussion</u>

   Plaintiff filed his original complaint on July 9, 2009.  Defendants contend that the
statute of limitations bars any claim that accrued more than four years earlier, that is, before July
9, 2005.

   The court initially notes that its review of the record—including all exhibits filed
in support of plaintiff's complaint, and all exhibits filed in support of plaintiff's opposition to

1   defendants' motion to dismiss—reveals only one pertinent and fully exhausted administrative

2   grievance.  That grievance, including all supporting documents—Log. No. SAC-05-2084

3   (Plaintiff's 98-page Exhibit 1, set forth in Dkt. No. 24 at 61-103, Dkt. No. 24-1 at 1-30, and Dkt.

4   No. 24-2 at 1-46)—challenges plaintiff's confinement in CSP-SAC's Segregated Housing Unit

5   ("SHU"), both intrinsically, and based on the conditions of confinement therein.

6            Although plaintiff submitted, or attempted to submit, other administrative

7   grievances (see e.g. Dkt. No. 24-1 at15-28 (Log No. SAC-05-0546 (challenging, inter alia, his

8   CCCMS and EOP classifications)); id. at 29-30 (Log No. SAC-05-668 (challenging refusal of

9   staff to provide plaintiff access to his psychiatric file)), including group grievances (see e.g. Dkt.

10  No. 24-1 at 4-14 (Log No. SAC-05-2214)), none appear fully exhausted.  The only other fully

11  exhausted administrative grievances, submitted by plaintiff in opposition to the motion to

12  dismiss, are not relevant to this action because:  (1) they were exhausted after this action was

13  filed, see 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001) (plaintiff must

14  exhaust available administrative remedies before filing federal civil rights action); and (2) they

15  challenge conditions of plaintiff's confinement not at CSP-SAC, but at California Men's Colony

16  (Log. No. CMC-09-0281) and Ironwood State Prison (Log No. ISP-09-0623, and Log No. ISP-

17  09-0444).  (See Dkt. No. 49 at 47-88, Dkt. No. 49-1 at 1-15.)

18       A.   Due Process and Eighth Amendment Claims Premised on Forced Administration
             of Psychotropic Medications
19

20            On screening, the complaint appeared to state potentially cognizable claims

21  against all named mental health defendants (Nicholas, Griffin, Costa, Soliman, Frishman,

22  Vasquez, Kelly, Baxter, Shelton,[5] and Johnson), based on plaintiff's allegations that he was

23  forced to receive psychotropic medications, in violation of his federal rights under the Fourteenth

24  Amendment Due Process Clause, and the Eighth Amendment's proscriptions against cruel and

25  _____

26       [5]  The court notes the name change of defendant "Lisa Shelton" to "Lisa Rocke" (Dkt.
     No. 69 at 1), but continues, for present purposes, to reference the name "Shelton."

1   unusual punishment, and deliberate indifference to serious medical needs.  Plaintiff also alleged

2   violation of state law, based upon the California appellate court's holding in Keyhea v. Rushen,

3   178 Cal. App. 3d 526 (1986), which upheld a consent decree affirming the right of state prisoners

4   to refuse psychotropic medications absent a judicial determination that a prisoner is incompetent

5   to refuse such medication.  (The consent decree upheld in Keyhea is now codified as a permanent

6   injunction in California Penal Code section 2600.  See In re Qawi, 32 Cal.4th 1, 21 (2004).)

7             These claims are premised on plaintiff's allegations that he was prescribed

8   antidepressant and antipsychotic medications from approximately April 2004 to January 2005.

9   (Dkt. No. 24 at 5, 7-12; Dkt. No. 24-3 at 79-92; Dkt. No. 24-4 at 1-2.)[6]  However, defendants

10  contend that, on January 5, 2005, Dr. Frishman discontinued plaintiff's psychiatric medications.

11  (Dkt. No. 38-1, at 12, citing Dkt. No. 24-3 at 43-44.)  The court's review of the record indicates

12  that plaintiff began refusing his medications in approximately December 2004 or January 2005

13  (Dkt. No. 24-3 at 39, 44, 49, 51, 54, 56-57, 61, 71); that plaintiff was placed on a suicide watch

14  ("Mental Health Crisis Bed") commencing January 7, 2005 (Dkt. No. 24-3 at 38-39, 41-43, 46,

15  49, 50, 57-60); and that such watch included the discontinuation of plaintiff's psychiatric

16  medications per his request (Dkt. No. 24-3 at 43, 46).  When plaintiff was released from such

17  watch on January 11, 2005, he "signed [an] informed refusal for meds," and staff were instructed

18  to "monitor [plaintiff] off psychotropics," for signs or symptoms of depressive relapse.  (Dkt. No.

19  24-3 at 62; see also id. at 51, 60, 63).

20            The allegations of the complaint regarding these medications are limited to the

21  aforementioned dates, and plaintiff does not, in his opposition to the pending motion, refute

22  defendants' statute of limitations argument.  Any cause of action premised on these allegations

23  accrued no later than January 11, 2005, when plaintiff signed the informed consent rejecting the

24  challenged medications.  Applying the four-year statute of limitations applicable to this case,

25
_____

26  [6] These medications included Quetiapine and Seroquel (antipsychotics), Citalopram,
    Celexa, and Mirtazapine (antidepressives).  (Dkt. No. 24-3 at 79-92; Dkt. No. 24-4 at 1-2.)

1    plaintiff had until January 11, 2009, to file an action challenging these matters.  No additional

2    tolling of this deadline is apparent from the record; for example, the record does not appear to

3    contain a fully exhausted administrative grievance that directly challenged the administration of

4    psychotropic medications to plaintiff, and thus would have tolled the statute of limitations

5    pending administrative exhaustion.  Because plaintiff did not file the instant action until July 9,

6    2009, six months after expiration of the limitations period applicable to these matters, the court

7    finds that plaintiff's claims premised on the allegedly forced administration of psychotropic

8    medications are barred by the statute of limitations.

9          B.    <u>First and Fourteenth Amendment Claims Premised on Alleged Denial of Access
to Religious Services</u>

10

11          Pursuant to the screening order, the court found that the complaint may state

12    potentially cognizable claims against correctional staff members Baker, Sclafani, Kernan and

13    Walker, and CSP-SAC mental health staff members Soliman, Frishman and Johnson, premised

14    on the alleged denial of plaintiff's First Amendment right to participate in religious services, and

15    his Fourteenth Amendment right to equal protection based on his Native American religion.

16    Plaintiff alleges that he was improperly denied his right to access the prison's Native American

17    religious services or to meet with a spiritual leader, even when he sought to mourn the death of

18    family members; and that the forced administration of psychotropic medications known to be

19    incompatible with exposure to high temperatures precluded his participation in religious

20    sweatlodge activities.

21          For the reasons previously stated, any claim premised on the forced administration

22    of psychotropic medications is barred by the statute of limitations; thus, plaintiff's claim that he

23    could not participate in sweatlodge activities due to these medications is time-barred.

24          To the extent that plaintiff asserts he was denied his right to access the prison's

25    Native American religious services, or to meet with a spiritual leader, as a result of his placement

26    in administrative segregation, this matter is addressed below.

1       C.    Eighth Amendment Claim Premised on Alleged Deliberate Indifference to
2              Plaintiff's Broken Wrist

3           Plaintiff alleges that defendants failed to treat his injured "right wrist which was

4   fractured or broke for four weeks.  Plaintiff was in constant physical pain, due to no medical

5   services provided." (Dkt. No. 24 at 16.)  Attachments to the complaint indicate that plaintiff

6   injured his wrist in April 2004, while detained at the Los Angeles County Jail.  (Dkt. No. 24-3 at

7   4-5.)  After plaintiff's transfer to CCI, an x-ray was taken on May 10, 2004, which confirmed a

8   fracture.  (Dkt. No. 24-3 at 3.)  Referral was made to an orthopedic surgeon on May 14, 2004 (id.

9   at 4-6), who concluded on June 1, 2004, that the fracture was healing satisfactorily without

10  further intervention (id. at 8). When plaintiff was transferred from CCI to CSP-SAC, it was

11  advised that he perform only light duty activities through November 2004.  (Id. at 10.)  An x-ray

12  taken September 15, 2004, indicated osteoarthritis.  (Dkt. No. 24-3 at 1.)

13          Neither plaintiff's injury nor the pertinent medical evaluations of that injury

14  accrued within the four-year limitations period preceding the filing on this action on July 9, 2009.

15  No additional tolling of this period is apparent from the record, as there does not appear to be any

16  fully exhausted administrative grievance that directly challenged the failure of prison officials to

17  adequately treat plaintiff's broken wrist.  Therefore, the court concludes that plaintiff's claims

18  premised on any alleged failure of defendants to adequately treat his wrist injury are barred by the

19  statute of limitations.

20      D.    Due Process and Eighth Amendment Claims Premised on Mental Health
21             Diagnoses and Placements

22          The court's screening order found that the complaint appears to state potentially

23  cognizable Fourteenth Amendment Due Process Claims against defendants Kernan (CSP-SAC

24  Warden), Walker (CSP-SAC Associate Warden), and all mental health defendants (Nicholas,

25  Griffin, Costa, Soliman, Frishman, Vasquez, Kelly, Baxter, Shelton, and Johnson), based on

26  plaintiff's allegations that each of his mental health diagnoses and placements failed to comport

1  with established criteria and procedures, and resulted in the violation of plaintiff's Eighth

2  Amendment rights to be free from cruel and unusual punishment, and deliberate indifference to

3  his serious medical needs.  (See Dkt. No. 21 at 12-13.)  Defendants contend that all of plaintiff's

4  claims premised on his mental health diagnoses and placements are barred by the statute of

5  limitations.

6          Broadly construing the complaint, plaintiff appears to premise these due process

7  and Eighth Amendment claims on the following three[7] mental health diagnoses and program

8  placements:  (1) plaintiff's April 30, 2004, diagnosis and placement in the Mental Health

9  Treatment Population at the CCI, in Tehachapi, California (Dkt. No. 24 at 15 ¶ 23; Dkt. No. 24-2

10  at 48); (2) plaintiff's July 6, 2004, placement in the Enhanced Out Patient ("EOP") mental health

11  program at CSP-SAC (Dkt. No. 24 at 16-17 ¶¶ 25-26; Dkt. No. 24-3 at 13-16); and (3) plaintiff's

12  May 4, 2005, reclassification from EOP to the Correctional Clinical Case Management System

13  ("CCCMS") at CSP-SAC (Dkt. No. 24 at 21-22 ¶¶ 36-37; Dkt. No. 24 at 100; see also id. at 89-

14  96).  Thereafter, on May 4, 2005, plaintiff was placed in the SHU at CSP-SAC, where he

15  remained for 309 days, until his transfer to CSP-LAC, on March 9, 2006.  (Dkt. No. 24 at 12-13,

16  21-22, 89, ¶¶ 36-37, 55-57; Dkt. No. 24-5 at 27.)

17          The court finds that plaintiff's claims premised on each of his three mental health

18  classifications are time-barred.  The accrual dates for claims resting on these classification are the

19  respective decisional dates— April 30, 2004; July 6, 2004; and May 4, 2005—each of which was

20  more than four years before plaintiff initiated this action.  Because it appears that plaintiff did not

21  exhaust his administrative remedies in challenging any of these decisions,[8] there is no tolling of

22

23          [7] Defendants construe plaintiff's SHU placement as his fourth placement premised on
     mental health considerations; the court separately addresses this placement.
24
          [8] Plaintiff generally challenged his placement in CSP-SAC's Mental Health Treatment
25  Program pursuant to an administrative grievance filed January 14, 2005.  (Log. No. SAC-05-
     0546; see Dkt. No. 24-1 at 25-30.)  Pursuant to the First Level Appeal Response, CSP-SAC
26  Chief Psychologist K. Kelly, Ph. D., partially granted the grievance, insofar as "it was decided

1    the four-year limitations period.

2              Moreover, none of these decisions warrant application of the continuing violation

3    doctrine.  These decisions were made by more than one mental health professional over a period

4    of nearly a year:  (1) the April 30, 2004 decision to assign plaintiff to the Mental Health

5    Treatment Population was made by CCI's Ann Nicholas, Psy. D. ( Dkt. No. 24-2 at 48); (2) the

6    July 6, 2004 placement of plaintiff in the EOP program was made by CSP-SAC's Lisa Shelton,

7    Psy. D. (Dkt. No. 24-3 at 12-16); and (3) the May 4, 2005 decision to reclassify plaintiff to the

8    CCCMS program was made by CSP-SAC Chief Psychologist K. Kelly, Ph. D. (Dkt. No. 24-1 at

9    27-28), and, apparently, a multi-staffed "Enhanced Outpatient Program Interdisciplinary

10   Treatment Team/Unit Classification Committee," at CSP-SAC (which did not include Nicholas,

11   Shelton, or Kelly)[9] (Dkt. No. 24 at 100, 103.)[10]  The fact that each decision was made

12   independently, and by different staff, negates any reasonable inference that the decisions

13   represent a systemic effort to harm, isolate, discriminate or retaliate against plaintiff.  Each

14   decision was discrete, with its own consequences relative to plaintiff's treatment and placement.

15   Thus, the continuing violation doctrine does not overcome the statute of limitations bar to

16   plaintiff's claims premised on any of these three decisions.

17         E.      Claims Premised on Plaintiff's SHU Placement

18              Plaintiff was housed in the SHU at CSP-SAC for a total of 309 days, from May 4,

19   2005, until plaintiff's transfer to CSP-LAC, on March 9, 2006.  Pertinent ICC records indicate

20   that a decision to transfer plaintiff from CSP-SAC, to "alternate Level-IV housing of LAC-IC

21

22   that [plaintiff] would be removed from the EOP program and placed in the [CCCMS] effective
     5/4/2005." (Id. at 28.)  These documents indicate that plaintiff failed to complete the request for
23   Second Level Review. (Id. at 26, 30.)

24     [9]  Although plaintiff contends that Kelly "came to the committee and stated inquiries
     made by outside law firms on and about Plaintiff" (Dkt. No. 24 at 21-22), no supporting exhibit
25   so indicates.

26     [10]  However, the "progress notes" of the May 4, 2005, Interdisciplinary Treatment Team,
     recommend that plaintiff should be "retain[ed] in EOP." (Dkt. No. 24 at 103.)  See n.11, infra.

270 [CSP-LAC], alternate COR-IV 270 [California State Prison-Corcoran]," was made on June

15, 2005, within six weeks after plaintiff's SHU placement.[11]  (Dkt. No. 24 at 91.)  It was noted

that such transfer would be "non-adverse," based on plaintiff's request to be closer to his mother.

(Id.)  It was further noted that the decision to retain plaintiff in administrative segregation

pending such transfer was "based solely on circumstances at this institution," that is, plaintiff's

"local safety issues . . ."  (Id.)  Thus, upon transfer, plaintiff was "eligible for CLO A custody and

double cell housing."[12]  (Id.)

Plaintiff contends that he was placed in the SHU pending an investigation relative

to his safety, and was informed within a week of his placement, on May 11, 2005, by defendant

Warden Kernan, that, at the conclusion of the investigation, plaintiff would either be released

into the general population at CSP-SAC or, "if the issues raised by Plaintiff were found to be

true, then Plaintiff would be transferred immediately to the Lancaster State Prison close to his

family (mother's) residence."  (Dkt. No. 24 at 22, 89-96.)  The investigation, concluded on June

6, 2005, revealed information "that inmate Navarro . . . has safety concerns which preclude him

from being housed on 'B' or 'C' yards at CSP SAC;" significantly, however, it was determined

that "the information is not considered reliable at this time."  (Dkt. No. 24 at 101.)  Thus,

plaintiff contends that there was no basis for his extended SHU placement; plaintiff emphasizes

---

[11]  Plaintiff alleges that defendant Baxter, the ICC psychologist, opined that plaintiff should remain in EOP, and expect[ed] Plaintiff to decompensate while in AD-SEG. . . ."  (Dkt. No. 24 at 22 (complaint); see also id. at 103 (the "progress notes" of the May 4, 2005, Interdisciplinary Treatment Team recommended that plaintiff should be "retain[ed] in EOP"). However, the ICC notes reflect only the neutral observation that "[t]he treating clinician presented ICC with a Mental Health Assessment that included . . . [the] effects of [plaintiff's] psychological state if ordered retained in segregated housing."  (Dkt. No. 24 at 89 (May 11, 2005); 93 (September 14, 2005); 96 (December 4, 2005).)

[12]  Once transferred to CSP-LAC, plaintiff was retained in administrative segregation for an additional thirty days pending other bed availability.  (Dkt. No. 24 at 25; Dkt. No. 24-5 at 27.) Upon his arrival at CSP-LAC, plaintiff was informed by staff that "[d]ue to a lack of bed space on Facility 'D,' you will be housed in Administrative Segregation pending bed space availability. This is not punitive in nature and will not affect your privilege group or visiting status."  (Dkt. No. 24-5 at 27.)

1   that he had no adverse disciplinary rulings.

2          It appears that plaintiff fully exhausted his administrative grievance challenging

3   his CSP-SAC SHU placement and retention, and conditions of confinement therein.  (Log. No.

4   SAC-05-2084 (Plaintiff's Exh. 1, set forth in Dkt. No. 24 at 61-103, Dkt. No. 24-1 at 1-30, and

5   Dkt. No. 24-2 at 1-46).)  Moreover, the period of time pending exhaustion of this grievance

6   sufficiently tolled the statute of limitations to render timely plaintiff's claims premised on the

7   grievance.  Plaintiff submitted his initial grievance on October 24, 2005; the Director's Level

8   Appeal Decision was rendered on May 26, 2006, 214 days later.[13]  Based on the action accrual

9   date of May 4, 2005, plaintiff had four years, plus 214 days, within which to file a federal civil

10   rights complaint, or by December 4, 2009.  Therefore, the filing of this action on July 9, 2009,

11   was timely.

12          Plaintiff contends that his SHU placement and extended retention violated his

13   rights under the First, Eighth and Fourteenth Amendments.  Plaintiff contends that his prolonged

14   physical and psychological isolation, with attendant "severe sensory and environmental

15   deprivation[s]" of adequate food, heat, ventilation, lighting, clothing, bedding, hot water,

16   exercise, and other items, as well as his reduced ability to communicate with family members,

17   and to practice his religion, caused him significant mental and physical stress.  (Dkt. No. 24 at

18   32-34.)  Plaintiff contends that he was permitted access to the SHU's outside exercise yard only

19   twice during his placement.  (Dkt. No. 24 at 28.)  Plaintiff contends that his familial relationships

20   were damaged, particularly with his children and ailing mother, stating, "I used to speak with

21   [them] consistently almost (2) twice a week, before being locked away in solitary confinement,

22   and not being allowed to at least love and support them all, by verbally establishing a consistent

23   foundation of positive communication and support."  (Dkt. No. 24 at 81.)  Plaintiff further

24   contends that the inability to practice his religion, particularly "to participate in my regular Indian

25

26        [13]  The Director's Level decision, issued after plaintiff's transfer to CSP-LAC, found that plaintiff's claims were moot.  (Dkt. No. 24 at 62-63.)

ceremonies . . . has really harmed me . . . . Since I am a sincere believer of our ways [this] has . . . harm[ed] me inside of who I am in relation to my creator." (Id.)

The documents submitted by plaintiff pursuant to exhausting his administrative remedies include copies of several apparently unexhausted grievances,[14] and plaintiff's allegations that prison officials refused to process his grievances, or to complete certificates plaintiff needed to proceed in forma pauperis in civil actions; that staff destroyed some of plaintiff's legal materials; that prison staff provided plaintiff inadequate access to the law library and to his legal files; that staff failed to properly process plaintiff's mail; and that staff failed to accord plaintiff access to his medical records and inmate file, including the grievances he had filed.  Plaintiff alleges that he sustained "physical, mental, emotional, legal, spiritual harm by other deliberate indifferent individuals here at CSP-Sacramento, in circumventing, hindering, delaying, ignoring, denying administrative remedies available to me for redress."  (Dkt. No. 24 at 80.)  Plaintiff further contends that some of the adverse conditions of his confinement (e.g. limited outdoor exercise, denial of access to a spiritual advisor), as well as the failure of staff to

---

[14]  The First Amended Complaint lists the following administrative grievances initiated by plaintiff but unexhausted, allegedly due to the improper conduct of prison staff (Dkt. No. 24 at 36):

(1)  "Living Conditions Issue," Log No. SAC-S-05-2214 (never returned) filed on 11/20/05 and 12/1/05.

(2)  "Mental Health Right to Refuse Issue," Log No. SAC-H-05-00546, filed on January 14, 2005.  (Process impeded by Defendants purposefully.)  [But see n.8, supra, regarding plaintiff's apparent failure to exhaust this grievance.]

(3)  "Information Practice Act-Right to Access Medical/Mental Health Records," Log No. SAC-H-05-0668, filed on March 14, 2005.  ([P]rocess impeded by Defendants.)

(4)  "Violations of Opening, Withholding 'Confidential Legal Mail' Sent/ Received," filed December 22, 2005.  ([P]rocess again impeded by Defendants purposely.)

(5)  "Denial of 'Access to Courts' by Litigation Department at Sacramento," filed on December 4, 2005, and December 28, 2005, and March 5, 2005.  ([P]rocess impeded again.)

1   properly process plaintiff's legal materials and mail, represent intentional acts in retaliation

2   against plaintiff for his efforts to exercise his First Amendment rights.  (See e.g. Dkt. No. 24 at

3   38, 40-41.)

4            The court finds that plaintiff has stated timely and potentially cognizable claims

5   under the First, Eighth and Fourteenth Amendments, challenging his placement and prolonged

6   confinement in CSP-SAC's SHU, and the conditions of his confinement therein.  These claims,

7   and the defendants against whom they are made, appear to be as follows:

8            1.  Fourteenth Amendment Due Process

9            Plaintiff states potentially cognizable due process claims against defendants

10  Kernan (CSP-SAC Warden), Walker (CSP-SAC Associate Warden), Grannis (Appeals

11  Coordinator), O'Brian (former Appeals Coordinator), and Baxter (psychologist).  Each of these

12  defendants were directly involved in the decision to place or retain plaintiff in the SHU, either

13  pursuant to their participation in the SHU's Institutional Classification Committee ("ICC"),

14  and/or in their substantive involvement and responses to plaintiff's exhausted administrative

15  grievance challenging such placement and retention.

16           The Ninth Circuit has held that Title 15, California Administrative Code, sections

17  3335, 3336, and 3339,[15] together create a constitutionally protected liberty interest in a prisoner

18  remaining free from arbitrary administrative segregation.  Toussaint v. McCarthy, 801 F.2d 1080,

19  1097-98 (9th Cir.1986); Richardson v. Runnels, 594 F.3d 666, 672-73 (9th Cir. 2010).  See

20  Sandin v. Conner, 515 U.S. 472, 484 (1995) (prisoner's liberty interest protected by due process

21  triggered by conditions demonstrating "atypical and significant hardship[s] . . . in relation to the

22  ordinary incidents of prison life").  The process constitutionally due to an inmate placed in

23

24           [15]  These provisions regulate the placement, retention, and release of prisoners in
    administrative segregation.  See 15 C.C.R. § 3335 (administrative segregation); § 3336
25  (segregation order); § 3339 (release and retention, providing in pertinent part that, "[r]elease
    from segregation status shall occur at the earliest possible time in keeping with the circumstances
26  and reasons for the inmate's initial placement in administrative segregation").

1    segregated housing depends on whether the placement is inherently administrative or

2    disciplinary.  Toussaint, 801 F.2d at 1099.  In the administrative context, due process requires

3    that prison officials hold an informal nonadversary hearing within a reasonable time after the

4    prisoner is segregated, inform the prisoner of the reasons, and allow the prisoner to present his

5    views.  Id. at 1100.  A decision to segregate an inmate for administrative reasons must be

6    supported by "some evidence," id. at 1105-06, and periodic review is necessary to maintain the

7    segregated confinement, id. at 1101, quoting Hewitt v. Helms, 459 U.S .460, 477 n.9 (1983)

8    ("administrative segregation may not be used as a pretext for indefinite commitment of an

9    inmate").  Cf. Wolff v. McDonnell, 418 U.S. 539, 563-72 (1974) (disciplinary segregation

10   involving loss of good time credits requires that the prisoner receive advance written notice of

11   the charges against him, a hearing at which he may call witnesses and present documentary

12   evidence in a manner consistent with institutional security; staff assistance in preparing a defense

13   if the prisoner is illiterate; and a written statement explaining the basis of the decision); see also

14   Superintendent v. Hill, 472 U.S. 445, 454 (1985) (due process requires that disciplinary decisions

15   require "some evidence" of a disciplinary infraction).

16                2.  Eighth Amendment Cruel and Unusual Punishment

17                Plaintiff states potentially cognizable Eighth Amendment claims against

18   defendants Kernan, Walker, Grannis, O'Brian, and Baxter, based on the fact and continuation of

19   plaintiff's SHU detention, as well as the physical conditions of plaintiff's confinement.  In

20   addition, plaintiff states potentially cognizable Eighth Amendment claims against defendant

21   correctional officers Baker and Sclafani, based on the physical conditions of plaintiff's SHU

22   confinement.

23                The Eighth Amendment proscribes conditions of confinement constituting cruel

24   and unusual punishment.  The Eighth Amendment's prohibition against cruel and unusual

25   punishment imposes duties on prison officials to "provide humane conditions of confinement."

26   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  To establish a violation of the Eighth

18

1   Amendment, a prisoner must show that he was, objectively, deprived of something "sufficiently

2   serious." Id. at 834.  A deprivation is sufficiently serious when the prison official's act or

3   omission results "in the denial of 'the minimal civilized measure of life's necessities.' " Id.,

4   quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Next, the prisoner must show that the

5   deprivation occurred as a result of deliberate indifference to the inmate's health or safety; this

6   determination is premised on an assessment of the prison official's subjective state of mind.  Id.,

7   citing Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).

8           Plaintiff, a designated participant in CSP-SAC's Mental Health Program, spent

9   nearly a year in segregated housing waiting for transfer to another institution.  The Supreme

10  Court recently addressed problems associated with this confluence of factors:

11              This shortfall of resources relative to demand contributes to
                significant delays in treatment.  Mentally ill prisoners are housed in
12              administrative segregation while awaiting transfer to scarce mental
                health treatment beds for appropriate care.  One correctional officer
13              indicated that he had kept mentally ill prisoners in segregation for
                "6 months or more." [Citation omitted.]  Other prisoners awaiting
14              care are held in tiny, phone-booth sized cages.  The record
                documents instances of prisoners committing suicide while
15              awaiting treatment.

16  Brown v. Plata, 131 S. Ct. 1910, 1933 (May 23, 2011).  Both the fact of plaintiff's protracted

17  isolation, and the physical conditions of his confinement, warrant further inquiry.

18          3.  First and Fourteenth Amendments Authorizing Free Exercise of Religion

19          Among the conditions of confinement challenged by plaintiff is the denial of his

20  First Amendment right to freely exercise his religion.  This potentially cognizable claim appears

21  to be generally and appropriately made against the defendants responsible for the fact and

22  conditions of plaintiff's SHU confinement, viz., defendants Kernan, Walker, Grannis, and

23  O'Brian, as well as defendants Baker and Sclafani.  The appropriateness of the restrictions on

24  plaintiff's right to exercise his religious beliefs must be evaluated based upon the unique

25  circumstances of this case, specifically, that it appears that plaintiff was housed in the SHU for

26  his own protection, based on factors unique to CSP-SAC; the denial of visitation by a spiritual

1 advisor, particularly when members of plaintiff's family died, does not appear to be justified

2 based on the apparent reasons for plaintiff's SHU placement.

3           "The right to exercise religious practices and beliefs does not terminate at the

4 prison door.  The free exercise right, however, is necessarily limited by the fact of incarceration,

5 and may be curtailed in order to achieve legitimate correctional goals or to maintain prison

6 security." McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citations

7 omitted).  "[A] prison inmate retains those First Amendment rights that are not inconsistent with

8 his status as a prisoner or with the legitimate penological objectives of the corrections system."

9 Pell v. Procunier, 417 U.S. 817, 822 (1974); see also Clement v. Cal. Dep't. of Corr., 364 F.3d

10 1148, 1151 (9th Cir. 2004) (per curiam). A prison regulation that impinges on First Amendment

11 rights "is valid if it is reasonably related to legitimate penological interests." Turner v. Safley,

12 482 U.S. 78, 89 (1987).

13           Plaintiff also asserts a potentially cognizable Fourteenth Amendment equal

14 protection claim based on these circumstances, against the same defendants.  "The Equal

15 Protection Clause requires the State to treat all similarly situated people equally.  Moreover, the

16 Equal Protection Clause entitles each prisoner to a reasonable opportunity of pursuing his faith

17 comparable to the opportunity afforded fellow prisoners who adhere to conventional religious

18 precepts." Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (citations and internal quotation

19 marks omitted).  The essential inquiry here is whether plaintiff was treated differently in his

20 requests for religious expression due to his Native American beliefs.

21           4. First Amendment Right to Access the Courts

22           Plaintiff states potentially cognizable First Amendment claims against defendant

23 correctional officers Baker, Sclafani, and Morrow (Morrow was the SHU law librarian), and

24 defendant Appeals Coordinators O'Brian and Grannis, for alleged denial of plaintiff's right to

25 access the courts.

26           "It is now established beyond doubt that prisoners have a constitutional right of

20

access to the courts." <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977); <u>see</u> also <u>Ching v. Lewis</u>, 895 F.2d 608, 609 (9th Cir. 1990).  This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." <u>Bounds</u>, 430 U.S. at 828. In order to state a denial of access claim under the First Amendment, a prisoner must show that he suffered an "actual injury" as a result of the defendants' actions by explaining how the challenged official acts or omissions hindered plaintiff's efforts to pursue a nonfrivolous legal claim.  <u>Lewis v. Casey</u>, 518 U.S. 343, 351-55 (1996).  Actual injury may be shown if the alleged shortcomings "hindered his efforts to pursue a legal claim," such as having his complaint dismissed for "for failure to satisfy some technical requirement" or if he "suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." <u>Id.</u> at 351.

        The actual injuries alleged by plaintiff appear to be:  (1) his inability to present a timely and complete petition for review before the California Supreme Court, in the direct appeal of his criminal conviction, citing case number LA042924, and California Supreme Court Case No. S138165; and (2) plaintiff's inability to fully state all grounds in support of his habeas corpus petition filed in the United States District Court for the Central District of California, resulting in the dismissal of claims based on procedural default, failure to exhaust, and failure to raise issues on direct appeal in the state courts.  This court's review of <u>Navarro v. Sullivan</u>, Case No. Civ-07-1593 DDP [previously SGL] PJW,[16] supports plaintiff's assertion that he failed to exhaust his state court remedies on some claims.  (<u>See</u> generally <u>id.</u> at Dkt. No. 61 (according plaintiff (petitioner therein) the option of dismissing his unexhausted claims and proceeding on his exhausted claims, or to have his entire petition dismissed as "mixed.")

        This action should proceed on plaintiff's allegations that the above-named prison

---

        [16]  <u>See</u> <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980) (court may take judicial notice of its own records).

officials refused to process plaintiff's grievances, or to complete in forma pauperis certificates

necessary to pursue civil actions; failed to process plaintiff's mail or improperly opened legal

mail; failed to accord plaintiff access to his medical records and inmate file, including the

grievances he had filed or attempted to file; failed to provide plaintiff adequate access to the law

library and to his legal material; and destroyed legal materials.

     5. <u>First Amendment Retaliation</u>

    Plaintiff states potentially cognizable First Amendment retaliation claims, based

on the allegations that the following defendants retaliated against plaintiff for filing

administrative grievances:  defendants O'Brian and Grannis (by further refusing to process

administrative grievances); Morrow (by further refusing plaintiff access to his legal property and

to the law library, after plaintiff filed an administrative grievance alleging same); Sclafani and

Baker (by failing to remedy adverse conditions of confinement, denying plaintiff access to

exercise yard, or to religious advisor).

    "[A] viable claim of First Amendment retaliation entails five basic elements: (1)

An assertion that a state actor took some adverse action against an inmate (2) because of (3) that

prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

<u>Rhodes v. Robinson</u>, 408 F.3d 559, 568 (9th Cir. 2005).  Direct and tangible harm will support a

First Amendment retaliation claim even without demonstration of chilling effect on the further

exercise of a prisoner's First Amendment rights.  <u>Id.</u> at 568, n.11.  "[A] plaintiff who fails to

allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a

retaliatory adverse action.  <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009), citing <u>Rhodes</u>,

408 F.3d at 568 n.11.  A plaintiff must plead facts which suggest that retaliation for the exercise

of protected conduct was the "substantial" or "motivating" factor behind the defendant's conduct.

<u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310, 1314 (9th Cir. 1989).  Mere conclusions of

hypothetical retaliation will not suffice; rather, a prisoner must "allege specific facts showing

retaliation because of the exercise of the prisoner's constitutional rights." <u>Frazier v. Dubois</u>, 922

F.2d 560, 562 n.1 (10th Cir. 1990).

V. <u>Conclusion</u>

       Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that:

       1.  Defendants' motion to dismiss (Dkt. No. 38) plaintiff's First Amended

Complaint should be granted in part and denied in part.

       2.  This action should proceed on plaintiff's First, Eighth and Fourteenth

Amendment claims, as set forth above, against defendants Kernan, Walker, Grannis, O'Brian,

Baxter, Baker, Sclafani, and Morrow.

       3.  All other claims and defendants (specifically, defendants Nicholas, Griffin,

Costa, Soliman, Frishman, Vasquez, Kelly, Shelton, and Johnson) should be dismissed.

       These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

objections shall be filed and served within 14 days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 23, 2011

                                                               
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

nava1878.mtd.