1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARIO NAVARRO,                          No.  2:09-cv-1878 KJM KJN P

12              Plaintiff,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   DEBRA HERNDON, et al.,

15              Defendants.

16

17   I.  Introduction

18        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

19   to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment.

20   (ECF No. 165.)  After carefully reviewing the record, the undersigned recommends that

21   defendants' motion be granted in part and denied in part.

22   II.  Procedural Background

23        This action proceeds on the amended complaint filed August 10, 2010.  (ECF No. 24.)  On

24   November 19, 2010, defendants filed a motion to dismiss on the grounds that some claims were

25   barred by the statute of limitations and on the grounds that some claims failed to state claims

26   upon which relief may be granted.  (ECF No. 38.)  On August 24, 2011, the undersigned

27   recommended that defendants' motion to dismiss be granted in part and denied in part.  (ECF No.

28   78.)  On September 30, 2011, the Honorable Kimberly J. Mueller adopted the findings and

1

1  recommendations in part.  (ECF No. 79.)  Judge Mueller ordered that this action shall proceed on

2  plaintiff's First, Eighth and Fourteenth Amendment claims against defendants Kernan, Walker,

3  Baxter, Baker, Sclafani and Morrow.  (Id.)  Judge Mueller identified an issue not addressed in the

4  findings and recommendations:  how the involvement of defendants O'Brian and Grannis in

5  denying the grievances plaintiff identified in the complaint violated plaintiff's right to access the

6  courts.  (Id.)  Judge Mueller referred consideration of the access to the courts claim against

7  defendants O'Brian and Grannis to the undersigned.  (Id.)

8          On December 7, 2012, the undersigned issued supplemental findings and

9  recommendations finding that this action should proceed on plaintiff's denial of access to the

10  courts claims against defendants Grannis and O'Brian.  (ECF No. 84.)  On March 26, 2013, Judge

11  Mueller adopted the December 7, 2012 supplemental findings and recommendations.  (ECF No.

12  89.)

13          On May 13, 2014, defendants filed a motion for summary judgment on grounds that

14  plaintiff's claims were not administratively exhausted.  (ECF No. 147.)  On February 9, 2015, the

15  undersigned recommended that defendants' motion be denied.  (ECF No. 154.)  On March 19,

16  2015, Judge Mueller adopted the February 9, 2015 findings and recommendations.  (ECF No.

17  156.)

18          On May 29, 2015, defendants filed the pending summary judgment motion.  (ECF No.

19  165.)  In support of the motion, defendants filed 192 pages of exhibits.  (ECF No. 165-3.)  On

20  September 21, 2015, plaintiff filed his opposition (ECF No. 171) as well as 1384 pages of

21  exhibits.  (ECF Nos. 172, 173.)  On December 3, 2015, defendants filed a reply.  (ECF No. 180.)

22  III.  Legal Standard for Summary Judgment

23          Summary judgment is appropriate when it is demonstrated that the standard set forth in

24  Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

25  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

26  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

27          Under summary judgment practice, the moving party always bears the initial

28  responsibility of informing the district court of the basis for its motion, and identifying those

1  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

2  together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

3  of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

4  R. Civ. P. 56(c)).

5      "Where the nonmoving party bears the burden of proof at trial, the moving party need

6  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

7  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

8  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

9  committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

10  burden of production may rely on a showing that a party who does have the trial burden cannot

11  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

12  should be entered, after adequate time for discovery and upon motion, against a party who fails to

13  make a showing sufficient to establish the existence of an element essential to that party's case,

14  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

15  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

16  necessarily renders all other facts immaterial."  Id. at 323.

17      Consequently, if the moving party meets its initial responsibility, the burden then shifts to

18  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

19  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

20  establish the existence of such a factual dispute, the opposing party may not rely upon the

21  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

22  form of affidavits, and/or admissible discovery material in support of its contention that such a

23  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

24  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

25  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

26  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

27  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

28  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

1  (9th Cir. 1987), <u>overruled in part on other grounds</u>, <u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d

2  1564, 1575 (9th Cir. 1990).

3       In the endeavor to establish the existence of a factual dispute, the opposing party need not

4  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6  trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

7  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9  amendments).

10       In resolving a summary judgment motion, the court examines the pleadings, depositions,

11  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

12  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>See</u> <u>Anderson</u>, 477 U.S. at

13  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

14  drawn in favor of the opposing party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.  Nevertheless, inferences

15  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

16  predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F.

17  Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

18  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

19  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

20  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21  trial.'" <u>Matsushita</u>, 475 U.S. at 586 (citation omitted).

22       By contemporaneous notice provided on September 13, 2010 (ECF No. 28), plaintiff was

23  advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

24  Rules of Civil Procedure.  <u>See</u> <u>Rand v. Rowland</u>, 154 F.3d 952, 957 (9th Cir. 1998) (<em>en banc</em>);

25  <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).

26  IV.  Plaintiff's Claims

27       This action proceeds on plaintiff's first amended complaint against defendants Kernan,

28  Walker, Grannis, O'Brian, Baxter, Baker, Sclafani and Morrow.  (ECF No. 24.)

1    Plaintiff alleges that he was housed in administrative segregation ("ad seg") at California

2  State Prison-Sacramento ("CSP-Sac") for 309 days, from May 4, 2005, until plaintiff's transfer to

3  California State Prison-Lancaster ("CSP-LAC") on March 9, 2006.  Plaintiff alleges five claims

4  in connection with his placement in and retention in ad seg.  First, plaintiff alleges that he was

5  denied his right to due process with regard to the decisions to place him in and to retain him in ad

6  seg pending his transfer to CSP-LAC.  Second, plaintiff alleges that the fact and continuation of

7  his ad seg detention violated the Eighth Amendment.  Plaintiff also alleges that the physical

8  conditions of ad seg violated the Eighth Amendment.  Third, plaintiff alleges that he was denied

9  his First and Fourteenth Amendment rights to freely exercise his religion while housed in ad seg.

10  Fourth, plaintiff alleges that he was denied his right to access the court while housed in ad seg.

11  Fifth, plaintiff alleges that he was retaliated against for filing administrative grievances while

12  housed in ad seg.  The undersigned addresses these claims separately herein.

13    After reviewing the pleadings, the undersigned has discovered that plaintiff was housed in

14  three different ad seg units during the relevant time period.[1]  From May 4, 2005, through

15  November 14, 2005, plaintiff was housed in B Facility, Building 1.  (Baker declaration, ¶ 7.)

16  From November 14, 2005 through December 27, 2005, plaintiff was housed in B Facility,

17  Building 2.  (Id.)  From December 27, 2005 through March 8, 2006, plaintiff was housed in A

18  Facility, Building 5.  (Id.)  Plaintiff's claims do not distinguish between these ad seg units.  In the

19  discussion of plaintiff's claims herein, where relevant, the undersigned distinguishes between

20  these different ad seg units.

21  V.  Plaintiff's Exhibits

22    Defendants filed objections to plaintiff's voluminous exhibits.  The undersigned has not

23  considered all of these exhibits in evaluating defendants' summary judgment motion, as many are

24  not relevant.

25  ////

26

27  _____

[1]  Plaintiff alleges that he was held in the Security Housing Unit ("SHU") for 309 days.
However, as discussed below, it is undisputed that plaintiff was housed in administrative
28  segregation for that period of time.

1    Defendants objected to several of the exhibits the undersigned has considered on the

2  grounds that they are not authenticated. The undersigned may consider exhibits that are not

3  authenticated to the extent they are relevant because they could be made admissible at trial. See

4  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made

5  admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dep't

6  of Pub. Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion in not

7  considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation

8  and administrative documents involving another prisoner and letters from other prisoners" which

9  evidence could be made admissible at trial through the other inmates' testimony at trial).

10    Accordingly, defendants' objections to plaintiff's exhibits on the grounds that they are not

11  authenticated are overruled.

12  VI. Defendant Grannis

13    Plaintiff alleges that defendant Grannis violated his constitutional rights in connection

14  with her processing of plaintiff's administrative appeals. Defendant Grannis was the Chief of

15  Inmate Appeals for the California Department of Corrections and Rehabilitation ("CDCR") at all

16  relevant times.

17    Defendants argue that defendant Grannis should be granted summary judgment in the

18  entirety because she did not review, and was not responsible for reviewing, any documents

19  submitted by plaintiff.

20    Plaintiff alleges that he made numerous requests to defendant Grannis to remedy problems

21  of retaliation and harassment against him for filing grievances, all to no avail. (ECF No. 24 at 29-

22  30). Plaintiff also cites the May 26, 2006 Director's Level Decision denying his grievance

23  challenging his retention in ad seg. (Id. at 62-63.)

24    The gravamen of plaintiff's claims against defendant Grannis concern the denial of

25  plaintiff's Third Level Appeal grievance challenging his retention in ad seg and her responses, or

26  lack of responses, to his letters alleging that he was being denied access to the courts. The

27  December 7, 2012 supplemental findings and recommendations detailed plaintiff's claims against

28  defendant Grannis in connection with his claims alleging denial of access to the courts. (ECF No.

1  84.)  The undersigned finds that it is more appropriate to address plaintiff's claims against

2  defendant Grannis in the discussion of the individual claims herein.

3  VII.  Due Process

4      Plaintiff's due process claim is made against defendants Kernan (CSP-Sac Warden),

5  Walker (CSP-Sac Associate Warden), Grannis (Appeals Coordinator), O'Brian (former Appeals

6  Coordinator) and Baxter (psychologist).  (ECF No. 78 at 17.)

7      A.  Legal Standard

8      Prisoners have a constitutionally protected liberty interest in remaining free from arbitrary

9  segregation.  Toussaint v. McCarthy, 801 F.2d 1080, 1097-98 (9th Cir. 1986); Richardson v.

10  Runnels, 594 F.3d 666, 672-73 (9th Cir. 2010).  See Sandin v. Conner, 515 U.S. 472, 484 (1995)

11  (prisoner's liberty interest protected by due process triggered by conditions demonstrating

12  "atypical and significant hardship[s] … in relation to the ordinary incidents of prison life.")

13      The process constitutionally due to an inmate placed in segregated housing depends on

14  whether the placement is inherently administrative or disciplinary.  Toussaint, 801 F.2d at 1099.

15  In the administrative context, due process requires that prison officials hold an informal

16  nonadversary hearing within a reasonable time after the prisoner is segregated, inform the

17  prisoner of the reasons, and allow the prisoner to present his views.  Id. at 1100.  A decision to

18  segregate an inmate for administrative reasons must be supported by "some evidence," id. at

19  1105-06, and periodic review is necessary to maintain the segregated confinement, id. at 1101,

20  quoting Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983) ("administrative segregation may not be

21  used as a pretext for indefinite commitment of an inmate").  The evidence relied upon must have

22  "some indicia of reliability."  Madrid v. Gomez, 889 F.Supp. 1146, 1273–74 (N.D.Cal. 1995).[2]

23      B.  Undisputed Facts

24      On May 4, 2005, plaintiff appeared before the prison mental health committee for

25  program review.  (ECF No. 24 at 21 (plaintiff's verified amended complaint).)  On that date, the

26
_____

27  [2]  In the summary judgment motion, defendants incorrectly argue that the "some evidence"
   requirement only applies to orders for disciplinary segregation.  See Toussaint v. McCarthy, 801
   F.2d 1080, 1104 (9th Cir. 1986); see also Shotwell v. Brandt, 2012 WL 6569402 at *2 (N.D. Cal.

28  2012).

1   committee changed plaintiff's level of participation in the mental-health program from Enhanced

2   Outpatient Program ("EOP") to Correctional Clinical Case Management System ("CCCMS"),

3   which resulted in plaintiff's release from the EOP housing unit.  (Id.)  As a result of this new

4   classification, plaintiff was eligible for placement in the general population.  (Id.)

5       On May 4, 2005, plaintiff asked the committee if he would have safety concerns in the

6   general population, having come from the EOP.  (Plaintiff's deposition at 19-20.)  In a related

7   grievance, plaintiff explained his safety concerns.  (ECF No. 24 at 78-80.)  In the grievance,

8   plaintiff wrote that while in the EOP program, he was told by several inmates that he would be

9   stabbed or killed if he went into either of the "other two" general population facilities at CSP-Sac,

10  i.e., B and C facilities.  (Id. at 78-80; defendants' Exhibit 1.)  Plaintiff did not qualify for

11  placement in A Facility because it was considered a "soft" yard, which housed inmates that would

12  have safety concerns on any general population facility.  (Walker declaration, ¶ 17.)  Plaintiff's

13  case factors were not compatible with the inmates housed on the A Facility, so his placement

14  there could have endangered other inmates.  (Id.)  Plaintiff requested that he be transferred to a

15  prison in southern California so that he could be close to his mother.  (Defendants' Exhibit F.)

16      The mental health committee remanded plaintiff to administrative segregation pending an

17  investigation into the safety concerns raised by plaintiff at the hearing.  (Defendants' Exhibit A.)

18  The investigation was conducted by a non-defendant, Officer Smith.  (Id.)

19      That same day, plaintiff was given a notice explaining the reason for his placement in ad

20  seg.  (Plaintiff's deposition at 20-21; defendants' Exhibit A (notice to plaintiff).)  The notice

21  indicates that plaintiff refused to sign it.  (Defendants' Exhibit A.)

22      None of the defendants sat on the May 4, 2005 mental health committee were responsible

23  for placing plaintiff in ad seg on that date.[3]  (Defendants' Exhibit F (document listing committee

24  members).)

---

25  [3]   Plaintiff claims that defendants Kernan, Baxter and Walker were involved in the May 4, 2005
26  decision to place him in ad seg.  (ECF No. 171 at 10-11.)  Plaintiff argues that these defendants
    were "trained and admitted to having knowledge in the CCR Classification Processes, and
27  Segregation for the year 2004-2006."  (Id. at 10.)   However, plaintiff has provided no evidence
    contradicting the evidence provided by defendants that no defendant was involved in the May 4,
28  2005 mental health committee.

8

On May 11, 2005, defendants Kernan and Baxter participated in the committee reviewing plaintiff's placement in ad seg.  (Defendants' Exhibit B.)  The committee elected to retain plaintiff in ad seg because the investigation into plaintiff's security concerns was not complete.  (Id.)  Defendant Walker signed the chrono from the May 11, 2005 hearing in place of defendant Kernan, because defendant Kernan was unavailable at the time it was issued.  (Walker declaration, ¶ 8.)

On June 15, 2005, plaintiff appeared before the committee for review of his ad seg placement.  (Defendants' Exhibit C.)  Defendants Walker and Baxter participated in this committee.  (Id.)  The committee elected to retain plaintiff in ad seg pending his transfer to either California State Prison-Lancaster or California State Prison-Corcoran.  (Defendants' Exhibit C.)

On September 14, 2005, plaintiff appeared before the committee for review of his ad seg placement.  (Defendants' Exhibit D.)  Defendants Walker and Baxter participated in this committee.  (Id.)  The committee elected to retain plaintiff in ad seg pending his transfer.  (Id.)

On December 14, 2005, plaintiff appeared before the committee for review of his ad seg placement.  (Defendants' Exhibit E.)  Defendants Walker and Baxter participated in this committee.  (Id.)  The committee elected to retain plaintiff in ad seg pending his transfer.  (Id.)

Plaintiff was transferred to CSP-LAC in March 2006.

Mental health staff sometimes sit on classification committees to provide custody staff with information pertaining to an inmate's mental health treatment needs, and ability to participate in and understand the committee.  (Walker declaration, ¶ 1.)  While mental health staff have authority over inmates' treatment decisions, such as whether an inmate qualifies for participation in the EOP mental health program, they lack authority over custodial decisions, such as whether to place an inmate in the ad seg unit or release him to the general population.[4]  (Id.)

---

[4]  Plaintiff argues that the statement in defendant Walker's declaration, cited above, that mental health staff lack authority over custodial decisions does not demonstrate that defendant Baxter, a psychologist, did not participate in the decisions made at the committee hearings where his ad seg placement and retention were reviewed.  Plaintiff suggests that a declaration by defendant Baxter is required to make this point.  Defendant Walker, the Chief Deputy Warden at CSP-Sac, is qualified to provide evidence regarding the authority of mental health staff at classification committee hearings.

C. <u>Analysis</u>

1. <u>May 4, 2011 Hearing</u>

It is undisputed that no defendant participated in the May 4, 2011 initial decision to place plaintiff in ad seg.  Therefore, plaintiff cannot state a due process claim against defendants based on the May 4, 2011 initial decision to place him in ad seg.  Accordingly, defendants should be granted summary judgment as to plaintiff's due process claim regarding the May 4, 2011 hearing.

2. <u>May 11, 2005, June 15, 2005, September 14, 2005, December 14, 2005 Hearings</u>

It is undisputed that plaintiff received periodic reviews of the initial decision to retain him in ad seg, at which time he was allowed to present his views.  Accordingly, the undersigned finds no due process violation based on the frequency of the hearings and plaintiff's ability to present his views.  The gravamen of plaintiff's due process claim is that he was not informed of the reasons for the decisions to retain him in ad seg and that the decisions to retain him in ad seg were not supported by some evidence.

a. <u>May 11, 2005 Hearing</u>

The undersigned first finds no due process violation at the May 11, 2005 hearing.  The chrono from this hearing states that plaintiff was retained in ad seg because plaintiff's safety concerns, expressed at the May 4, 2005 hearing, were still under investigation by Officer Smith. (Defendants' Exhibit B.)  The chrono indicates that plaintiff received notice of this reason to retain him in ad seg.  (<u>Id.</u>)  The undersigned finds that the pending investigation into the safety concerns expressed by plaintiff was sufficient grounds, i.e., "some evidence," on which to retain plaintiff in ad seg.

Defendants Kernan and Baxter are the only defendants who participated at this hearing. Accordingly, defendants Kernan and Baxter are entitled to summary judgment as to plaintiff's claim that he was denied due process at the May 11, 2005 hearing.

b. <u>June 15, 2005, September 14, 2005 and December 14, 2005 Hearings</u>

*Was Defendant Walker's Decision to Retain Plaintiff in Ad Seg Supported by Some Evidence?*

The undersigned next considers whether the decisions to retain plaintiff in ad seg made by

10

1  defendant Walker at the June 15, 2005, September 14, 2005, and December 14, 2005 hearings

2  were supported by some evidence with indicia of reliability.  According to defendant Walker,

3  these committees decided to retain plaintiff in ad seg pending his transfer for the following

4  reasons:

> 17.   Until the Administrative Segregation Overflow unit was relocated to A Facility in late 2006, A-Facility was considered a "soft" yard which housed inmates that would have safety concerns on any general population facility.  These inmates had safety concerns similar to inmates housed in a Sensitive Needs Yard (SNY).  Inmate Navarro did not request SNY placement and his case factors were not compatible with the inmates housed on A Facility, therefore his placement there could have endangered other inmates.

> 18.  I did not believe that Navarrro could be safely placed on either B or C Facility.  B Facility housed Sureno gang members and associates, and other dangerous and violent inmates who often refused to program and consistently involved themselves in serious and violent incidents.  As a result, B Facility was constantly subject to lockdowns and modified programs that restricted the outdoor exercise and programming opportunities.  While CSP-Sacramento's C Facility housed predominately general population inmates who were more compliant and programmed more consistently than those housed in B Facility, it also housed two rival gangs, the Nortenos and the Surenos, that were subservient to the Nuestra Familia, Northern Structure, and Mexican Mafia prison gangs.

> 19.  The Sureno are a disruptive group with a documented history of attacking other Surenos with R-suffixes (denoting a sexual commitment offense), a history of EOP treatment, and those that disassociate from the gang.  Navarro had an R suffix on a prior commitment offense, a history of EOP treatment, and his association with the Southsiders (a.k.a. Surenos), according to the May 11, 2005[5] ICC chrono.  Nortenos are a disruptive group with a documented history of attacking Surenos.  Placing Navarro on either B or C Facility would have unnecessarily placed him at risk of attack.

> 20.  That the officer initially assigned to investigate the asserted safety concern found it not to be reliable does not show that no safety concern existed.  That officer was assigned to A Facility's EOP program, and may not have been familiar with the disruptive groups housed on B and C Facilities, or the dynamics within those groups.  As CDW, determining which facility could safely house the inmates at CSP-Sacramento was a responsibility that I dealt with daily, and took seriously.  I had extensive experience with the inmate groups on all three Facilities.  Based on my experience, and the intelligence CDCR had developed concerning these groups,

28  _____

[5]   Defendant Walker's declaration mistakenly identifies the date of this chrono as May 11, 2011.

1      placing Navarro on either B or C Facility would have unnecessarily
       placed him at risk of attack.

2

3    (Walker declaration, ¶¶ 17-20.)

4         As discussed above, it is undisputed that plaintiff did not qualify for placement in A

5    Facility.

6         According to defendant Walker, plaintiff did not qualify for placement on B or C Facility

7    because 1) he associated with the Surenos; 2) the Surenos were known to attack other Surenos

8    with R suffixes; and 3) the Surenos were known to attack other Surenos who had been in the EOP

9    program.  It is undisputed that plaintiff had been in the EOP program and had an R suffix.  (See

10   ECF No. 173 at 477 (chrono stating plaintiff has R suffix); ECF No. 172 at 100 (chrono stating

11   that plaintiff had a sex offense.).

12        For the reasons stated herein, the undersigned finds that the issue as to whether plaintiff

13   was affiliated with a prison gang, and whether defendant Walker actually relied on plaintiff's

14   gang affiliation to retain plaintiff in ad seg, are materially disputed facts.

15        The undersigned first addresses the issue of whether defendant Walker relied on plaintiff's

16   gang affiliation to retain plaintiff in ad seg.  Plaintiff argues that defendants' claim that he was

17   retained in ad seg because of his alleged gang affiliation appears to be an explanation made up

18   "after the fact."  Plaintiff indicates that he did not know that he was retained in ad seg because of

19   his alleged gang affiliation until he received defendants' summary judgment motion.  The

20   undersigned finds support for this argument.

21        The June 15, 2005, September 14, 2005, and December 14, 2005 chronos do not state why

22   plaintiff was retained on ad seg.  Instead, without further explanation, these chronos state that

23   plaintiff was retained in ad seg after a review of plaintiff's CDC 114D  (i.e., the May 4, 2005

24   notice placing plaintiff in ad seg), plaintiff's central file, case factors and a thorough discussion

25   with plaintiff.  (Defendants' Exhibits C, D, E.)  None of these chronos say anything about

26   plaintiff's alleged gang affiliation or that plaintiff was retained in ad seg due to safety concerns.

27   (Defendants' Exhibits C, D, E.)  These chronos do not reference the May 11, 2005 chrono stating

28   that plaintiff told the committee that he was "Southside."  While the September 14, 2005 and

1   December 14, 2005 chronos state that plaintiff was retained on single cell and walk alone yard

2   due to localized safety concerns, these chronos do not describe those safety concerns.

3   (Defendants D, E.)  In his declaration, defendant Walker does not state that he told plaintiff at

4   these hearings that he was being retained in ad seg based on security concerns posed by his

5   alleged gang affiliation.

6          The June 15, 2005 chrono actually suggests that plaintiff may have been retained in ad seg

7   for reasons other than his alleged gang status.  The June 15, 2005 chrono states that Correctional

8   Officer Smith's report was complete and, based on that report, the committee believed that

9   plaintiff had local safety issues and should be transferred to Lancaster or Corcoran.  (Defendants'

10  Exhibit C.)   This finding appears to contradict the statement by defendant Walker in his

11  declaration that Officer Smith found no safety concern.  Thus, the June 15, 2005 chrono suggests

12  that plaintiff was retained in ad seg for reasons other than the statement in the May 11, 2005

13  chrono that plaintiff had said he was gang affiliated.  The undersigned also observes that the

14  statements in the September 14, 2005 and December 14, 2005 chronos that plaintiff was retained

15  on single cell and walk alone yard due to localized safety concerns mirror the language in the

16  June 15, 2005 chrono that plaintiff was to be transferred based on local safety issues found by

17  Officer Smith.  The report by Officer Smith is not in the court file.

18         For the reasons discussed above, the undersigned finds that whether defendant Walker

19  relied on plaintiff's alleged gang affiliation to retain him in ad seg is disputed.

20         For the reasons stated herein, the undersigned further finds that whether the May 11, 2005

21  chrono was "some evidence" of plaintiff's gang affiliation, with indicia of reliability, is a

22  materially disputed fact.  In relevant part, the chrono reports that plaintiff stated at this hearing, "I

23  am with Southside." (Defendants' Exhibit B.)   Defendants cite no other evidence supporting the

24  finding that plaintiff was associated with the Sureno gang.

25         Conversely, in his verified statement of undisputed facts, plaintiff states that "on May 4,

26  2005 and all later related committee dates were [sic] instructed by plaintiff he was not a gang

27  member or associate in any type or form and his family lives only in the southside of California,

28  ////

13

1   no northern California prisons."[6]  (ECF No. 171 at 12.)   The June 15, 2005 chrono states that

2   plaintiff stated, "I want to go down south to be closer to my mother."  (Defendants' Exhibit C.)

3        In his opposition, plaintiff also cites a July 8, 2004 classification committee chrono,

4   signed by defendant Walker, stating that plaintiff had no gang affiliations.  (ECF No. 172 at 100.)

5   The chronos from the June 15, 2005, September 14, 2005, and December 14, 2005 committee

6   hearings all state that the committees reviewed plaintiff's central file, which presumably

7   contained this chrono.  (Defendants' Exhibits C, D, E.)  Defendants do not explain how defendant

8   Walker considered the July 8, 2004 chrono.

9        Plaintiff's allegations that he told the committees that he was not associated with any

10   gang, that he wanted to go "down south" to be closer to his mother, the July 8, 2004 chrono

11   stating that he was not gang affiliated, and the lack of any other evidence linking plaintiff to the

12   Sureno gang, undermine the credibility of the statement in the May 11, 2005 chrono that plaintiff

13   stated that he was associated with the Surenos.  Based on this evidence, which plaintiff alleges

14   defendant Walker had knowledge of, the undersigned finds that the May 11, 2005 chrono

15   potentially lacked indicia of reliability.  The evidence suggests that the statement in the May 11,

16   2005 chrono that plaintiff was "southside" could also have meant to reflect plaintiff's request to

17   be housed near his mother rather than any alleged gang affiliation.

18        In his declaration, defendant Walker also states that in his experience, inmates sometimes

19   deny having asserted a valid safety concern once they realize it will affect their housing.  (Walker

20   declaration, ¶ 16.)  Defendant Walker states that prison policy dictates that safety and security

21   take precedent over all other security concerns and, as part of plaintiff's committee, he was

22   responsible for determining whether a valid safety concern existed.  (Id.)  Defendant Walker may

23   be suggesting that even if plaintiff later denied having told the May 11, 2005 committee that he

24   was associated with a gang, defendant Walker was entitled to disregard this statement because

25   _____

    [6] Plaintiff's Statement of Disputed Facts is essentially an unverified declaration. To the extent that

26   the facts stated therein are based on plaintiff's personal knowledge, his testimony on those
    subjects could be presented in admissible form at trial, and, accordingly, it is considered here in

27   determining the propriety of summary judgment.  See Fraser v. Goodale, 342 F.3d 1032, 1036
    (9th Cir. 2003) (concluding that, at the summary judgment phase, a court may consider evidence

28   that is inadmissible in form, so long as its contents can be presented in admissible form at trial).

1  plaintiff may have disavowed it once he realized it would affect his housing.  The problem with

2  this argument is that, according to defendants, at the May 4, 2011 hearing plaintiff expressed

3  concerns regarding his safety in the general population.  Therefore, plaintiff appeared to be aware

4  of his own safety issues and showed a willingness to express them.  Defendants' claim that

5  plaintiff was willing to be housed in the general population regardless of safety concerns is

6  inconsistent with plaintiff's actions at the May 4, 2011 hearing.

7       Defendants argue that "[t]he Constitution demands due process, not error-free decision

8  making."  See Shotwell v. Brandt, 2012 WL 6569402 at *2 (N.D. Cal. 2012).  In other words,

9  defendants argue that even if the May 11, 2005 chrono mistakenly stated that plaintiff reported

10  affiliation with the Sureno gang, they were entitled to rely on it in retaining plaintiff in ad seg.

11  The undersigned agrees that reliance on information that later proves false may not violate due

12  process if the information had indicia of reliability at the time the decision was made.  However,

13  for the reasons discussed above, the undersigned cannot find that the information relied on to

14  retain plaintiff in ad seg necessarily had indicia of reliability at the times it was relied on by

15  defendant Walker to justify his decisions to retain plaintiff in ad seg.

16       For the reasons discussed above, the undersigned finds that defendant Walker should be

17  denied summary judgment as to plaintiff's claim that defendant's decisions to retain plaintiff in

18  ad seg on June 15, 2005, September 14, 2005, and December 14, 2005 were not supported by

19  some evidence in violation of plaintiff's right to due process.

20       *Did Defendant Walker Provide Plaintiff with Adequate Notice of the Reasons Plaintiff*

21  *Was Retained in Ad Seg?*

22       Defendant Walker claims that plaintiff was retained in ad seg on June 15, 2005,

23  September 14, 2005, and December 14, 2005 based on safety concerns posed by plaintiff's gang

24  affiliation.  Defendant Walker states that the finding that plaintiff was gang affiliated was based

25  on the statement in the May 11, 2005 chrono that plaintiff told the committee that he was

26  associated with the Surenos.

27       As discussed above, the June 15, 2005, September 14, 2005, and December 14, 2005

28  chronos do not specifically state why plaintiff was retained in ad seg.  The June 15, 2005 chrono

1  states that plaintiff should be transferred due to local safety issues, and the September 14, 2005

2  and December 14, 2005 chronos state that plaintiff should be single-celled and placed on walk

3  alone yard due to "localized safety" issues.  However, these local safety issues are not explained.

4  In his declaration, defendant Walker does not state that he told plaintiff at these hearings that he

5  was being retained in ad seg based on security concerns posed by his alleged gang affiliation.  At

6  his deposition, plaintiff testified that he was not told at the committee hearings why he was being

7  retained in ad seg other than being told it was for general security and safety reasons.

8         Citing plaintiff's deposition transcript, defendants claim that plaintiff was told the reasons

9  he was retained in ad seg.  However, plaintiff testified that he was not told why he was being

10  retained in ad seg other than based on general safety and security issues.  (Plaintiff's deposition at

11  46: 20-46; 47: 1-8; 51: 23-25;  53: 24-25;  54: 1-7; 54: 24-25; 55: 1-22; 56: 17-25.)  In other

12  words, plaintiff did not testify that he was told that he was being housed in ad seg due to safety

13  concerns raised by his gang affiliation.  Plaintiff's alleged gang affiliation was not discussed at

14  the deposition.

15         While due process in the administrative segregation context does not require detailed

16  written notice of the charges or even a written description of the reasons for placing the prisoner

17  in administrative segregation, see Toussaint, 801 F.2d at 1100-01, the Supreme Court has held

18  that the level of due process due prisoners before being placed in administrative segregation

19  includes "some notice" of the charges.  Hewitt v. Helms, 459 U.S. 460, 476 (1983).  In Taylor v.

20  Rodriguez 238 F.3d 188, 193 (2d Cir. 2001), the Second Circuit held that the constitutional

21  requirements for notice in administrative segregation should be similar to the notice requirement

22  in disciplinary segregation, and should contain specific allegations of conduct of involvement

23  with a prison gang, not merely vague, unspecific charges of being involved.  Id. ("[a] hearing is

24  not meaningful if a prisoner is given inadequate information about the basis of the charges against

25  him.  A prisoner should not ... have to guess what conduct forms the basis for the charges against

26  him.").

27         Defendants have not demonstrated that plaintiff received adequate notice of the reasons he

28  was being retained in ad seg.  At best, the record demonstrates that plaintiff was generally

1   informed that he was being retained for security and safety reasons.  However, these vague,

2   unspecific reasons did not adequately inform plaintiff of the reasons he was being retained.

3   According to plaintiff's deposition transcript and opposition, he did not know that he was being

4   retained in ad seg based on an alleged gang affiliation until he received defendants' summary

5   judgment motion.  If plaintiff was not informed that his retention was gang related at the

6   committee hearings, then plaintiff did not receive adequate notice of the reasons for his retention

7   in ad seg.  For these reasons, defendant Walker should be denied summary judgment as to this

8   claim.

9        *Defendant Baxter*

10       Defendant Baxter, a psychologist, attended the May 11, 2005, June 15, 2005, September

11  14, 2005, and December 14, 2005 hearings.  It is undisputed that defendant Baxter had no

12  authority over the decision regarding whether to place plaintiff in the general population or to

13  retain him in ad seg.  On these grounds, defendants move for summary judgment as to defendant

14  Baxter.

15       Because it is undisputed that defendant Baxter had no authority over the decision

16  regarding whether to place plaintiff in the general population or retain him in ad seg, defendant

17  Baxter should be granted summary judgment as to plaintiff's due process claims.

18       *Defendants O'Brian and Defendant Kernan*

19       Plaintiff alleges that his grievance challenging his retention in ad seg was improperly

20  denied.  Defendants O'Brian and Kernan participated in the second level denial of grievance no.

21  05-1022, aka SAC 0502084, challenging plaintiff's retention in ad seg.

22       In his declaration, defendant Walker states that he reviewed grievance 05-1022, aka SAC

23  05-02084 in defendant Kernan's place:

24            I reviewed administrative appeal S-05-02084, attached at
              Defendants' Exhibit H, in Warden Kernan's place.  I was
25            responsible for conducting a supervisory review of the second level
              response prepared by a subordinate officer.
26

27  Walker declaration, ¶ 27.

28  ////

17

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no affirmative link between the incidents of police misconduct and the adoption of any plan or policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978) (no liability where there is no evidence of personal participation), cert. denied, 442 U.S. 941 (1979).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of personal participation is insufficient).

Because defendant Kernan did not participate in the review of this grievance, the undersigned recommends that defendant Kernan be granted summary judgment as to plaintiff's

1   claim that defendant Kernan's review of this grievance violated his right to due process in

2   connection with his retention in ad seg.

3         In his declaration, defendant O'Brian discusses grievance no. 05-1022, in relevant part, as

4   follows,

5         1.  I was employed by the California Department of Corrections and
          Rehabilitation (CDCR) as an Appeals Coordinator at California

6         State Prison-Sacramento (CSP-Sacramento) from approximately
          2004 through 2008.

7

8         2.  Although I was assigned to CSP-Sacramento's Appeals Office, I
          was not the only Appeals Coordinator employed there and I was not

9         the only person responsible for processing the appeals.   The
          Litigation Office, Inmate Trust Department, and the prison facilities
          that housed the inmates were separate from the Appeals Office, and

10        I neither supervised, nor had authority over, the staff employed in
          those separate locations.

11

12        ****

13        18.  I have reviewed the responses to appeal SAC-S-05002084.  My
          response at the second level of review contains an inadvertent error:

14        I indicated that I had considered the first-level interview when no
          such interview was conducted. When preparing appeal responses, I

15        sometimes cut and pasted a prior response and used it as a template,
          and then edited it to address the situation.   In preparing this
          response, I unintentionally erred and failed to delete the reference to

16        the first level interview.  I did, however, review the appeal packet
          and investigate the issues before preparing my response.  Navarro

17        could have submitted a request-for-interview form or return to the
          second level of review and request that the error be addressed.  I do

18        not recall him ever doing so.  He also could have addressed this
          error in his appeal to the third level of review.

19

20        ****

21        23.  Appeal SAC-05-4-2084.  I have reviewed the documents at
          page 67-76 and 85-96 of the complaint (ECF No. 24) and pages 3-

22        7, 10-11, and 12-13 of Navarro's Request for Judicial Notice (ECF
          No. 120-1.)   Based on these documents, I am able to tell how I

23        processed this appeal.  This appeal, submitted on October 2, 2005,
          was initially stamped as received by the OT on October 4, 2005.  In

24        the Action Requested section, Navarro sought a transfer, and all
          documentation concerning his alleged hold status.  I screened out

25        the appeal on October 4, 2005, in accordance with prison
          regulations, because Navarro failed to attach documents from his

26        last Institutional Classification Committee (ICC) action and his
          Classification Staff Representative (CSR) endorsement.  Navarro

27        resubmitted the appeal on approximately October 7, 2005,
          explaining that he did not have the necessary documents because he

28        was not given them after the hearing.  He did not indicate that he
          had ever sought the documents from a Correctional Counselor.

                                        19

Correctional Counselors are responsible for providing inmates copies of the documents after a classification hearing, and for providing inmates access to the Central File where these documents were kept. In accordance with CDCR policy, on October 14, 2005, I again screened out the appeal, and directed Navarro to request the documents from the Correctional Counselor.

24.  Navarro submitted a new appeal form on October 24, 2005, addressing the same issue and explaining that he had requested documents from Correctional Counselor Lynch, but was unable to resolve the issue. The OT stamped the appeal received on October 25, 2005, and provided it to me for processing. I authorized the bypass of the informal-level of review, assigned the appeal to the Administrative Segregation Captain and Correctional Counselor II for the first-formal level of review, and gave the appeal packet to the OT for processing. I expected that the assigned reviewers would competently investigate and respond to the appeal and address any issues found to exist. Because this appeal concerned the timing of Navarro's transfer and not the transfer decision itself, prison regulations did not dictate that the appeal bypass the first-formal level of review. On December 7, 2005, the first-formal level of response issued, granting the appeal in full, advising Navarro that he did not have any transfer holds, and that he was the second inmate on the list for transfer to California State Prison-Lancaster.

25.  Navarro appealed to the second level of review on December 14, 2005, asserting that nothing had been granted because his transfer endorsement had expired on December 9, 2005, two days after the first-level response issued. The OT stamped the appeal as received on December 23, 2005 and provided it to me for processing. I assigned the appeal response to myself and the Warden for the second level of review, and I gave the appeal packet to the OT for processing. I conducted a thorough inquiry at the second level of review, despite the typographical error explained in paragraph 18, above. My response explained that Navarro still was endorsed for transfer, detailed the proceedings concerning his transfer, and provided him copies of all classification documents concerning the transfer decision. (See Compl. 87, 89-96, ECF No. 24.) I advised Chief Deputy Warden Walker of my findings through my draft response, which he reviewed and approved. I had no authority to make Navarro's transfer occur any sooner or move him out of the administrative segregation unit, and I could not predict the exact date of his transfer. I do not believe that there is any further relief he sought that I could have granted. I did not intentionally delay, or fail to properly process his appeal.

(O'Brian declaration.)

Copies of the documents relevant to grievance no. 05-1022, aka SAC 0502084, are attached as defendants' Exhibit H. After reviewing these documents, the undersigned finds that defendant O'Brian's description of these documents is accurate.

////

20

Ratification of an unconstitutional act by superiors after the fact will only support liability when the superiors' past actions were the moving force behind the constitutional violation in the first place. Williams v. Ellington, 936 F.2d 881, 884–885 (9th Cir. 1991). This court is unwilling to adopt a rule that anyone involved in adjudicating grievances after the fact is per se potentially liable under a ratification theory. However, this is not to say that persons involved in adjudicating administrative disputes, or persons to whom complaints are sometimes made, can never be liable. If, for example, a reviewing official's rejections of administrative grievances can be construed as an automatic whitewash, which may have led other prison officials to have no concern of ever being reprimanded, a ratifying official may be liable for having put a defective policy in place.

The undersigned does not find that the processing or denial of grievance no. 05-1022 by defendant O'Brian violated plaintiff's right to due process. There is no evidence that past actions by defendant O'Brian were the moving force behind the alleged deprivation, i.e., plaintiff's continued retention in ad seg. The undersigned further finds that the denial of plaintiff's second level grievance was not an "automatic whitewash" of the alleged deprivation, as evidenced by plaintiff being provided with the classification documents pertaining to his ad seg placement. If defendant O'Brian was attempting to "whitewash" the alleged deprivation, then plaintiff would not have been provided with these documents. Accordingly, for these reasons, the undersigned recommends that defendant O'Brian be granted summary judgment with respect to plaintiff's due process claims.

*Defendant Grannis*

Plaintiff alleges that defendant Grannis improperly denied grievance no. 05-1022 challenging his retention in ad seg.

It is undisputed that on May 26, 2006, plaintiff's Third Level Appeal challenging his continued retention in ad seg, i.e., grievance no. 05-1022, was denied at the Third Level of Review. (ECF No. 172-1 at 209-10.) While the Third Level Response contains defendant Grannis's name typed at the end, defendant Grannis did not sign the response. (Id. at 210.) Plaintiff's appeal was denied as moot because he was no longer housed at CSP-Sac. (Id. at 209-

21

1    10).

2          Defendants move for summary judgment as to this claim on grounds that defendant

3    Grannis did not review grievance no. 05-1022.  In support of this argument, defendants make the

4    following arguments.

5          From the time plaintiff entered CDCR custody in 2004 until his transfer away from CSP-

6    Sac in March 2006, plaintiff filed one grievance that was accepted for third level review:  No. 05-

7    1022.  (Voong declaration, ¶ 7.)

8          Defendant Grannis was employed by the California Department of Corrections and

9    Rehabilitation ("CDCR") as Chief of the Inmate Appeals Branch ("IAB") from 2002 through her

10   retirement in December 2009, and for three additional months was a retired annuitant.  (Grannis

11   Declaration, ¶ 1.)  The IAB provides the third and final level of review in CDCR's administrative

12   grievance process.  (Id. at ¶ 2.)  In her declaration defendant Grannis goes on to state, in relevant

13   part,

14          4.  Appeals Screening

15          Approximately three IAB employees were responsible for screening
            appeals.  They would review each appeal and determine whether to
16          accept it for review, or screen it out (reject it) because it failed to
            comply with the prison regulations governing the appeal process
17          (e.g., the appeal was untimely, lacked critical information, had not
            been processed at the lower-levels of review, or otherwise did not
18          comply with prison regulations).

19          5.  Inmates sometimes claimed that the prison Appeals Coordinator
            would not properly process their appeals.  When this occurred, the
20          employee screening the appeal would conduct an inquiry to
            determine why the appeal was being rejected at the lower levels of
21          review.  Based on their findings, the appeal could be screened out,
            or forwarded for further processing.
22

23          6.  When a decision was made to screen out an appeal, a letter was
            prepared to notify the inmate of the screening decision.  My
24          signature typically was placed on the letter electronically because I
            was the Chief of the IAB.  The presence of my signature of a
25          screening letter does not indicate that I reviewed, assessed or even
            was aware of a screened-out appeal.  I generally was not involved
26          in the appeal-screening process at all.  I did not directly supervise
            the employees responsible for screening appeals, I did not sign
27          screening letters, and I did not review appeals at the screening stage
            except – on very rare occasions – when a screening question rose
28          that could not be resolved by the screening employee's direct
            supervisor.

7.  The IAB on average, received daily over one hundred appeals that were accepted for review.  Although isolated screening errors may have occurred, I was not aware of any pervasive deficiencies in the appeal-screening process.

8.  Appeal Inquiry

Each appeal that survived screening was assigned to one of approximately twenty Appeals Examiners for review.  Appeals Examiners typically held the rank of Facility Captains – the highest ranking uniformed officer – and were assigned to handle appeals from a set number of specified institutions.  This ensured that the Appeals Examiner was familiar with the institution, and any and institution-specific issues (e.g. an ongoing modified program).  Appeals Examiners would review the allegations in the appeal, determine whether and what additional information was needed, obtain the necessary information, and prepare a written response.  Although isolated errors may have occurred, I was not aware of any pervasive deficiencies in the appeal-inquiry response process.

9.  Appeal Decisions

Appeals Examiners forwarded their draft responses to my office for review.  I was unable to, and did not, personally review every response submitted to my office.  At any given time, at least three people, including myself, were responsible for conducting the final review.   My typed name was typically included on third-level decisions because I was the Chief of the IAB; it does not indicate that I investigated, reviewed, or even was aware of a particular appeal.

10.   Unless an appeal was assigned to me for review, I generally was not aware of its content.  When I reviewed an appeal, I always assessed the Appeals Examiner's written response to determine whether it satisfactorily addressed the issue the inmate raised.  If I believed that the response missed an issue or did not fully flesh out all relevant facts, I returned it to the Appeals Examiner for further consideration.  Once I was satisfied with the response, I signed "N. Grannis" above my typed name.

11.  Letters

Inmates sometimes submitted letters to the IAB instead of formal appeals on a CDCR 602 form.  When this occurred, the letters were processed in accordance with the procedures outlined above:  the letter was date stamped and forwarded for screening, the screening employee could issue a screening letter directing the inmate to submit a formal 602 or could forward the letter to the Appeals Examiner for further processing; and any response would undergo a final review.

12.  Inmate Mario Luis Navarro (V-31698)

I was not responsible for screening out or otherwise rejecting inmate Navarro's appeals or letters.  I have reviewed appeals No.

051022 (SAC-05-02084).  As is indicated by the absence of my signature on this document, I had no substantive role in processing this appeal, and I was not responsible for any of the response.

13.  I have never taken any adverse action against an inmate for filing an administrative appeal or lawsuit.  I never caused inmate Navarros's appeals to be delayed, screened out, denied, or improperly processed because he had filed appeals.

14.  I was not employed at California State Prison, Sacramento during Navarro's incarceration there in 2005 and 2006 and I neither supervised, nor had authority over, the staff employed there.  I was not responsible for the fact or continuation of Navarros' administrative segregation placement; his access to religious services, his legal property, his trust account statement, or the prison library; and I was not responsible for the physical conditions of his confinement.  And I do not recall ever being informed that Navarro was seeking review, through the appeals process or otherwise.

(Grannis Declaration, ¶¶ 4-14.)

Defendants have presented evidence that defendant Grannis had no substantive role in the processing of the grievance filed by plaintiff regarding his continued retention in ad seg.  Plaintiff has provided no evidence demonstrating that defendant Grannis participated in the processing of this grievance.

Because defendant Grannis did not participate in the processing of plaintiff's grievance challenging his continued retention in ad seg, defendant Grannis should be granted summary judgment as to this claim.

3.  Qualified Immunity

As discussed above, the undersigned recommends that all defendants except for defendant Walker be granted summary judgment with respect to plaintiff's due process claim.  Accordingly, the undersigned considers defendants' argument for qualified immunity with respect to defendant Walker only.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Resolving the defense of qualified immunity involves a two-step process; the court must determine (1) whether the plaintiff

24

1   has alleged or shown a violation of a constitutional right, and (2) whether the right at issue was

2   clearly established at the time of defendant's alleged misconduct.  Pearson, 555 U.S. at 232 (citing

3   Saucier v. Katz, 533 U.S. 194, 201-02 (2001)).  These steps may be analyzed in any order.  Id. at

4   236.

5        "Qualified immunity is applicable unless the official's conduct violated a clearly

6   established constitutional right."  Pearson, 555 U.S. at 232.  To be clearly established "[t]he

7   contours of the right must be sufficiently clear that a reasonable official would understand that

8   what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

9   "[E]xisting precedent must have placed the statutory or constitutional question beyond debate."

10  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011); see also Clement v. Gomez, 298 F.3d 898, 906

11  (9th Cir. 2002) ("The proper inquiry focuses on...whether the state of the law [at the relevant

12  time] gave 'fair warning' to the officials that their conduct was unconstitutional.") (quoting

13  Saucier, 533 U.S. at 202).

14       First, for the reasons discussed above, the undersigned finds that defendant Walker

15  potentially violated plaintiff's right to due process because the decisions to retain plaintiff in ad

16  seg were not supported by some evidence.  Whether defendant Walker actually relied on

17  plaintiff's self-proclaimed gang affiliation, contained in the May 11, 2005 chrono, to justify

18  plaintiff' retention is not clear.  Moreover, to the extent defendant Walker relied on the May 11,

19  2005 chrono as proof of plaintiff's gang affiliation, this chrono lacked indicia of reliability.   The

20  undersigned further finds, for the reasons discussed above, that defendant Walker potentially

21  violated plaintiff's right to due process by not giving plaintiff adequate notice of the reasons he

22  was retained in ad seg.

23       It is difficult to evaluate the second prong of the qualified immunity analysis with respect

24  to plaintiff's due process claim because it is not clear why defendant Walker retained plaintiff in

25  ad seg.  However, to the extent defendant Walker relied on the May 11, 2005 chrono, for the

26  reasons discussed above, the undersigned finds that a reasonable prison official would have

27  potentially known that this chrono lacked indicia of reliability with respect to plaintiff's alleged

28  gang affiliation. Thus, a reasonable officer would have known that relying on this chrono alone to

1  retain plaintiff in ad seg violated plaintiff's right to due process.

2          With respect to plaintiff's claim alleging that defendant Walker did not give him adequate

3  notice of the reasons he was detained in ad seg, the undersigned finds that a reasonable prison

4  official would know that only telling an inmate that he was being in retained in ad seg, month

5  after month, based on unspecified "security concerns" violated due process.

6          For these reasons, defendant Walker should not be granted qualified immunity.

7  VIII.  Eighth Amendment

8          Plaintiff alleges that the fact and continuation of his ad seg detention violated the Eighth

9  Amendment.  This claim is made against defendants Kernan, Walker, Grannis, O'Brian and

10  Baxter.  (ECF No. 78 at 18.)  Plaintiff also alleges that the physical conditions of ad seg violated

11  the Eighth Amendment.  This claim is made against defendants Kernan, Walker, Grannis,

12  O'Brian, Baxter, Baker and Sclafani.  (Id.)

13          A.  Retention in Ad Seg

14          The findings and recommendations addressing defendants' motion to dismiss described

15  this claim as follows:

16              Plaintiff, a designated participant in CSP-Sac's Mental Health
                Program, spent nearly a year in segregated housing waiting for
17              transfer to another institution.  The Supreme Court recently
                addressed problems associated with this confluence of factors:
18

19                  This shortfall of resources relative to demand contributes to
                    significant delays in treatment.  Mentally ill prisoners are
20                  housed in administrative segregation while awaiting transfer
                    to scarce mental health treatment beds for appropriate care.
21                  One correctional officer indicated that he had kept mentally
                    ill prisoners in segregation for "6 months or more."
22                  [Citation omitted.]  Other prisoners awaiting care are held in
                    tiny, phone booth sized cages.  The record documents
23                  instances of prisoners committing suicide while awaiting
                    treatment.

24              Brown v. Plata, S. Ct. 1910, 1933 (May 23, 2011.)  Both the fact of
                plaintiff's protracted isolation, and the physical conditions of his
25              confinement, warrant further inquiry.

26  (ECF No. 78 at 19.)

27          In the summary judgment motion, defendants first argue that plaintiff has repeatedly

28  asserted that he was "incorrectly labeled" with mental illness, and that his diagnoses were mere

26

1   pretext.  (ECF No. 165-1 at 25.)  Thus, defendants argue, any theory that plaintiff's mental health

2   diagnoses precluded his placement in ad seg should not preclude summary judgment.  (Id.)

3          While plaintiff claims that he did not suffer from any mental illness, it is undisputed that

4   he was in the EOP Program and then transferred to the CCCMS program.  While plaintiff alleges

5   that he did not suffer from mental illness, the evidence suggests otherwise.

6          Defendants next argue that they are entitled to summary judgment as to this claim because

7   there is no evidence that plaintiff's purported mental illness presented a substantially serious risk

8   that could be exacerbated because of his ad seg placement.

9          As noted above, plaintiff was classified as "CCCMS" while he was housed in ad seg.

10  "The Correctional Clinical Case Management System (CCCMS) provides mental health services

11  to seriously mentally ill inmates with 'stable functioning in the general population,

12  Administrative Segregation Unit (ASU) or Security Housing Unit (SHU)' whose mental health

13  symptoms are under control or in 'partial remission as a result of treatment.'"  Coleman v. Brown,

14  28 F.Supp.3d 1068, 1074 (E.D.Cal. 2014) (citations omitted).  "CCCMS is the lowest level of

15  care in the State's prison mental health delivery system, and is designed to provide a level of care

16  equivalent to that received by non-incarcerated patients through outpatient psychiatric treatment."

17  Lemire v. CDCR, 726 F.3d 1062, 1069 (9th Cir. 2013).

18         To succeed on a claim that his retention in ad seg violated his Eighth Amendment rights

19  based on his mental illness, plaintiff must demonstrate some harm to his mental illness.  See

20  Madrid v. Gomez, 889 F.Supp. 1146, 1264 (N.D. Cal. 1995.)  For example, plaintiff could

21  demonstrate that his mental illness decompensated while he was housed in ad seg.  In the instant

22  case, plaintiff has not demonstrated that his incarceration in ad seg caused any harm to his mental

23  illness.  For this reason, defendants should be granted summary judgment as to this claim.[7]

24  _____

25  [7]  In Coleman v. Brown, 28 F.Supp.3d 1068, 1099 (E.D. 2004), the district court held that the
    placement of seriously mentally ill inmates in ad seg for non-disciplinary reasons for more than a
26  minimal period necessary to effect a transfer violates the Eighth Amendment.  This holding was
    based on a finding regarding CDCR policy and involved a claim for injunctive relief only.  This
27  holding does not apply to individual cases for money damages.  In other words, mentally ill
    prisoners alleging Eighth Amendment claims for money damages based on extended
28  incarceration in ad seg must still prove injury.

B.   Conditions of Ad Seg

Plaintiff alleges an Eighth Amendment claim based on the conditions of ad seg against defendants Kernan, Walker, Grannis, O'Brian, Baxter, Baker and Sclafani.  Plaintiff alleges the following specific conditions that allegedly violated the Eighth Amendment:  1) inadequate lighting in his cell; 2) inadequate ventilation, which made it hot in the summer and cold in the winter; 3) his toilet and sink leaked, causing unsanitary puddles of water; 4) inadequate access to outdoor exercise; 5) inadequate access to clean clothing and clean linen; 6) no hot water in the cell; 7) inadequate access to cleaning supplies; and 8) inadequate food.

The undersigned observes that defendants do not generally argue that the conditions in ad seg did not violate the Eighth Amendment.  Instead, defendants generally argue that they were not responsible for any alleged deprivation.

The undersigned again observes that it is undisputed that plaintiff was housed in different ad seg units during the relevant time period.  Plaintiff was housed in B Facility, Building 1, from May 4, 2005, through November 14, 2005.  (Baker declaration, ¶ 7.)  On November 14, 2005, plaintiff was transferred to B Facility, Building 2.  (Id.)  On December 27, 2005, plaintiff was transferred to A Facility, Building 5, where he remained until his March 8, 2006 transfer.  (Id.)

Plaintiff's complaints regarding the conditions in ad seg do not appear to distinguish between these different ad seg units.  Thus, it appears that plaintiff is arguing that he suffered all of the alleged Eighth Amendment violations in each of the ad seg units in which he was housed.

1.   Legal Standard

The Eighth Amendment proscribes conditions of confinement constituting cruel and unusual punishment.  The Eighth Amendment's prohibition against cruel and unusual punishment imposes duties on prison officials to "provide humane conditions of confinement."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  To establish a violation of the Eighth Amendment, a prisoner must show that he was objectively deprived of something "sufficiently serious."  Id. at 834.  A deprivation is sufficiently serious when the prison official's act or omission results "in the denial of 'the minimal civilized measure of life's necessities.'"  Id., quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Next, the prisoner must show that the deprivation occurred as a result

28

1  of deliberate indifference to the inmate's health or safety; this determination is premised on an

2  assessment of the prison official's subjective state of mind.  Id., citing Wilson v. Seiter, 501 U.S.

3  294, 302-03 (1991).

4       A prison official who knows of and disregards an excessive risk to the inmate's health or

5  safety demonstrates deliberate indifference.  Farmer v. Brennan, 511 U.S. at 837.  Thus, "the

6  official must both be aware of facts from which the inference could be drawn that a substantial

7  risk of serious harm exists, and he must also draw that inference."  Id.  However, an official that

8  knows of a substantial risk to an inmate's health or safety but acts reasonably under the

9  circumstances will not be held liable under the cruel and unusual punishment clause, even if the

10  threatened harm results.  See id. at 843.

11       2.  Defendant Grannis

12       Plaintiff bases defendant Grannis's liability for his Eighth Amendment claim challenging

13  the conditions in ad seg on her processing of grievance no. 05-1022, which was denied at the third

14  level review.  Defendants argue that defendant Grannis should be granted summary judgment

15  because she did not know about the alleged conditions of ad seg.

16       As discussed above, defendants have presented undisputed evidence that from the time

17  plaintiff entered CDCR custody in 2004 until his transfer away from CSP-Sac in March 2006,

18  plaintiff filed one grievance that was accepted for third level review:  No. 05-1022.  (Voong

19  declaration, ¶ 7.)  While the memorandum denying this grievance at the third level of review

20  contains defendant Grannis's name typed at the end, defendant Grannis did not sign the response.

21  (ECF No. 172-1 at 209-10.)  In her declaration, defendant Grannis states that she had no

22  substantive role in the processing of this appeal, and was not responsible for any of the response.

23  (Id. at ¶ 12.)

24       Defendants have presented evidence that defendant Grannis had no substantive role in the

25  processing of grievance no. 05-1022.  Plaintiff has provided no evidence demonstrating that

26  defendant Grannis participated in the processing of this grievance or otherwise had knowledge of

27  the conditions of ad seg.  For these reasons, defendant Grannis should be granted summary

28  judgment as to plaintiff's Eighth Amendment claim challenging the conditions of ad seg.

1   3. Defendant Baxter

2       Defendants argue that defendant Baxter, the psychologist who participated at the

3   committee hearings reviewing plaintiff's retention in ad seg, should be granted summary

4   judgment as to Eighth Amendment claim challenging the conditions of ad seg.  Defendants argue

5   that defendant Baxter had no authority over the conditions in ad seg.  In support of this claim,

6   defendants cite defendant Walker's declaration which states, in relevant part,

7              11.   Mental health staff sometimes sit on ICC committees to
            provide custody staff with information pertaining to the inmate's
8          mental health treatment needs, and ability to participate in and
            understand the committee.  While mental health staff have authority
9          over inmates' treatment decisions, such as whether an inmate
            qualifies for participation in the EOP mental health program, they
10         lack any authority over custodial decisions, such as whether to
            place an inmate in the ASU or release him to the general
11         population.   Mental health staff also lack responsibility for or
            authority over the day-to-day conditions in the ASU, and are not
12         responsible for the due process protections provided in connection
            with the hearing.

13

14  (Walker declaration, ¶ 11.)

15      Defendants have presented evidence that defendant Baxter had no authority over the

16  conditions in ad seg, and plaintiff has presented no evidence contradicting this evidence.  Because

17  defendant Baxter had no authority over the conditions in ad seg, she cannot be liable for any of

18  the unconstitutional conditions that allegedly existed while plaintiff was confined in ad seg.

19  Accordingly, defendant Baxter should be granted summary judgment as to this claim.

20  4. Defendant Kernan

21      Defendants move for summary judgment as to plaintiff's Eighth Amendment claim

22  against defendant Kernan, the Warden, on the grounds that plaintiff did not inform defendant

23  Kernan of any ad seg conditions, except law library access.  In support of this argument,

24  defendants cite defendant Walker's declaration which states, in relevant part,

25             I reviewed administrative appeal S-05-02084, attached at
            Defendants' Exhibit H, in Warden Kernan's place.   I was
26         responsible for conducting a supervisory review of the second level
            response prepared by a subordinate officer.

27

28  Walker declaration, ¶ 27.

Defendants also cite plaintiff's deposition testimony at pages 32-34 and 92.

At page 92 of his deposition, plaintiff testified that, "—basically, from the beginning when I saw Kernan, I told him that I need my legal property…" (Plaintiff's deposition at 92.)   At page 33, plaintiff testified that he asked defendant Kernan if he could get his legal property.   (Id. at 33.)   From this testimony, defendants infer that when plaintiff saw defendant Kernan, he only asked defendant Kernan about his legal property, and raised no other conditions of confinement.

In his opposition, citing his deposition testimony, plaintiff alleges that he repeatedly gave defendant Kernan notice of the alleged Eighth Amendment violations.  (ECF 171 at 17.)  The undersigned has reviewed the deposition testimony cited by plaintiff.  At his deposition, plaintiff testified that he told defendant Kernan about the inadequate conditions in ad seg when defendant Kernan walked the ad seg tiers.  At page 84-85, plaintiff testified,

> Q:  All right.  How about in terms of the defendants that you named in this lawsuit –Baker, Baxter, Grannis, Kernan, O'Brian, Sclafani and Walker --- which of those defendants were responsible for clothing and bedding –
>
> A:  I told them –
>
> Q:  --providing you clothing and bedding?
>
> A:  I told them at each committee how it was, and I'm –since Kukrall was there during the committees and Mr. Walker, the defendant Walker, I'm thinking he's –he's the one that can fix it.  Like, if I'm going – in this environment when there's a problem you go to the top and he will fix it; usually a captain or lieutenant and in some cases a sergeant.
>
> But the CO's, unless they get direct orders, they won't fix it unless some paper pushes it; so I brought it directly to Mr. Walker. I wish I had told – *there was Mr. Kernan.  He did walk the tiers once in a while.  That was a surprising thing about him.  He used to walk the tiers, and I did see him on five occasions, and a lot of people, not just me, they were hollering for him and referencing the things that we were being subject to back there.  So he's aware of it too.*

(Plaintiff's deposition at 84-85 (emphasis added).)

Plaintiff also testified that he gave defendant Kernan a grievance alleging that he was not receiving yard access:

> I was given this, and these –I gave this to the warden.  I gave this to Grannis.  I gave it to Walker. I sent it to Kernan, and he was shown this when he walked the tier one day.  My neighbors were there

1    when I gave it to him, …

2    (Plaintiff's deposition at 89-90.)

3        The undersigned agrees with defendants that defendant Kernan did not receive notice of

4    the at-issue conditions in ad seg from grievance S-05-02084 because he did not participate in the

5    review of this grievance.  However, the undersigned does not find that the other evidence cited by

6    defendants, i.e., plaintiff's deposition transcript, demonstrates that plaintiff did not make

7    defendant Kernan aware of the at-issue conditions in ad seg.

8        At his deposition, plaintiff clearly testified that he handed defendant Kernan a grievance

9    alleging inadequate outdoor exercise when defendant Kernan "walked the tier one day."

10   Plaintiff's testimony that he and other inmates shouted out their concerns regarding ad seg

11   conditions to defendant Kernan on another occasion as he walked the tier is less persuasive

12   evidence of defendant Kernan's knowledge of the ad seg conditions.[8]  Nevertheless, the

13   undersigned finds that plaintiff's deposition testimony cited above is sufficient to create a

14   materially disputed fact regarding whether defendant Kernan had knowledge of the at-issue

15   conditions in all three of the ad seg units in which plaintiff was confined.  Accordingly, defendant

16   Kernan should be denied summary judgment as to this claim.

17       5.  <u>Defendant Walker</u>

18       Defendants argue that defendant Walker should be granted summary judgment as to

19   plaintiff's Eighth Amendment claim challenging the conditions of ad seg on the grounds that he

20   did not deliberately disregard any condition of confinement.  Defendants argue that defendant

21   Walker consistently relied on his staff, whom he trusted and believed to be capable and

22   competent, to investigate and respond to any complaints.

23       In support of their argument that defendant Walker did not act with deliberate

24   indifference, defendants cite the following sections of defendant Walker's declaration:

25           21.  As CDW [i.e., Chief Deputy Warden] I generally was not
     responsible for the direct supervision of inmates.  Rather, I

26

27   [8]  In his declaration, quoted below, defendant Walker states that "it was not uncommon for
     inmates to yell out to me with their concerns when I walked through the housing unit."  (Walker
28   declaration, ¶ 23.)

supervised the high ranking officials responsible for supervising the
correctional staff who ran the housing units.  Whenever I became
aware that an employee under my supervision was not performing
their required or expected duties, or needed additional training or
supervision, I promptly took corrective action.   While isolated
issues occurred, I did not allow any pervasive or ongoing problems
to continue uncorrected.

22.  As with any environment where people are held against their
will, inmates sometimes complained about the conditions of
confinement or the officers responsible for their supervision.   I
never knowingly disregarded any complaint.  But if I personally
reviewed, investigated or handled every complaint, I would not
have had time to perform my duties as CDW.  Thus, I typically
delegated the review, investigation and response to subordinate
staff.

23.  Inmates sometimes voiced their concerns to me in person,
through the administrative appeal process, or in writing.  It was not
uncommon for inmates to yell out to me with their concerns when I
walked through the housing unit.  I always would delegate an
investigation of any significant concerns to building staff.

24.  At committee hearings, inmates sometimes presented me with
letters addressing their concerns or directly addressed their
concerns.  I relied on the Sergeant or Correctional Counselor in
attendance at the committee to investigate and address the concern.
The chronos attached at Defendants' Exhibit C through E indicate
that Sergeant Kukrall, Correctional Counselor Lynch, and
Correctional Counselor Forrester sat on Navarro's ICC hearings
with me.   In my experience, these officials were capable,
experienced, and competently performed their duties.  I trusted
them to investigate the issues brought to my attention, and relied on
them to do so.  Further, I assumed that if the inmate was unhappy
with the result of the investigation, he would file an administrative
appeal.  I regularly informed inmates that they should do so.

(Walker declaration, ¶¶ 21-22.)

In essence, defendant Walker argues that it was not his job to personally investigate

inmate complaints regarding ad seg conditions.  Defendant Walker states that it was the job of

other prison officials he supervised, which apparently included other members of plaintiff's

classification committee, i.e., Sergeant Kurkrall, Correctional Counselor Lunch and Correctional

Counselor Forrester, to investigate inmate complaints regarding conditions of confinement.

Defendant Walker states that if an inmate was unhappy with the results of an investigation, they

could file an administrative grievance.

////

33

1       At his deposition, plaintiff testified that he complained about ad seg conditions at the June

2    15, 2005, September 14, 2005, and December 14, 2005 committees.[9]  Plaintiff also testified that

3    he handed defendant Walker a grievance alleging that he was not receiving adequate outdoor

4    exercise.  (Plaintiff's deposition at 89.)

5       "In a § 1983 or a <u>Bivens</u> action – where masters do not answer for the torts of their

6    servants – the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each

7    Government official, his or her title notwithstanding, is only liable for his or her own

8    misconduct."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677 (2009).  A supervisor may be liable under

9    Section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2)

10   a sufficient causal connection between the supervisor's wrongful conduct and the constitutional

11   violation.  <u>See Henry A. v. Willden</u>, 678 F.3d 991, 1003-04 (9th Cir. 2012) (citing <u>Starr v. Baca</u>,

12   652 F.3d 1202, 1207 (9th Cir. 2011)).  Supervisor liability is established by showing the

13   supervisor's knowing acquiescence to Eighth Amendment violations that are based upon

14   deliberate indifference.  <u>See Oregon State University Student Alliance v. Ray</u>, 699 F.3d 1053,

15   1074-75 & n.18 (9th Cir. 2012).

16      While defendant Walker may have delegated the authority to review plaintiff's complaints

17   regarding the ad seg conditions to other prison officials he supervised, plaintiff alleges that he

---

[9]   At his deposition, plaintiff testified that at the June 15, 2005 classification hearing, he told the
committee about the conditions in ad seg:  "I told them my property issues.  I told them how the
custody – how they were not letting me out to yard.  I told them many grievance issues – no
clothing.  All kinds of different issues with this."  (Plaintiff's deposition at 48.)  Plaintiff also
testified that at the September 15, 2005 classification hearing, he told the committee about the
conditions in ad seg:

> I presented many issues to them and that I was very upset that I was not being provided
> answers and pretty much I had told them all kinds of other issues related to my
> environment there:  not having [m]y legal property, using the phone, exercise yard, and all
> kinds of –aside from the administrative process, many, many things I told them.  I think it
> was like a – a good ten minutes I sat in there.  I elaborated on facts.  I didn't just sit there.

(<u>Id.</u> at 50.)

Plaintiff testified that after he told the committee about the conditions in ad seg, defendant
Walker told plaintiff that he, plaintiff, would be transferred soon.  (<u>Id.</u> at 51.)  Plaintiff testified
that, "[Walker] told his sergeant that was there – I think that was Kukrall.  Kukrall.  He was there,
and I thought that I would get some things fixed since he was there at that time."  (<u>Id.</u>)  Plaintiff
also testified that at "each committee," he "mentioned" the "filthy conditions, where I wasn't
given clothing.  It was freezing or hot.  I wasn't being provided yard."  (<u>Id.</u> at 71; 84.)

repeatedly complained about the alleged Eighth Amendment violations at the June 15, 2005, September 14, 2005, and December 15, 2005 committee hearings.  Plaintiff's complaints at the September 14, 2005, and December 15, 2005 committee hearings suggested that the prison officials who defendant Walker supervised had not responded to plaintiff's complaints.  Based on plaintiff's repeated complaints, the record suggests that defendant Walker knowingly acquiesced to the alleged Eighth Amendment violations.  Based on these circumstances, the undersigned cannot find that defendant Walker did not act with deliberate indifference when plaintiff repeatedly complained about the conditions in ad seg.

Defendant Walker suggests that he did not act with deliberate indifference to any complaint by plaintiff regarding the conditions in ad seg because he knew that plaintiff could file an administrative grievance regarding ad seg conditions if he felt that his complaints were not adequately investigated.  That administrative remedies were available to plaintiff does not demonstrate that defendant Walker's failure to respond to plaintiff's alleged repeated complaints regarding ad seg conditions did not constitute deliberate indifference.[10]

For the reasons discussed above, defendant Walker should be denied summary judgment as to plaintiff's claim alleging Eighth Amendment violations in all three of the ad seg units in

---

[10]  Plaintiff filed a grievance challenging the conditions in ad seg.  (See Defendants' Exhibit G, grievance no. 05-2214.)  On March 22, 2006, defendant Walker reviewed the second level grievance.  (Id.)  Defendant Walker's response suggested knowledge of some of the conditions of which plaintiff complained.  In his memorandum, defendant Walker described the summary of plaintiff's appeal,

> You are appealing the living conditions in the B Facility Administrative Segregation Unit (ASU) 2 Block Overflow, where you contend you and other inmates have been deprived of linen and blanket exchange, unit temperature being too cold, no hot water in the cell, and not having access to the Law Library.

> It should be noted that Correctional Sergeant Baker addressed your concerns at the First Level Response.  At that time, a portion of your appeal was granted.  In addition you are now informed that you and other inmates were removed from the B Facility ASU overflow, which made our appeal issues null and void.  B Facility ASU had *limited and restricted programs to yard and library* and with the *deactivation of the unit*, your appeal issues were eliminated.

(Id.) (emphasis added.)

1   which he was housed.

2        6. <u>Defendant Baker</u>

3        It is undisputed that defendant Baker was assigned only to B Facility, Building 2, where

4   plaintiff was housed from November 17, 2005, through December 27, 2005.  (Baker declaration

5   at ¶ 7.)  In his response to grievance no. 05-2214, defendant Walker described this housing unit as

6   "2 Block Overflow."  (Defendants' Exhibit G.)   It is undisputed that defendant Baker worked as

7   Administrative Segregation/Overflow Sergeant in B Facility, Building 2.  (Baker declaration, ¶

8   1.)

9        Defendants move for summary judgment as to defendant Baker on the grounds that she

10  did not knowingly disregard any risk to plaintiff.  In her declaration, defendant Baker describes

11  her duties as the Administrative Segregation/Overflow Sergeant:

12              As ASU Sergeant, I worked Thursday through Monday, with
             Tuesdays and Wednesdays off.  I was not directly responsible [for]
13           supervising the inmates; that was the role of the assigned
             correctional officers.   My duties included supervising the
14           correctional officers assigned to Building 2, keeping records and
             preparing reports and resolving issues brought to my attention by
15           subordinate officers.  When I became aware, on isolated occasions,
             that an officer was derelict in his duties, that ASU procedures were
16           not being followed (e.g., searches for contraband were not being
             conducted or a blanket exchange was overdue), or that an officer
17           needed assistance resolving an issue, I promptly investigated and
             took corrective action.
18

19  (Baker declaration, ¶ 3.)

20       The undersigned herein addresses plaintiff's Eighth Amendment claims against defendant

21  Baker as to each of the alleged Eighth Amendment violations.

22       *Blanket, Cell and Water Temperature*

23       Defendants argue that defendant Baker promptly responded to plaintiff's living-conditions

24  grievance no. 05-2214, investigated and took corrective action.  In relevant part, this grievance

25  addressed plaintiff's claims alleging that his cell was cold and his cell had no hot water, and his

26  claim alleging that he did not have a clean blanket.

27  ////

28  ////

                                    36

In her declaration, defendant Baker addresses her response to grievance no. 05-2214:

10. I have reviewed administrative appeal No. SAC-S-05-02214, at Defendants' Exhibit G. On December 12, 2005, I was assigned to investigate and respond to this appeal at the first-formal level for review. Navarro raised four issues: 1) that there had been no blanket exchange for over seven months; 2) the cell temperatures were too cold; 3) the in-cell water was not hot; and 4) ASU inmates did not receive weekly law-library access unless they were eligible for Preferred Legal User (PLU) status, and despite numerous requests for library access, Navarro had not been able to attend. I completed my investigation and the first-formal level response by December 19, 2005, well before the deadline I was given, and I did not disregard any unacceptable condition of confinement of which I was aware.

11. **Blanket Exchange**. Prison operational procedure directed that blankets be exchanged for laundering every six months, during the winter months. Navarro, who had been housed in the building only since November 14 (six days before the earliest date the grievance appears to have been submitted), asserted that the blanket exchange was overdue. Because approximately 75 inmates were housed in Building 2, 150 blankets were needed to complete the exchange. I promptly contacted Laundry, but was informed that they did not have sufficient blankets in stock to complete the exchange. I did not have direct authority over Laundry, but I granted the relief within my control by drafting a memorandum notifying Laundry that blankets were needed to conduct the exchange. On December 21, 2005, nine days after the Navarro appeal had been assigned to me, the blanket exchange was completed.

12. **Cell Air & Water Temperature**. Each ASU cell contains an air vent and a sink. I requested that the prison Maintenance Department conduct temperature readings in Navarro's cell. On Friday, December 16, 2005, a Maintenance Department employee determined that the vent blowing air into Navarro's cell registered at 78 degrees and the sink's hot-water temperature registered at 90 degrees. Both of these temperatures were within the standard housing unit temperature guidelines. I was not responsible for establishing the guidelines, and I had no reason to believe temperatures that fell within the guidelines were unsafe.

13. Custody staff could not adjust the in-cell temperature. It is my understanding that all water-temperature controls were located in the boiler room, outside the facility. I did not have authority to, nor did I know how to, adjust the water temperature myself. I also never turned off the hot water supply to the cells, and I was not aware of any custody staff doing so. Water temperatures were the responsibility of the Maintenance Department. When I was alerted to water-temperature complaints, I contacted the Maintenance Department.

14. Inmates sometimes complained about the air temperatures in their cells. When this occurred, I either filled out a work-order notifying the Maintenance Department, directed that a subordinate

37

<blockquote>
officer do so, or notified the Maintenance Department myself.  I lacked authority to make adjustments to the ventilation system myself, and I never did so.  I also was not aware of any custody staff doing so.  Sometimes a change in the in-cell temperature was caused by a number of inmates who impeded the air flow into their cells by covering the vents with wet paper.  This redirected the air to cells with unblocked vents and, when enough vents were covered, affected the temperature in the unblocked cells.  When this happened, I would have officers walk the tiers and direct the offending inmates to remove the paper.
</blockquote>

(Baker Declaration, ¶¶ 10-14.)

In his opposition, plaintiff does not dispute that he received a clean blanket as a result of defendant Baker's investigation.  The undersigned finds that defendant Baker's response to plaintiff's grievance alleging that he required a clean blanket did not demonstrate deliberate indifference.   Defendant Baker did not disregard plaintiff's concerns and responded reasonably.

The undersigned next considers plaintiff's claim alleging that defendant Baker disregarded his complaints that his cell was cold.  At his deposition, plaintiff testified that even though the tests indicated that heat was blowing in through the air vent, it was still cold.  (Plaintiff's deposition at 79.)   Plaintiff testified that "The building was built below the earth at least about waist high.  So the walls were always moist with water and – back there."  (Id. at 77.)  He also testified,

<blockquote>
To me the air was turned on cold in the winter time.  They were not providing no extra blankets.  All the COs were wearing thick jackets, scarves.  Back then I think they let them wear scarves, but they were wearing beanies and everything, mitts sometimes.  And me, I was in boxers.
</blockquote>

(Id.)

Plaintiff's testimony that the guards wore thick jackets, scarves, beanies and mittens is inconsistent with the finding that the air temperature going into plaintiff's cell was 78 degrees.  This deposition testimony is sufficient to create a factual dispute regarding whether the air in plaintiff's cell was unconstitutionally cold.  While the undersigned acknowledges that the temperature in plaintiff's cell may be different from the temperature outside of his cell, the difference in temperatures alleged by plaintiff and defendants is so stark that they cannot be reasonably reconciled.

1        Turning to the issue of defendant Baker's state of mind, it is undisputed that defendant

2   Baker responded to plaintiff's grievance alleging that his cell was cold by sending out a

3   maintenance worker, who then measured the temperature of air going into plaintiff's cell at 78

4   degrees.  If the air going into plaintiff's cell was 78 degrees and if, as plaintiff alleges, the guards

5   outside his cell were wearing heavy jackets, etc., then there was clearly something wrong with the

6   ventilation, lending credence to plaintiff's claim.  Because defendant Baker was the unit Sergeant,

7   then it is reasonable to infer that she had knowledge of or was able to see the clothing the officers

8   working in her unit were wearing.  For these reasons, the undersigned cannot determine whether

9   defendant Baker acted with deliberate indifference when she relied solely on the 78 degree

10  temperature measured by the maintenance department to find that plaintiff's cell was adequately

11  warm.  Accordingly, defendant Baker should be denied summary judgment as to this claim.

12       Turning to plaintiff's claim that his cell lacked hot water, plaintiff does not dispute that

13  the temperature of the water in his cell was measured at 90 degrees.  At his deposition, plaintiff

14  testified that he thought the reason that there was no hot water in his cell was because guards

15  turned the hot water off to the cells to punish the inmates for complaining.  (Id. at 80.)

16  Apparently this action could explain why his cell water could be warm on the day it was tested by

17  maintenance, but cold on other days.  Plaintiff has no proof that any defendant was involved in

18  turning off the hot water to his cell.  (Id. at 81.)

19       In her declaration, defendant Baker stated that she had no knowledge of custody staff

20  turning down the water temperature.  Plaintiff has presented no evidence that defendant Baker

21  had knowledge that custody staff turned down the water temperature.  Unlike plaintiff's claim

22  alleging that his cell was cold, plaintiff has presented no evidence suggesting that defendant

23  Baker had reason to doubt the water temperature measured by maintenance.  For these reasons,

24  the undersigned finds that defendant Baker did not act with deliberate indifference to plaintiff's

25  complaints that his cell lacked hot water.  Accordingly, defendant Baker should be granted

26  summary judgment as to this claim.

27  ////

28  ////

39

1          *Leaks*

2          The undersigned next considers plaintiff's claim that his cell toilet and sink leaked while

3   he was housed in B facility, Building 2.  In her declaration, defendant Baker states, in relevant

4   part,

5              27.  **Leaks**.  Building 2 occasionally had leaks, either because of
                temporary plumbing issues or moisture seeping through the
6              concrete structure.  I do not recall being made aware of any leaks in
                Navarro's cell.  However, when I became aware of leaks, I made
7              sure Maintenance was notified and provided notice up my chain of
                command.  I always followed this procedure.
8

9   (Baker declaration, ¶ 27.)

10          In his opposition, plaintiff provides no evidence that defendant Baker had knowledge of

11  any leak in his cell while he was housed in B Facility, Building 2.  Accordingly, the undersigned

12  finds no evidence of deliberate indifference by defendant Baker with respect to alleged leaks in

13  plaintiff's cell.  On this ground, defendant Baker should be granted summary judgment as to this

14  claim.

15          *Cleaning Supplies, Clean Clothing and Linen*

16          The undersigned next considers plaintiff's claim that he was denied adequate cleaning

17  supplies and clean linen and clothing while housed in B Facility, Building 2.  In her declaration,

18  defendant Baker states, in relevant part,

19             29.  **Cleaning supplies & Laundry exchange**.  Upon assignment
                to the ASU, inmates were typically provided a kit containing toilet
20             paper, soap, toothpowder (powdered toothpaste), forms, and
                cleaning supplies.  The ASU had schedules for the laundering of
21             clothing and linens, and for providing basic hygiene and cleaning
                supplies to inmates.  I was not directly responsible for providing the
22             supplies or conducting the laundry exchange.  Whenever I became
                aware that the established schedules were not being adhered to, I
23             promptly took action to correct the situation.

24  (Baker declaration, ¶ 29.)

25          Attached to plaintiff's opposition as exhibits are logs showing the days on which plaintiff

26  received a cell inspection, exercise, showers, supplies, clothing, meals, and trash disposal.  These

27  logs show that from November 17, 2005, through December 27, 2005, plaintiff received

28

40

1   "supplies" on November 20, 2005, November 27, 2005, December 4, 2005, and December 18,

2   2005.  (ECF No. 173 at 88-93.)  The log form states, "Cleaning and personal hygiene supplies

3   shall be offered on a weekly basis to all inmates and provided on an as-needed basis."  (Id.)

4        In a verified declaration filed in support of his opposition, plaintiff observes that the form

5   does not state what supplies were provided.  (Id. at 6.)  Plaintiff states that he was not given

6   adequate toilet paper.  (Id.)  Plaintiff states that he was frequently forced, "for weeks, to use my

7   uncovered hand to clean myself after using the toilet, because toilet paper was not provided 'as

8   needed.'"  (Id.)

9        In her declaration, defendant Baker states that her duties included "keeping records and

10  preparing reports."  (Baker declaration, ¶ 3.)  Defendant Baker does not address whether her

11  record keeping duties included reviewing the logs described above.  However, it is not

12  unreasonable to infer that defendant Baker's record keeping duties as well as her duties of

13  supervising the correctional officers in the unit included review of these logs.

14       The logs indicate that plaintiff was given "supplies" on an almost weekly basis while

15  housed in B Facility, Building 2.  While plaintiff alleges that he was not given adequate cleaning

16  supplies and toilet paper, he has provided no evidence that defendant Baker was made aware that

17  he did not receive adequate supplies.  Accordingly, the undersigned finds that to the extent

18  defendant Baker reviewed the logs regarding supplies, they contained no evidence that plaintiff

19  was not receiving adequate cleaning and personal hygiene supplies.  Accordingly, defendant

20  Baker should be granted summary judgment as to this claim.

21       Regarding linen exchange, the log form states, in relevant part, "Clothing will be issued

22  upon assignment and exchanged and laundered not less than every other week.  Towels, sheets

23  and pillow cases will be laundered not less than once every (2) weeks."  (ECF No. 173 at 88.)

24  The ad seg logs show that plaintiff did not receive "linens" for the entire time he was housed in B

25  Facility, Building 2.  (Id. at 88-92.)

26       Prisoners have an Eighth Amendment right to be provided with clean clothing and clean

27  linen on a regular basis.  Toussaint v. Rushen, 553 F.Supp. 1365, 1379 (N.D. Cal. 1983.)  The

28  undersigned finds that plaintiff's alleged failure to receive clean bedding and linen for the 40 days

41

1    he was housed in B Facility, Building 2 potentially violated the Eighth Amendment.  Because the

2    record suggests that defendant Baker reviewed the logs containing the information regarding

3    linen exchange, defendant Baker is not entitled to summary judgment as to this claim.[11]

4         *Outdoor Exercise*

5         The undersigned next considers plaintiff's claim that he was denied adequate exercise

6    while housed in B Facility, Building 2.

7         There are two requirements for an Eighth Amendment violation based on prison

8    conditions:  (1) the deprivation must be, objectively, sufficiently serious; and (2) the defendant

9    must have acted or failed to act with deliberate indifferent to a substantial risk to the prisoner's

10   health or safety.  See Farmer, 511 U.S. at 834, 836.

11        "'[O]rdinarily the lack of outdoor exercise for extended periods is a sufficiently serious

12   deprivation' for Eighth Amendment purposes."  Thomas v. Ponder, 611 F.3d 1144, 1151 (9th Cir.

13   2010) (quoting LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993).  The Ninth Circuit has not

14   specified exactly how much exercise time passes constitutional muster, though it has found 45

15   minutes per week insufficient, Allen v. Sakai, 48 F.3d 1082, 1088 (9th Cir. 1994), and agreed that

16   two hours per week was enough, Pierce v. Cty. of Orange, 526 F.3d 1190 (9th Cir. 2008).

17        In her declaration, defendant Baker addresses plaintiff's claim alleging inadequate access

18   to outdoor exercise:

19            22.  **Outdoor Yard**.  My role in Building 2's outdoor-exercise
             program was limited.  I believe that the Facility Captain set the yard
20           schedule, which designated the day and time for each yard group to
             attend the outdoor yard.  The ICC assigned each inmate to a
21           particular yard assignment (i.e., a particular walk-alone or
             compatible group or yard).  The building correctional officers
22           escorted the inmates to yard in accordance with their scheduled
             yard assignment.  Inmates could decline to attend yard if they did
23           not want to go.  While I monitored yard release to ensure that the
             officers properly escorted the inmates, in accordance with ASU
24           procedures, I was not directly responsible for escorting the inmates,
             or for determining who would be escorted.    It was my
25           understanding that the exercise schedule was being adhered to.  I do
             not recall knowing that Navarro was not receiving the yard time.
26           Whenever an inmate complained of an ongoing denial of yard time,

27   _____

28   [11]   At his deposition, plaintiff testified that when defendant Baker interviewed him in his cell
     regarding his grievance, "my clothes were just filthy."  (Plaintiff's deposition at 72.)

1
2

> I investigated by talking to the building officers.  I did not know that the amount of yard time offered to Navarro put him at a sufficiently serious risk of harm.

3

4   (Baker declaration, ¶ 22.)

5        In her declaration, defendant Baker states that she was not responsible for escorting

6   inmates to the yard, although she monitored the yard release to ensure that the officers were

7   properly escorting the inmates.  Defendant Baker states that she does not recall that plaintiff was

8   not receiving yard time.

9        Attached to plaintiff's opposition are logs showing that, while he was housed in B

10  Facility, Building 2, he received exercise on November 24, 2005, November 25, 2005, November

11  29, 2005, December 6, 2005, and December 8, 2005.  (ECF No. 173 at 89-92).  The logs show

12  that plaintiff refused yard on November 29, 2005.  (Id. at 90.)  At his deposition, plaintiff testified

13  that the entries indicating that he refused yard were false.  He also alleges that he received

14  outdoor exercise on only one occasion while housed in B Facility, Building 2.

15       Once again, it is not unreasonable to infer that defendant Baker's record keeping duties, as

16  well as her duty to supervise the correctional officers working in the unit, included reviewing

17  these logs.

18       Assuming that the logs are accurate, they reflect that plaintiff *may* have received

19  constitutionally adequate exercise during the first part of his stay in B Facility, Building 2, but

20  inadequate exercise during the second part of his stay.  Assuming defendant Baker reviewed these

21  logs, the undersigned cannot find that she is entitled to summary judgment as to plaintiff's claim

22  alleging inadequate outdoor exercise.

23       In addition, the undersigned observes that in response to plaintiff's grievance alleging

24  inadequate yard time in B Facility, Building 2, defendant Walker stated that "B Facility ASU had

25  limited and restricted programs to yard…"  (Defendants' Exhibit G.)  It is unclear what defendant

26  Walker meant by "limited and restricted" yard programs.  However, it is reasonable to infer that

27  defendant Baker, as the unit Sergeant, had knowledge of the "limited and restricted" yard

28  program in her unit.

1

*Spoiled Food*

2       At his deposition, plaintiff clarified his claim regarding inadequate food.  Plaintiff testified

3   that he was served spoiled meat "[o]n a couple of occasions," that made him ill.  (Plaintiff's

4   deposition at 90.)  Plaintiff also testified that the lunch meat he was given was "real bad."  (Id. at

5   91.)  Plaintiff testified that because he did not have access to the canteen, he could not supplement

6   his diet when he received bad meat.  (Id.)  Plaintiff testified that he told "the sergeant" about the

7   bad meat, referring to defendant Baker.  (Id. at 91.)

8       Defendants argue that defendant Baker was not responsible for plaintiff's receipt of bad

9   food.  Defendants cite defendant Baker's declaration which states,

10
> ASU inmates were served food prepared on another facility by
> persons outside the ASU.  The individual meals were prepackaged
11
> and plated on a tray or placed in a lunch bag before being delivered
> on a cart to Building 2.  The building officers were responsible only
12
> for delivering the meals to the inmates through the tray slot in the
> cell door.   As a Correctional Sergeant, I was not directly
13
> responsible for delivering food, and I was not aware of any problem
> with the food or food service.
14

15   (Baker declaration, ¶ 21.)

16       Based on plaintiff's deposition testimony, the undersigned finds that whether defendant

17   Baker had knowledge that plaintiff received bad or rotten meat, or did anything to address that

18   issue, are disputed material facts.  Accordingly, defendant Baker should be denied summary

19   judgment as to this claim.

20       *Lighting*

21       Defendants do not address plaintiff's claim against defendant Baker that his cell did not

22   have adequate lighting.[12]  Accordingly, defendant Baker is not entitled to summary judgment as

23   _____

24   [12]   Adequate lighting is one of the "fundamental attributes of 'adequate shelter' required by the
Eighth Amendment."  Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996).  Inmates are required
to have "a minimum level of illumination in jails so that normal activities of life may be
25   conducted.  See, e.g., Martino v. Carey, 563 F.Supp. 984, 1000 (D.Or. 1983) (collecting
illumination cases).  Courts have found lighting conditions to be inadequate if they cause inmates
26   to suffer health problems, including headaches, eye strain, and fatigue.  See Hoptowit v.
Spellman, 753 F.2d 779, 783 (9th Cir. 1985).  In his amended complaint, plaintiff alleges that the
27   inadequate lighting exacerbated his impaired vision that was already damaged.  (ECF No. 24 at
32.)
28

1   to plaintiff's claim that his cell was not adequately lit.

2       7.  Defendant Sclafani

3       Neither party has clarified in which of the three ad seg units where plaintiff was housed

4   defendant Sclafani, a correctional officer, worked.  In his declaration, defendant Sclafani states

5   that he worked in the ad seg unit at CSP-Sac, but does not identify the particular unit.  (Sclafani

6   declaration, ¶ 1.)  In his deposition, plaintiff testified that defendant Sclafani was "one of the

7   regular custody officers that worked in the building that I was – or actually the block B2."

8   (Plaintiff's deposition at 72.)  Based on this testimony, the undersigned finds that defendant

9   Sclafani worked in Facility B, Building 2, where plaintiff was housed from November 17, 2005,

10  to December 27, 2005.  This finding is supported by defendant Baker's statement in her

11  declaration that she supervised defendant Sclafani.  (Baker declaration, ¶ 9.)  Accordingly, the

12  undersigned's analysis of plaintiff's Eighth Amendment claim against defendant Sclafani is

13  limited to the time plaintiff spent in Facility B, Building 2.[13]

14      To the extent defendant Sclafani worked in the other at-issue ad seg units in which

15  plaintiff was housed, defendants' summary judgment motion is denied.  Given defendants' failure

16  to clearly specify the ad seg units defendant Sclafani worked in, and the voluminous record, the

17  undersigned is not willing to evaluate claims which may or may not exist.

18      Defendants move for summary judgment as to defendant Sclafani on the grounds that he

19  did not knowingly disregard any risk to plaintiff.

20      *Cleaning Supplies, Clean Clothes and Linen*

21      With respect to cleaning supplies, clothing and linen exchange, defendant Sclafani states

22  in his declaration, in relevant part:

23          19.  **Cleaning supplies, Clothing, and Linen Exchange.**  Upon
            assignment to the ASU, inmates were typically provided a kit
24          containing cleaning and hygiene supplies (toilet paper, soap, tooth
            powder, cleaning supplies, etc.) and request forms.  The ASU
25          building officers were responsible for passing out cleaning and

26  ───────────────────────
    [13]   In the statement of undisputed facts, defendants indicate that defendant Sclafani may have
27  worked in B Facility, Building 1, where plaintiff was housed from May 4, 2005, to November 14,
    2005.  However, the undersigned can find no evidence indicating that defendant Sclafani actually
28  worked in B Facility, Building 1 during this time.

                                        45

hygiene supplies and conducting the clothing and linen exchange in accordance with a set building schedule. At one point, inmates were responsible for the supply line. When I learned that there were distribution problems and that some inmates were not receiving equal supply rations, I revamped the process and prepared the supply bags for the building officers to distribute to the inmates. While isolated errors may have occurred, I never became aware of any significant deficiency, much less any deficiency sufficient to pose a risk of harm to any ASU inmate.

20. Correctional officers also were responsible for conducting laundry exchange for linens and clothing. The ASU schedule divided these duties between the second and third watch officers. Third watch officers were responsible for conducting clothing exchange. Inmates who did not have clothes to exchange could still be provided clean clothes. While isolated errors may have occurred, I was not aware of any ongoing deficiency in the clothing exchange process, much less any deficiency sufficient to pose a risk of harm to any ASU inmate.

21. Second watch officers were responsible for exchanging linens on Tuesdays. While isolated errors may have occurred, I was not aware of any ongoing deficiency in the linen exchange process, much less any deficiency sufficient to pose a risk of harm to any ASU inmate.

Sclafani declaration, ¶¶ 19-21.

At his deposition, plaintiff testified that he "referred his concerns" to defendant Sclafani regarding "toilet paper, soap, toothpaste, anything." (Plaintiff's deposition at 72.) Plaintiff went on to testify that defendant Sclafani "didn't do anything" after plaintiff expressed his concerns to him. (Id. at 74.)

Based on plaintiff's deposition testimony, the undersigned finds that whether defendant Sclafani provided plaintiff with adequate cleaning and hygiene supplies is materially disputed. Accordingly, defendant Sclafani should be denied summary judgment as to this claim.

Defendants argue that defendant Sclafani should be granted summary judgment as to plaintiff's claim that he did not receive adequate clean clothing and linen.[14] As discussed above, plaintiff presented logs indicating that he did not receive any clean clothes or linen while he was

_____

[14] Defendants argue that plaintiff has identified only two days when defendant Sclafani was responsible for linen exchange and the exchange did not occur: September 5, and November 22, 2005. (ECF No. 165-2 at 12 (Defendants' Statement of Undisputed Facts No. 71).) As discussed above, it does not appear that defendant Sclafani was employed in the ad seg unit where plaintiff was housed on those dates. Accordingly, the undersigned will not address this issue further.

1   housed in B Facility, Building 2 from November 17, 2005, to December 27, 2005.  It is

2   undisputed that correctional officers, like defendant Sclafani, were responsible for conducting the

3   laundry exchange.  (Sclafani declaration, ¶ 20.)  In his declaration, defendant Sclafani states that

4   he was not aware of any deficiency in the laundry exchange process.  (Id. ¶ 20-21.)

5        While plaintiff did not specifically testify at his deposition that he told defendant Sclafani

6   that he was not receiving clean clothes and clean linen, he testified that he made him aware of his

7   concerns regarding the conditions in ad seg:   "So I got at him – you know, referred my concerns

8   to him many times:  toilet paper, soap, toothpaste, anything."  (Plaintiff's deposition at 72.)

9   Plaintiff also testified that defendant Sclafani did not respond to his concerns:

10            Q:  Now, in terms of – in terms of officers complying.  So he was a
              correctional officer assigned to the administrative segregation unit
11            and you expressed your concerns to him and you felt like he didn't
              do enough to address those concerns?
12
              A:  Who did you mean by saying "him"?
13
              Q:  Officer Sclafani.
14
              A:  Oh yeah, he didn't do anything.  I told her that.
15

16   (Id. at 74.)

17        From plaintiff's deposition testimony, it is reasonable to infer that plaintiff made

18   defendant Sclafani aware of his complaints regarding the conditions in ad seg, including the lack

19   of clean linen and clean clothes.  Accordingly, the undersigned finds that whether defendant

20   Sclafani had knowledge of plaintiff's failure to receive clean linen and clean clothes is a

21   materially disputed fact.  Therefore, defendant Sclafani should be denied summary judgment as to

22   this claim.

23        *Inadequate Lighting and Leaks*

24        With respect to inadequate lighting, defendant Sclafani states in his declaration,

25   "Whenever I became aware that the lighting in a cell was too dim, I relayed that information up

26   the chain of command so that a work order could be submitted to correct the problem."  (Sclafani

27   declaration, ¶ 25.)   With respect to plaintiff's claim that his cell contained leaks, defendant

28   Sclafani states in his declaration, "On occasion, I became aware of leaks in the building.  When

47

1   this occurred, I provided notice up the chain of command so that the Maintenance Department

2   could be notified and fix the problem.  I was not responsible for fixing the leak myself." (Id. at

3   12.)

4        Plaintiff has provided no evidence that defendant Sclafani failed to provide notice of his

5   complaints regarding inadequate lighting and leaks up the chain of command.  Plaintiff has

6   provided no evidence, for example, that he repeatedly complained to defendant Sclafani regarding

7   these conditions, which would suggest that defendant Sclafani did not report his complaints.  For

8   these reasons, the undersigned finds that there is no evidence that defendant Sclafani acted with

9   deliberate indifference with respect to these conditions.  Accordingly, defendant Sclafani should

10  be granted summary judgment as to these claims.

11       *Cell and Water Temperature*

12       With respect to plaintiff's claims alleging that his cell was cold and lacked hot water,

13  defendant Sclafani states,

14       8.   **Cell Air and Water Temperatures**.   Heating and air
         conditioning was supplied to the ASU cells through a centralized
15       system that vented directly into each cell.  I had no authority to
         change the temperature settings, and I never did.  When I received
16       complaints concerning cell temperature, I would convey the
         complaint up my chain of command, so that the Maintenance
17       Department could be contacted to address the problem.  ASU
         inmates sometimes regulated cell temperature by blocking their cell
18       vents with toilet paper.  This threw the heating and air system off
         by forcing excess air into the cells with unblocked vents.
19       Whenever I was aware that this was occurring I, or another officer,
         went to cell and directed the inmates to unblock the vents. I never
20       believed the in-cell temperatures to pose any risk of harm to inmate
         Navarro,  and  I  never  knowingly  disregarded  his  complaint
21       concerning the temperature of his cell.

22       9.   The hot water supply controls for the showers and cells were
         separate.   I lacked the authority or ability to adjust the water
23       temperature in the ASU cells; this was the responsibility of the
         Maintenance Department.  I did not have the authority to turn off
24       the hot-water supply to a cell, and I never did so.  I did not know
         the in-cell water temperature to pose any risk to inmates in the
25       ASU.

26       ****

27       11.  When problems arose involving the temperatures in the ASU
         cells, the officers were required to either correct the problem (i.e.
28       direct inmates to uncover the vents), or report the problem up the

48

chain of command so that it could be addressed.  I always did so.

(Sclafani declaration, ¶¶ 8, 9, 11.)

As discussed above, whether plaintiff's cell was unconstitutionally cold is a disputed material fact.  With regard to defendant Sclafani's mental state, at his deposition, plaintiff testified that he told defendant Sclafani "numerous times" that there was no heat in his cell.  (Plaintiff's deposition at 76.)   While plaintiff has presented no direct evidence that defendant Sclafani failed to convey his complaints "up the chain of command," as defendant Sclafani states was his practice, plaintiff's claim that he told defendant Sclafani "numerous times" that his cell was cold suggests that defendant Sclafani may not have conveyed plaintiff's concerns.  For these reasons, the undersigned finds that whether defendant Sclafani responded to plaintiff's complaints regarding the temperature of his cell is a materially disputed fact.  Therefore, defendant Sclafani should not be granted summary judgment as to this claim.

With respect to plaintiff's claim that his cell lacked hot water, as discussed above, plaintiff's cell water temperature was measured at 90 degrees.  At his deposition, plaintiff testified that correctional staff tampered with the water temperatures to punish inmates for complaining, which would explain why his water temperature would measure 90 degrees on the day it was measured, i.e., correctional staff were not tampering with it on that day.  Plaintiff has presented no evidence disputing defendants' evidence that defendant Sclafani had no control over the cell water temperature, i.e., he did not tamper with it.  Based on this evidence, the undersigned finds that plaintiff has not demonstrated that defendant Sclafani violated his Eighth Amendment rights with respect to the temperature of the water in his cell.

*Outdoor Exercise*

With respect to plaintiff's claim alleging inadequate outdoor exercise, defendant Sclafani states in his declaration,

> Yard time was divided into separate sessions.  The classification committees assigned each inmate to either a walk-alone (individual) or a compatible group yard assignment, and a master list which directed which inmates were assigned to each outdoor-yard session. I was not responsible for creating this list.  The Control Booth Operator typically retained the list and directed the building officers to escort particular inmates for safety reasons, to ensure that two

49

1
2
3
4
5
6
7
8

incompatible inmates would not be escorted at the same time.  Any available building officer could be assigned [to] escort any inmate on a given day.  Inmates could, and sometimes did, refuse to attend yard.  Approximately three times a month, when the regular Control Booth Operator was absent and a relief officer was filling in, the ASU building officers would run the yard program.   I never knowingly failed to offer to escort Navarro to his assigned yard session when it was my responsibility to do so.  I also never denied Navarro access to the exercise yard because of any administrative appeal or lawsuit filed.  As a Correctional Officer, I was required to report any complaints that an inmate was not receiving his scheduled yard up the chain of command so that it could be addressed.  I took this duty seriously, and never failed to report any yard deprivation of which I was aware.

9    (Sclafani declaration, ¶ 15.)

10    As discussed above, the logs indicate that plaintiff may not have received adequate

11    outdoor exercise while housed in B Facility, Building 2.  The record contains no evidence

12    regarding why plaintiff failed to receive adequate exercise.  However, defendant Walker's

13    response to plaintiff's second level grievance no. 05-2214 states that B Facility had a "limited and

14    restricted" yard program, suggesting that plaintiff's failure to receive adequate yard time was

15    based on a policy.  (Defendants' Exhibit G.)  In his declaration, defendant Sclafani states that it

16    was not his responsibility to schedule inmates for yard sessions.  He also states that he never

17    knowingly failed to escort plaintiff to the yard when it was his responsibility to do so.  Plaintiff

18    has provided no evidence demonstrating that defendant Sclafani was responsible for his failure to

19    receive yard time.

20    Because defendants have presented unopposed evidence that defendant Sclafani was not

21    responsible for plaintiff's failure to receive yard time, the undersigned recommends that

22    defendant Sclafani be granted summary judgment with respect to this claim.

23    *Spoiled Food*

24    Regarding plaintiff's claim alleging that he received spoiled food, defendant Sclafani

25    states,

26
27
28

ASU inmates were served food prepared on another facility by persons outside the ASU.  Individual meals were prepackaged and either put on a tray or into a lunch bag before delivery to the building.  The building officers, including myself, were responsible for delivering the meals through the tray slot in the cell door.

> Although isolated issues arose, I was not aware of any pervasive problems with the food or the food service, and I never knowingly delivered an unsafe or nutritionally unsafe meal.

(Sclafani declaration, ¶ 14.)

At his deposition, plaintiff testified that he told defendant Sclafani about the spoiled food. (Plaintiff's deposition at 92.)  In his opposition, plaintiff also states that when he received the spoiled food from defendant Sclafani, he showed the food each time to defendant Sclafani.  (ECF No. 171 at 24.)  Plaintiff alleges that in response, defendant Sclafani told him that there was nothing else, take it or leave it.  (Id.)  Based on these statements, the undersigned finds that whether defendant Sclafani had knowledge that plaintiff was receiving spoiled food is a materially disputed fact.  Accordingly, defendant Sclafani should be denied summary judgment as to this claim.

## 8.  Defendant O'Brian

Regarding his Eighth Amendment claims, plaintiff alleges that defendant O'Brian failed to respond to grievance no. 05-2214 which challenged the conditions in ad seg.  Plaintiff also alleges that defendant O'Brian ignored his requests for interviews.

Defendants argue that defendant O'Brian is entitled to summary judgment as to plaintiff's Eighth Amendment claims challenging the conditions of ad seg on the grounds that she did not have authority over the conditions in ad seg.  Defendants also argue that defendant O'Brian alerted supervisory staff whenever she became aware of an issue that required staff intervention.  Defendants further argue that defendant O'Brian was not aware of plaintiff's repeated requests for interviews.  In support of these arguments, defendants cite defendant O'Brian's declaration which states, in relevant part,

> 17.   Inmates could, and often, submit request-for-interview slips requesting the status of their appeals, including whether they had been logged and received.  The [Office Technician] generally was responsible for responding to these requests, without my assistance or oversight.  However, on occasions, these requests were given to me for response.
>
> 20.   I was not assigned to the facility where inmate Navarro was housed, and I was not directly responsible for his confinement

51

conditions or his requests for access to his property, the law library, inmate trust records, or the services of religious advisors.  I also did not supervise the staff in Navarro's assigned building, or those officers in departments other than the Appeals Office.  Although some errors inevitably occurred in the processing of appeals, I was not aware of any pervasive deficiencies in the processing of appeals.

****

26.  Appeal SAC-S-05-2214.  I have reviewed the documents comprising defendants' Exhibit G, and pages 59-77 of Navarro's Request for Judicial Notice (ECF No. 120-1).  Based on these documents, I am able to tell how I processed this appeal.  This appeal, originally submitted as a group appeal on November 30, 2005, sought:  1) clean blankets to be issued; 2) a higher thermostat temperature; 3) hot water in the cells; and 4) weekly law library access for all administrative segregation unit inmates.  On November 29, 2005, I screened out this appeal in compliance with the appeal regulations, because it did not contain the names, signatures, CDCR number, and housing information for the other inmates who sought to be included in the appeal, and did not document the cells lacking hot water or the dates that requests had been made to staff.  Navarro corrected the deficiencies and resubmitted the appeal for review on December 1, 2005.  The OT stamped and dated the appeal as received on approximately December 6, 2005, and provided to me for processing. I allowed the appeal to bypass the informal level of review and assigned it to facility, where Sergeant Baker and the Facility Captain conducted the review.

27.  The first level response, dated December 22, 2005, stated that the blanket-exchange process had been started, the Maintenance Department had investigated and verified that the cell air and water temperatures were within correctional guidelines, and that a process had been instituted to provide increased library access.  It appears that the OT sent the appeal packet out to Navarro but that it was returned to the Appeals Office before reaching him, because the OT stamped the appeal as being received again on January 9, 2006, and updated the response date to indicate it was provided to Navarro on January 13, 2006.  I was not responsible for this delay.

28.  Navarro appealed to the second level of review on January 29, 200[6 ] and the OT stamped the appeal as received on February 1, 200[6].  The appeal was given to me for processing and I assigned it to the facility for review at the second level, and returned it to the OT for processing.  The appeal was misfiled until the error was discovered on February 25, 200[6].  I did not cause this delay, and I was not aware of it at the time.  Because Navarro had transferred out of the institution, the reviewer interviewed inmate Young (E-65018) in his place.  Inmate Young withdrew the appeal because the complained-of-conditions no longer existed.

29.   While I processed this appeal, I was not assigned to or responsible for addressing the substantive issues.  I expected that

1   the assigned reviewers would competently investigate and
2   respon[d] to the appeal, and address any issues found to exist, and I
    did not intentionally delay, or fail to properly process this appeal.

3

4   (O'Brian declaration, ¶¶ 17, 20, 26-29.)

5          Plaintiff has provided no evidence demonstrating that defendant O'Brian intentionally

6   ignored a request for interview slip plaintiff submitted regarding the ad seg conditions.

7          The undersigned next considers defendant O'Brian's processing of grievance 05-2214.

8   As discussed above, ratification of an unconstitutional act by superiors after the fact will only

9   support liability when the superiors' past actions were the moving force behind the constitutional

10  violation in the first place.  Williams v. Ellington, 936 F.2d 881, 884–85 (9th Cir. 1991).  This

11  court is unwilling to adopt a rule that anyone involved in adjudicating grievances after the fact is

12  per se potentially liable under a ratification theory.  However, this is not to say that persons

13  involved in adjudicating administrative disputes, or persons to whom complaints are sometimes

14  made, can never be liable.  If, for example, a reviewing official's rejections of administrative

15  grievances can be construed as an automatic whitewash, which may have led other prison

16  officials to have no concern of ever being reprimanded, a ratifying official may be liable for

17  having put a defective policy in place.

18         Defendant O'Brian was not a superior officer to any of the officials responsible for

19  conditions in ad seg.  Therefore, defendant O'Brian is not liable for the conditions of ad seg

20  unless her processing of grievance 05-2214 could be construed as a whitewash.  While defendant

21  O'Brian admits that errors occurred in the processing of this grievance, it is clear that the

22  grievance was responded to on the merits.  The undersigned does not find that defendant

23  O'Brian's involvement with this grievance constituted a whitewash which may have led other

24  prison officials to have no concern for the conditions in ad seg.  Accordingly, defendant O'Brian

25  should be granted summary judgment as to plaintiff's Eighth Amendment claims.

26  ////

27  ////

28  ////

53

1    9.  Qualified Immunity

2        *Defendant Kernan*

3        Defendants argued that defendant Kernan should be granted summary judgment because

4    he was not informed of any condition plaintiff complained of in ad seg.  However, as discussed

5    above, whether defendant Kernan had knowledge of the ad seg conditions is a materially disputed

6    fact.  Accordingly, taking the facts in the light most favorable to plaintiff, the undersigned finds

7    that defendant Kernan potentially violated plaintiff's Eighth Amendment rights by disregarding

8    plaintiff's complaints regarding the ad seg conditions.  The undersigned further finds that a

9    reasonable correctional official, in defendant Kernan's position, would know that disregarding

10   plaintiff's complaints violated the Eighth Amendment.  Accordingly, defendant Kernan is not

11   entitled to qualified immunity.

12       *Defendant Walker*

13       Based on the discussion above, the undersigned finds that defendant Walker potentially

14   violated plaintiff's Eighth Amendment rights.  Based on plaintiff's allegation that he complained

15   about the ad seg conditions at the June 15, 2005, September 14, 2005, and December 14, 2005

16   classification committee hearings, the undersigned finds that a reasonable prison official in

17   defendant Walker's position would have known that continuing to rely on his subordinates, and

18   disregarding plaintiff's complaints, potentially violated plaintiff's Eighth Amendment rights.

19   Accordingly, defendant Walker is not entitled to qualified immunity.

20       *Defendant Baker*

21       Defendants' summary judgment motion does not address plaintiff's claim that defendant

22   Baker violated plaintiff's Eighth Amendment right to adequate cell lighting.  Accordingly, the

23   undersigned does not address the qualified immunity analysis with respect to this claim.

24       Based on the discussion above, the undersigned finds that defendant Baker potentially

25   violated plaintiff's Eighth Amendment rights with respect to his claims alleging that his cell was

26   cold, he did not receive clean linen and clothing, he received spoiled food and he did not receive

27   adequate outdoor exercise. Based on the evidence discussed above, the undersigned also finds

28   that a reasonable prison official in defendant Baker's position would have known that

54

1    disregarding the alleged violations violated the Eighth Amendment.  As discussed above, the logs

2    would have put defendant Baker on notice that plaintiff was not receiving adequate clean

3    clothing, linens and outdoor exercise.  Plaintiff claims that he told defendant Baker that he

4    received rotten food.

5         With regard to plaintiff's claim alleging that his cell was cold, a reasonable correctional

6    official would have known that even if the temperature at plaintiff's cell vent read 78 degrees,

7    something was wrong with the ventilation if the officers in the unit wore heavy jackets, etc.

8         For the reasons discussed above, defendant Baker is not entitled to qualified immunity.

9         *Defendant Sclafani*

10        Based on the discussion above, the undersigned finds that defendant Sclafani potentially

11   violated plaintiff's Eighth Amendment rights with respect to his claims alleging inadequate

12   cleaning supplies, inadequate clean clothing and linen, his cell was cold, and he received spoiled

13   food.  Taking the facts in the light most favorable to plaintiff, the evidence suggests that

14   defendant Sclafani was made aware of all of these conditions but failed to take any corrective

15   action.  The undersigned finds that a reasonable correctional officer would have known that

16   failing to respond to plaintiff's complaints violated the Eighth Amendment.  Accordingly,

17   defendant Sclafani is not entitled to qualified immunity.

18   IX.  Religious Freedom

19        Plaintiff, who is Native American, alleges that he was denied his First Amendment right

20   to freely exercise his religion.  Plaintiff also raises an Equal Protection claim related to his request

21   to practice his religion.  (ECF No. 78 at 19.)   These claims are made against defendants Kernan,

22   Walker, Grannis, O'Brian, Baker and Sclafani.  (Id. at 19.)

23        A.  First Amendment Right to Religious Freedom

24        Plaintiff alleges that during the time he was held in ad seg at CSP-Sac, he was denied

25   access to sweat lodges and a spiritual leader.  He also alleges that he was not allowed to access

26   his religious property.

27   ////

28   ////

1   *Legal Standard*

2   "The right to exercise religious practices and beliefs does not terminate at the prison door.

3   The free exercise right, however, is necessarily limited by the fact of incarceration, and may be

4   curtailed in order to achieve legitimate correctional goals or to maintain prison security."

5   McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citations omitted).  "[A]

6   prison inmate retains those First Amendment rights that are not inconsistent with his status as a

7   prisoner or with the legitimate penological objectives of the corrections system."  Pell v.

8   Procunier, 417 U.S. 817, 822 (1974); see also Clement v. Cal. Dep't. of Corr., 364 F.3d 1148,

9   1151 (9th Cir. 2004) (per curiam).  A prison regulation that impinges on First Amendment rights

10   "is valid if it is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S.

11   78, 89 (1987).

12   *Discussion—Defendants Grannis and O'Brian*

13   Citing plaintiff's deposition, defendants state that with respect to defendants O'Brian and

14   Grannis, plaintiff bases his claim for denial of his ability to practice his religion on a grievance he

15   sent to Grannis that was never returned.  (Plaintiff's deposition at 98.)  Defendants argue that

16   because defendant Grannis was not responsible for processing or responding to plaintiff's

17   grievances, plaintiff's First Amendment claims against these defendants should be dismissed.

18   In response to defendants' argument regarding defendants O'Brian and Grannis, plaintiff

19   argues in his opposition, "The evidence is too numerous to adequately present in such limited

20   space.  Including that plaintiff has responded to this substance of both facts of the persons and

21   evidence concerning 'hindering' 'ability' and practice of religion in the previous DUF's sections

22   to each named defendant."  (ECF No. 171 at 58.)

23   Plaintiff does not direct the court to the particular grievance raising his claim alleging

24   denial of ability to practice his religion to which defendant Grannis allegedly failed to respond.  It

25   is not the court's duty to comb through the record looking for this grievance, or any other relevant

26   grievance, on plaintiff's behalf.  For the reasons set forth above, the undersigned finds that there

27   is no evidence that either defendant Grannis or defendant O'Brian failed to process a grievance

28   alleging plaintiff's inability to practice his religion.  Accordingly, defendants Grannis and

1    O'Brian should be granted summary judgment as to plaintiff's First Amendment claim.

2           *Discussion—Access to Sweat Lodge*

3           Defendants move for summary judgment as to plaintiff's claim that he was denied access

4    to a sweat lodge on the grounds that the same safety concerns that precluded his placement into

5    CSP-Sac's other yards also precluded him from access to the sweat lodges there.  (See Walker

6    declaration, ¶ 26.)  Defendants state that this restriction was necessary to ensure plaintiff's safety.

7    (Id.)  As discussed above, the undersigned cannot determine whether valid security concerns

8    precluded plaintiff's placement in Facility B and Facility C.  For that reason, defendants are not

9    entitled to summary judgment on these grounds.

10          Defendants go on to, somewhat indirectly, address the involvement of each defendant in

11   plaintiff's inability to practice his religion.  The focus of the court's inquiry regarding this issue is

12   whether the individual defendants caused plaintiff to be denied access to the sweat lodge.

13          To be liable for a civil rights violation, a state actor must act or fail to act in a manner that

14   deprives another of a constitutional right.  Leer v. Murphy, 844 F.2d 628, 632 (9th Cir. 1988).

15          The Ninth Circuit explains:

16                  A person deprives another of a constitutional right, within the
                    meaning of section 1983, if he does an affirmative act, participates
17                  in another's affirmative acts, or omits to perform an act which he is
                    legally required to do that causes the deprivation of which [the
18                  plaintiff complains].  The inquiry into causation must be
                    individualized and focus on the duties and responsibilities of each
19                  individual defendant whose acts or omissions are alleged to have
                    caused a constitutional deprivation.
20

21   Id. at 633 (internal citation, quotation omitted; emphasis in original).

22          "The inquiry into causation must be individualized and focus on the duties and

23   responsibilities of each individual defendant whose acts or omissions are alleged to have caused a

24   constitutional deprivation."  Id.

25          In the statement of undisputed facts, defendants concede that plaintiff addressed his ability

26   to practice his religion with defendant Walker "at committee."  (ECF No. 165-2 at 22.)

27   Defendants argue that defendant Walker then directed the Sergeant or Correctional Counselor in

28

                                                        57

1   attendance at the committee hearings to address such concerns.  (Id.)

2          It is undisputed that defendant Walker caused plaintiff to be retained in ad seg.  It is

3   undisputed that plaintiff could not access the sweat lodge while he was in ad seg.  Thus, the

4   Sergeant and Correctional Counselors could take no action to address this issue.  Because

5   defendant Walker caused plaintiff to be retained in ad seg and had knowledge that plaintiff could

6   not attend the sweat lodge, and because it is disputed whether valid security reasons justified

7   plaintiff's retention in ad seg, defendant Walker should be denied summary judgment as to this

8   claim.

9          Defendants argue that defendant Kernan had no knowledge that plaintiff was being denied

10  his ability to practice his religion.  Defendants cite the portion of plaintiff's deposition where he

11  testified that he "really didn't address" his religion claims with defendant Kernan.  (Plaintiff's

12  deposition at 98.)

13          Q:  Okay. And then Kernan and Walker – did you talk to them
             about your religious religion claim?
14
             A:  Kernan I didn't –when I was asking him, I was more concerned
15           with my legal property when I saw Kernan walking the tier, and at
             the committee that's all I mentioned.  At that time I didn't think an
16           issue was with religion with Kernan.  I was just thinking I was
             going to get out of there; but if I ended up staying there, I wanted
17           my legal property.  So I really didn't address that to Kernan other
             than inmate requests that was never responded to.
18

19  (Id.)

20          The undersigned has reviewed the record and can find no evidence of plaintiff otherwise

21  informing defendant Kernan that he could not access the sweat lodge.

22          In his opposition to defendants' summary judgment motion, plaintiff argues that he

23  informed defendant Kernan of his claims involving his inability to practice his religion in

24  grievances nos. 2214 and 2084.  As discussed above, defendant Kernan did not participate in

25  either of these grievances.  Accordingly, defendant Kernan should be granted summary judgment

26  as to plaintiff's claim that he was denied access to the sweat lodge because there is no evidence

27  that defendant Kernan had knowledge of this issue.

28
                                                 58

With respect to defendants Baker and Sclafani, it is clear that neither of these defendants had control over plaintiff's placement in ad seg, which caused him to be denied access to the sweat lodge. Defendant Baker was the ad seg sergeant, whose duties included supervising the correctional officers in Facility B, Building 2, keeping records and preparing reports, and resolving issues brought to her attention by subordinate officers. (Baker declaration, ¶ 3.) Defendant Sclafani worked as a Correctional Officer in Facility B, Building 2. Defendant Sclafani's duties included supervising the inmates in his assigned building. (Sclafani declaration, ¶ 2.) Even assuming these defendants had knowledge that plaintiff was being denied access to a sweat lodge, they did not cause plaintiff's placement in ad seg, nor did they have any control over plaintiff's removal from ad seg to a yard where he would have access to a sweat lodge. Accordingly, because defendants Baker and Sclafani did not cause plaintiff to be denied access to a sweat lodge, these defendants should be granted summary judgment as to this claim.

*Discussion -- Access to Spiritual Advisor*

Defendants argue that no defendant denied plaintiff access to a spiritual advisor.

Defendants argue that defendant Kernan is entitled to summary judgment as to this claim because plaintiff did not ask defendant Kernan to see a spiritual advisor. Defendants state that plaintiff testified at his deposition that he did not tell defendant Kernan about his religious claims. (Plaintiff's deposition at 98.) While plaintiff gave this statement at his deposition, he earlier testified that he asked defendant Kernan for access to a chaplain at a classification committee. (Id. at 94.) It is undisputed that defendant Kernan participated only in the May 11, 2005 classification committee hearing.

Plaintiff's deposition testimony regarding whether he asked defendant Kernan for access to a spiritual advisor is conflicting. However, defendants are not entitled to summary judgment based on this conflicting testimony. Rather, a jury should decide whether plaintiff asked defendant Kernan for access to a spiritual advisor at the May 11, 2005 classification committee hearing.[15] Accordingly, defendant Kernan should be denied summary judgment as to this claim.[16]

---

[15]   Under the "sham affidavit rule," which is most often invoked in the context of a motion for summary judgment, "a party cannot create an issue of fact by an affidavit contradicting his prior

1    Defendants argue that defendant Walker is entitled to summary judgment as to this claim

2    because defendant Walker directed the Sergeant and Correctional Counselor in attendance at the

3    committee hearings to investigate such concerns, and trusted and relied on them to do so.

4    (Walker declaration, ¶ 24.)  Defendant Walker was not aware of any ongoing problem that was

5    not promptly corrected once supervising staff was notified.  (Id.)

6    At his deposition, plaintiff testified that at each committee hearing, he mentioned his

7    religion claims to defendant Walker.  (Plaintiff's deposition at 98.)  Plaintiff is claiming that he

8    told defendant Walker that he was being denied access to a spiritual advisor at the June 15, 2005,

9    September 14, 2005, and December 14, 2005 classification committee hearings.  If plaintiff

10    complained about access to a spiritual advisor at each of these hearings, then it appears that the

11    Sergeants and Correctional Counselors, whose job it was to investigate this claim, were not doing

12    their job.  Based on plaintiff's ongoing complaints, the undersigned does not find that defendant

13

14    deposition testimony." Van Asdale v. International Game Technology, 577 F.3d 989, 998 (9th
Cir. 2009) (citing Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991)).  Courts

15    generally do not apply the sham affidavit rule to conflicting statements within the same
deposition.  See Kimble v. State Farm Fire and Cas. Co., 2013 WL 4501023 at * 4 (N.D. Ohio

16    2013) ("The court rejects defendants' assertion that the sham affidavit doctrine...enables courts to
disregard deposition testimony."); Gullick v. Ott, 517 F.Supp.2d 1063, 1075 (W.D. Wis. 2007)

17    ("sham affidavit" rule does not apply to inconsistencies within same deposition); Kelly v.
Chambers, 2009 WL 765267 at * 5 (N.D. Ill. 2009) ("Although such "sham affidavits" are looked

18    down upon, the rationale for disfavoring "sham affidavits" does not extend to discrepancies
within the same deposition.").  "In short, the decision as to what to believe and what to disregard

19    in plaintiff's deposition testimony is entrusted to the jury at trial, not to the court on summary

20    judgment." Kimble, 2013 WL 4501023 at *4.

21    [16] The undersigned also observes that in his opposition, plaintiff alleges that after his uncle died in

22    January 2006, he saw defendant Kernan walking the ad seg block and asked him if he, plaintiff,
could see the chaplain.  (ECF No. 171 at 55.)  Plaintiff alleges that he showed defendant Kernan

23    his uncle's obituary from the newspaper.  (Id.)  Plaintiff alleges that defendant Kernan told
plaintiff to write the ad seg sergeant.  (Id. at 55-56.)

24    Plaintiff's claim in his opposition that he asked defendant Kernan to see a spiritual advisor
after his uncle died contradicts his deposition testimony that he did not address his religious

25    claims to defendant Kernan.  Plaintiff cannot create an issue of fact regarding whether he asked
defendant Kernan to see a spiritual advisor by contradicting his prior deposition testimony in his

26    opposition.  See Van Asdale v. International Game Technology, 577 F.3d 989, 998 (9th Cir,

27    2009).  In other words, plaintiff's contradictory statement in his opposition constitutes a "sham
affidavit."  Accordingly, the undersigned disregards plaintiff's claim in his opposition that he

28    asked defendant Kernan for access to a spiritual advisor after his uncle died.

1    Walker is entitled to summary judgment as to this claim.  See Cunnigham v. Gates, 229 F.3d

2    1271, 1292 (9th Cir. 2000) (supervisor liable for acquiescence to the constitutional deprivation).

3           Turning to defendant Baker, at his deposition, plaintiff testified that on December 22,

4    2005, he filed a grievance with defendant Baker requesting access to a chaplain.  (Plaintiff's

5    deposition at 96-97.)  Plaintiff testified that the grievance was never returned to him.  (Id. at 97.)

6    Defendants move for summary judgment as to defendant Baker on grounds that defendant Baker

7    did not know of this grievance.  In support of this argument, defendants cite defendant Baker's

8    declaration:

9           Inmates can worship in their cells, and I never interfered with
10          Navarro's ability to do so.  I am an American Indian and I am
             familiar with American Indian religious practices.  I never treated
11          Navarro differently from other inmates because of his Native
             American beliefs.  Moreover, as ASU Sergeant, I generally was not
12          responsible for processing inmates' requests for religious items or
             services but whenever I received such a request, I always relayed it
13          to the appropriate recipient.  I do not recall ever being aware that
             Navarro was having difficulties accessing any permitted religious
14          items or a spiritual advisor.  I am informed that Navarro claims he
             submitted an appeal concerning his ability to practice his religion
15          on December 22, 2005.  I generally was not informed of the content
             of inmates' appeals unless they were assigned to me for review, or
16          brought to my attention by the reviewing officer.  I do not recall
             ever being aware of an appeal concerning Navarro's ability to
17          practice his religion.   Moreover, Navarro transferred out of
             Building 2 just five days after the appeal was submitted.  Thus, by
18          the time any response could have been due, I no longer had any
             authority over Navarro.  I am informed that Navarro claims that his
19          uncle passed away on January 7, 2006.  I was not assigned to the
             facility where Navarro was housed in 2006 and, therefore, had no
20          authority over his ability to practice his religion at that time.

21   (Baker declaration, ¶ 28.)

22          Plaintiff's opposition contains no evidence demonstrating that defendant Baker was aware

23   of the grievance he allegedly filed on December 22, 2005.  Plaintiff has also presented no

24   evidence that defendant Baker was otherwise made aware of his request to see a spiritual advisor.

25   Defendants have presented uncontroverted evidence that defendant Baker had no knowledge of

26   plaintiff's desire to see a spiritual advisor.  For this reason, defendant Baker should be granted

27   summary judgment as to this claim.

28   ////

                                              61

1    With regard to defendant Sclafani, defendants argue that there is no evidence that

2    defendant Sclafani denied any request by plaintiff to see a spiritual advisor.  In support of this

3    argument, defendants cite defendant Sclafani's declaration which states, in relevant part,

4
> Inmates could also request, either in writing or verbally, to any
> correctional officer in the unit, to see a spiritual advisor.  Any time I
5
> received such a request, I conveyed it to either the head chaplain or
> the denomination-specific spiritual advisor requested.  I did not
6
> have the authority to require the spiritual advisor to respond.

7    (Sclafani declaration, ¶ 18.)

8    At his deposition, plaintiff testified that he raised his religious claims with defendant

9    Sclafani "many times."  (Id. at 98-99.)   Based on plaintiff's testimony that he made his religious

10   claims to defendant Sclafani "many times," the undersigned finds that whether defendant Sclafani

11   conveyed plaintiff's requests to the spiritual advisor is a reasonably disputed fact.  Accordingly,

12   defendant Sclafani should be denied summary judgment as to this claim.

13   *Discussion—Access to Religious Property*

14   Plaintiff alleges that he was not given his religious property while in ad seg.  (Plaintiff's

15   deposition at 96.)   In his opposition, plaintiff describes his religious property as including a red

16   headband, medicine bag, prayer ties, eagle feather and herbal medicine.  (ECF No. 171 at 56.)

17   Defendants argue that there is no evidence that any defendant attempted to interfere with

18   any attempt made by plaintiff to access his religious property.

19   There is no evidence that plaintiff ever asked defendant Kernan for assistance in obtaining

20   his religious property.  At his deposition, as discussed above, plaintiff did not testify that he asked

21   defendant Kernan for access to his religious property.  Plaintiff has provided no evidence that he

22   otherwise brought this matter to the attention of defendant Kernan.  Accordingly, defendant

23   Kernan should be granted summary judgment as to this claim.

24   Defendants argue that defendant Walker is entitled to summary judgment as this claim

25   because defendant Walker directed the Sergeant and Correctional Counselor in attendance at the

26   committee hearings to investigate such concerns, and trusted and relied on them to do so.

27   (Walker declaration, ¶ 24.)  Defendant Walker was not aware of any ongoing problem that was

28   not promptly corrected once supervising staff was notified.  (Id.)

1   As discussed above, at his deposition plaintiff testified that at each committee hearing he

2   mentioned his religion claims to defendant Walker.  (Plaintiff's deposition at 98.)  Plaintiff is

3   claiming that he told defendant Walker that he was being denied access to his religious property

4   at the June 15, 2005, September 14, 2005, and December 14, 2005 classification committee

5   hearings.  If plaintiff complained about access to his religious property at each of these hearings,

6   then it is appears that the Sergeants and Correctional Counselors, whose job it was to investigate

7   this claim, were not doing their job.  Based on plaintiff's ongoing complaints, the undersigned

8   does not find that defendant Walker is entitled to summary judgment as to this claim.  See

9   Cunnigham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000) (supervisor liable for acquiescence to

10  the constitutional deprivation).

11  Turning to defendant Sclafani, in his declaration, defendant Sclafani addresses the

12  procedures inmates follow to obtain their religious property:

13  The portion of an inmate's personal, religious and legal property
    that was not kept in his assigned cell was maintained by the
14  property officer assigned to Receiving and Release (R & R).
    Inmates could submit requests to R & R to access that property.  I
15  did not have authority over the property stored in R & R.  It was not
    my responsibility to process person, legal, or religion property
16  access requests, or to retrieve inmates' property from R & R.
    Whenever I received a property access request, I always forwarded
17  it to R & R.

18  (Sclafani declaration, ¶ 17.)

19  As discussed above, at his deposition, plaintiff testified that he raised his religious claims

20  with defendant Sclafani "many times."  (Id. at 98-99.)  Based on plaintiff's claim that he raised

21  his religious claims with defendant Sclafani "many times," the undersigned finds that whether

22  defendant Sclafani forwarded plaintiff's requests for access to his religious property to R & R is a

23  disputed material fact.  Accordingly, defendant Sclafani should be denied summary judgment as

24  to this claim.

25  Turning to defendant Baker, in her declaration, defendant Baker states that she was not

26  generally responsible for processing inmate's requests for religious items.  (Baker declaration, ¶

27  28.)  Defendant Baker states that when she received such a request, she always relayed it to the

28  appropriate recipient.  (Id.)  Defendant Baker states that she does not recall ever being aware that

63

1  plaintiff was having difficulty accessing his permitted religious items. (Id.)

2          In his opposition, plaintiff provides no evidence that he ever gave defendant Baker a

3  request for access to his religious property or that defendant Baker failed to forward the property

4  request to R & R.  Because defendants have presented uncontroverted evidence that defendant

5  Baker had no knowledge that plaintiff was having difficulty accessing his religious property,

6  defendant Baker should be granted summary judgment as to this claim.

7          *Qualified Immunity*

8          Because the undersigned recommends that defendants Grannis, O'Brian and Baker be

9  granted summary judgment on the merits of plaintiff's First Amendment claim, there is no need

10  to address qualified immunity as to these defendants.

11          As discussed above, the undersigned recommends that defendant Walker be denied

12  summary judgment as to all three of plaintiff's First Amendment claims based on plaintiff's claim

13  that he repeatedly brought these issues to defendant Walker's attention at the classification

14  committee hearings.  With respect to the first prong of the qualified immunity analysis, the

15  undersigned finds that defendant Walker potentially violated plaintiff's First Amendment rights

16  with respect to all three of these issues:  access to a sweat lodge, access to a spiritual advisor and

17  access to religious property.  With respect to the second prong of the qualified immunity analysis,

18  the undersigned finds that a reasonable prison official would have known that plaintiff's repeated

19  complaints indicated that his First Amendment rights were being violated, and that the people

20  defendant relied on to investigate these complaints were not doing their job.  See Cunnigham v.

21  Gates, 229 F.3d 1271, 1292 (9th Cir. 2000) (supervisor liable for acquiescence to the

22  constitutional deprivation).  Accordingly, defendant Walker is not entitled to qualified immunity.

23          The undersigned recommends that defendant Kernan be denied summary judgment as to

24  plaintiff's claim that he was being denied access to a spiritual advisor based on plaintiff's claim

25  that he brought this issue to defendant Kernan's attention at the classification committee.  The

26  record suggests that defendant Kernan ignored this request, as plaintiff allegedly did not meet

27  with a spiritual advisor for the entire time he was housed in ad seg.  With respect to the first prong

28  of the qualified immunity analysis, the undersigned finds defendant Kernan potentially violated

1  plaintiff's First Amendment rights by disregarding his request for access to a spiritual advisor.  It

2  is difficult to analyze the second prong of the qualified immunity analysis because it is unclear

3  why defendant Kernan allegedly ignored this request.  Nonetheless, the undersigned finds that a

4  reasonable prison official, including a Warden, would have known that ignoring a request for

5  access to a spiritual advisor violated the First Amendment.  Accordingly, defendant Kernan is not

6  entitled to qualified immunity.

7       The undersigned recommends that defendant Sclafani be denied summary judgment as to

8  plaintiff's First Amendment claims that he was denied access to a spiritual advisor and to his

9  religious property.  Plaintiff alleges that he made his First Amendment requests to defendant

10 Sclafani "many times."  With respect to the first prong of the qualified immunity analysis, the

11 undersigned finds that defendant Sclafani potentially violated plaintiff's First Amendment rights

12 by allegedly disregarding his requests for access to a spiritual advisor and access to his legal

13 property.  With respect to the second prong of the qualified immunity analysis, the undersigned

14 finds that a reasonable correctional officer would have known that ignoring these requests

15 violated plaintiff's First Amendment rights.  Accordingly, defendant Sclafani is not entitled to

16 qualified immunity with respect to these claims.

17      B.  Equal Protection

18      *Legal Standard*

19      "The Equal Protection Clause requires the State to treat all similarly situated people

20 equally.  Moreover, the Equal Protection Clause entitles each prisoner to a reasonable opportunity

21 of pursing his faith comparable to the opportunity afforded fellow prisoners who adhere to

22 conventional religious precepts."  Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (citations

23 and internal quotation marks omitted).

24      *Discussion*

25      Defendants argue that they are entitled to summary judgment as to this claim because they

26 did not treat plaintiff differently from any other inmates because of his Native American beliefs.

27 Defendants cite the declarations of defendants Baker, Walker and Sclafani in support of this

28 claim.  (ECF No. 165-2 at 22 (statement of undisputed facts, no. 138).)  Defendants also claim

1   that plaintiff alleges in the amended complaint at page 81 that "a number of other prisoners" felt

2   that they were denied their right to practice their religious ceremonies.  The undersigned cannot

3   locate this allegation in the amended complaint.

4          At his deposition, plaintiff testified that in the December 22, 2005 grievance he made the

5   following claim:

6              Because I did bring that up to her as one of the program things.
               That's –that's not listed on the programs available, but I should be
7              entitled to see a chaplain.  I saw a Catholic chaplain go back there
               to see another inmate, so I felt entitled to that as well; that I should
8              have the Native American chaplain.

9

10  (Plaintiff's deposition at 97.)

11         Plaintiff's deposition testimony set forth above is the only evidence the undersigned can

12  locate supporting his Equal Protection claim.

13         To succeed on the instant claim, plaintiff must demonstrate that the alleged discrimination

14  was intentional.  See Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997).  That means that

15  plaintiff must demonstrate that defendants knew that plaintiff was being denied access to a

16  spiritual advisor while spiritual advisors of other faiths were permitted in the ad seg unit.  Plaintiff

17  has provided no evidence demonstrating that any defendant had knowledge of this disparity,

18  either from personal observation or from information received from plaintiff.  As discussed

19  above, there is no evidence that defendant Baker reviewed plaintiff's December 22, 2005

20  grievance.  For these reasons, plaintiff has not demonstrated that defendants intentionally

21  discriminated against him.  Accordingly, defendants should be granted summary judgment as to

22  this claim.

23  X.  Access to the Courts

24         Plaintiff alleges that he was denied his right to access the courts.  This claim proceeds

25  against defendants Baker, Sclafani, Morrow, O'Brian and Grannis. (ECF No. 78 at 20.)   The

26  undersigned summarized plaintiff's access to the courts claims in the August 24, 2011 findings

27  and recommendations addressing defendants' motion to dismiss as follows:

28

66

> "It is now established beyond a doubt that prisoners have a constitutional right of access to the courts." <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977); <u>see also</u> <u>Ching v. Lewis</u>, 895 F.2d 608, 609 (9th Cir. 1990). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." <u>Bounds</u>, 430 U.S. at 828. In order to state a denial of access claim under the First Amendment, a prisoner must show that he suffered an "actual injury" as a result of the defendants' action by explaining how the challenged official's acts or omissions hindered plaintiff's efforts to pursue a nonfrivolous legal claim. <u>Lewis v. Casey</u>, 518 U.S. 343, 351-55 (1996). Actual injury may be shown if the alleged shortcomings "hindered his efforts to pursue a legal claim." such as having his complaint dismissed for "failure to satisfy some technical requirement" or if he "suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to even file a complaint." <u>Id.</u> at 351.
>
> The actual injuries alleged by plaintiff appear to be: (1) his inability to present a timely and complete petition for review before the California Supreme Court, in the direct appeal of his criminal conviction, citing case number LA042924, and California Supreme Court Case No. S138165; and (2) plaintiff's inability to fully state all grounds in support of his habeas corpus petition filed in the United States District Court for the Central District of California, resulting in the dismissal of claims on procedural default, failure to exhaust, and failure to raise issues on direct appeal in the state courts. This court's review of <u>Navarros v.Sullivan</u>, Case No. Civ-07-1593 DDP [previously SGL] PJW [footnote omitted], supports plaintiff's assertion that he failed to exhaust his state court remedies on some claims. (<u>See generally id.</u> at Dkt. No. 61 (according to plaintiff [petitioner therein] the option of dismissing his unexhausted claims and proceeding on his exhausted claims, or to have his entire petitioner dismissed as "mixed.")

(ECF No. 78 at 21-22.)

*Plaintiff's State Appeal*

After reviewing the record, the undersigned finds that the following facts are undisputed regarding plaintiff's state appeal.

In the California Court of Appeal, plaintiff was represented by counsel in his appeal of his criminal conviction. (ECF No. 181 at 6.) On August 13, 2004, plaintiff's counsel filed a <u>Wende</u> brief, indicating that there were no arguable issues for review. (<u>Id.</u>) On December 17, 2004, plaintiff filed his own supplemental briefing in support of the appeal. (<u>Id.</u> at 7.) The docket from the California Court of Appeal indicates that on December 17, 2004, the case was fully briefed.

1    (Id.)  On September 14, 2005, the California Court of Appeal issued an opinion affirming

2    plaintiff's conviction.  (Id.)

3          Plaintiff signed his petition for review addressed to the California Supreme Court on

4    October 16, 2005.  (ECF No. 165-4 at 13.)  On November 30, 2005, the California Supreme Court

5    denied the petition for review without comment or citation. (Id. at 11.)

6          *Plaintiff's Federal Petition*

7          The undersigned has taken a closer look at plaintiff's federal petition, and summarizes that

8    review herein.

9          On March 10, 2007, plaintiff filed the original petition in the United States District Court

10   for the Central District of California.[17]  (See United States District Court docket, 2:07-1593 at

11   ECF No. 78 at 3 (findings and recommendations recommending that the petition be denied.)  On

12   September 13, 2007, respondent filed a motion to dismiss, arguing that the claims were

13   unexhausted and that plaintiff had a pending habeas petition before the California Supreme Court.

14   (Id.)  That state habeas petition was denied on October 10, 2007.  (Id.)

15         On October 17, 2007, plaintiff filed an amended petition, raising 15 grounds for relief,

16   many of which appeared to be based on the recently denied state habeas petition.  (Id.)

17   Accordingly, on November 6, 2007, the magistrate judge court denied the motion to dismiss as

18   moot.  (Id.)  The magistrate judge ordered respondent to file a response to the amended petition.

19   (Id.)

20         On December 13, 2007, respondent filed a motion to dismiss the amended petition on the

21   grounds that it contained unexhausted claims.  (See id. at ECF No. 54.)   On February 7, 2008, the

22   magistrate judge denied the motion to dismiss, finding that plaintiff's claims were exhausted.

23   (Id.)

24         On December 10, 2009, the magistrate judge issued an 18 page opinion recommending

25   that plaintiff's habeas petition be denied on the merits.  (Id. at ECF No. 78.)  On April 7, 2001,

26   the district court adopted these findings and recommendations.  (Id. at ECF No. 80.)

27   _____

28   [17]  Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981).

1          *Analysis*

2          Plaintiff's pleadings regarding the instant claim are somewhat confusing.  However, after

3   reviewing the opposition, the undersigned finds that plaintiff has clarified his access to the courts

4   claim to allege as follows.

5          Plaintiff alleges that due to inadequate law library access, etc., he was unable to present in

6   his petition for review and federal habeas petition a claim challenging his three strikes sentence.

7   (ECF No. 171 at 32-22.)  It appears that plaintiff is arguing that his two prior convictions used as

8   strikes were improperly counted as two strikes because they arose from a single criminal act.

9   Plaintiff alleges that his strikes came from his 1995 convictions in case no. KA026295.  (Id. at

10  31.)  A copy of the minute order from that case is attached to the opposition.  (ECF No. 173-2 at

11  25-26.)  The minute order reflects that on March 10, 1995, plaintiff was convicted of making a

12  terrorist threat (Cal. Penal Code  422) and oral copulation against a victim (Cal. Penal Code §

13  288A(c).  (Id. at 26.)

14         In his opposition, plaintiff cites People v. Burgos, 117 Cal.App.4th 1209 (2004), in

15  support of his argument that his convictions for oral copulation and making a terrorist threat in

16  case no. KA026295 should not have been considered as separate strikes.  A trial court may, but is

17  not required to, exercise its discretion to strike a prior strike conviction where the prior strikes

18  arise from a single incident with a single victim or a single act.   People v. Burgos (2004) 117

19  Cal.App.4th 1209, 1212, fn.3, 1216. (2004).

20         The undersigned observes that plaintiff raised his claim challenging his 3 strikes sentence

21  in his federal petition.  (See Defendants' Request for Judicial Notice, Exhibit M, p. M18.)   Thus,

22  plaintiff's access to the courts claim is without merit to the extent it is based on his inability to

23  raise this claim, as a violation of federal law, in federal court.  Plaintiff's access to the courts

24  claim is, therefore, limited to his alleged inability to raise this claim, as a violation of state law, in

25  his petition for review filed in the California Supreme Court.

26         Defendants move for summary judgment as to plaintiff's access to the courts claim on

27  several grounds.  Defendants argue that plaintiff's access to the courts claim fails because he has

28  not demonstrated that he sought to raise a non-frivolous issue.  Defendants also argue that

69

1    plaintiff has failed to link any defendant to his claim.  Defendants also argue that plaintiff's claim

2    is barred by Heck v. Humphrey, 512 U.S. 477 (1994).

3         For the reasons discussed herein, the undersigned finds that plaintiff's access to the courts

4    claim is Heck barred.  For that reason, the undersigned does not address defendants' other

5    arguments for summary judgment as to this claim.[18]

6         In Heck v. Humphrey, 512 U.S. 477, 481 (1994), the Supreme Court held "habeas corpus

7    is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement

8    and seeks immediate or speedier release, even though such a claim may come within the literal

9    terms of § 1983."   Thus, a plaintiff cannot maintain a § 1983 action to recover damages for

10   "harm caused by actions whose unlawfulness would render [his] conviction or sentence invalid"

11   when his sentence and conviction have not previously been reversed, expunged, declared invalid,

12   or called into question upon issuance of a writ of habeas corpus by a federal court.  Id. at 486–87.

13        As noted by defendants, the Seventh Circuit and several Ninth Circuit district courts have

14   held that until an inmate's conviction or sentence has been overturned, he cannot bring claims for

15   damages for denial of access to legal materials or legal assistance to aid him in challenging some

16   aspect of his conviction or sentence.  The undersigned quotes herein from Koch v. Jester, 2014

---

17,18   [18]   The undersigned observes that it is possible, although not likely, that the California Supreme
        Court would have taken up plaintiff's claim challenging his 3 strikes sentence had he raised it in
19      his petition for review.  The California Supreme Court, when considering a petition for review,
        "normally will not consider an issue that the petitioner failed to timely raise in the Court of
20      Appeal."  Cal. Rules Court, Rule 8.500(c).  The exceptions to this rule are when:  the California
        Supreme Court has granted review (Rule 8.516(b)(1), Cal. R. Ct.); or the newly-raised claim
21      involves a pure question of law not turning upon disputed issues of fact, or a matter of particular
        public importance.  People v. Randle, 35 Cal.4th 987, 996–97 (2005).
22           Plaintiff's claim alleging that his convictions for making a terrorist threat and oral
        copulation against a victim should have been counted as one strike raises a question of law, i.e.,
23      whether the trial court should have exercised its discretion to strike one of the convictions.  Thus,
        arguably, the California Supreme Court could have considered this claim even though it was not
24      raised in the California Court of Appeal.
25           Whether plaintiff's claim challenging his 3 strikes sentence was "non-frivolous" is not
        clear.  Plaintiff has not demonstrated that the facts underlying his convictions in case no.
26      KA026295 should have resulted in his two convictions being treated as one strike.   Other than
        the minute order, plaintiff has filed no evidence regarding this case.   As such, plaintiff's claim
27      that his convictions in that case should have been treated as one strike is speculative and
        unsupportive.  The fact that plaintiff's appellate counsel failed to raise this claim suggests that
28      this claim lacks merit.

70

WL 3783961 at *5 (D. Or. 2014), which addressed this issue:

> Although the Ninth Circuit has not addressed the intersection of the First Amendment and <u>Heck</u> as they apply to an inmate's claim for denial of access to the courts, the Seventh Circuit and several district courts in the Ninth Circuit have addressed the issue and held <u>Heck</u> bars such claims. For example, in <u>Burd v. Sessler</u>, 702 F.3d 429 (7th Cir. 2012), the plaintiff brought a claim under § 1983 for damages against prison officials alleging they denied him access to the courts in violation of the First Amendment when they prevented him from using library resources to prepare a motion to withdraw his guilty plea. The plaintiff's conviction had not been reversed, expunged, declared invalid, or called into question upon issuance of a writ of habeas corpus by a federal court before the plaintiff filed his § 1983 action. The defendant moved to dismiss the plaintiff's claim on the ground that it was barred by <u>Heck</u> because the plaintiff's conviction had not been reversed. The plaintiff asserted the "favorable termination requirement of <u>Heck</u> ... [was] inapplicable because an award of damages for having been denied an opportunity to research his motion to withdraw his plea or his right to appeal his sentence would not necessarily imply that his conviction or sentence is invalid." <u>Id.</u> at 432. Specifically, the plaintiff asserted

>> his access-to-courts claim [did] not challenge directly his underlying criminal conviction, despite the fact that ... he sought access to the courts to withdraw his guilty plea. Invoking <u>Lewis v. Casey</u> ... and <u>Christopher v. Harbury</u>, 536 U.S. 403 (2002), [the plaintiff] further argue[d] that "the loss of an opportunity to seek some particular order of relief" can form the basis of an access-to-courts claim. <u>Harbury</u>, 536 U.S. at 414 (emphasis added). Consequently, [the plaintiff] maintain[ed] that he need only demonstrate that his lost, underlying claim—here, a lost opportunity to withdraw a guilty plea or to appeal—would have been non-frivolous or "arguable," not that it would have been successful.

> <u>Id.</u> at 433. The district court rejected the plaintiff's argument and granted the defendant's motion to dismiss on the ground that "a favorable determination on [the plaintiff's] damages claim necessarily would imply the invalidity of [the plaintiff's] conviction," and, therefore, the plaintiff's claim was barred by <u>Heck</u>. The Seventh Circuit affirmed the district court and noted the plaintiff's argument gave "too crabbed a reading to the scope of the bar established in <u>Heck</u>." <u>Id.</u> The Seventh Circuit pointed out that it had concluded in an earlier case (<u>Hoard v. Reddy</u>, 175 F.3d 531 (7th Cir.1999)) "'that only prospective relief is available in a prisoner's suit complaining of denial of access to the courts unless he has succeeded in getting his conviction annulled, since otherwise an effort to obtain damages would be blocked by <u>Heck</u>.'" <u>Burd</u>, 702 F.3d at 433 (quoting Hoard, 175 F.3d at 533). Although the Seventh Circuit acknowledged that ruling "seem[s] paradoxical alongside <u>Lewis</u>'s holding that a § 1983 plaintiff in an access-to-courts case needs only a non-frivolous, rather than meritorious,

claim," the Seventh Circuit, nevertheless, concluded the following after examining <u>Lewis</u>, <u>Heck</u>, and other cases:

> Because the underlying claim for which [the plaintiff] sought access to the prison law library was the opportunity to withdraw his guilty plea, he cannot demonstrate the requisite injury without demonstrating that there is merit to his claim that he should have been able to withdraw the plea. Such a showing necessarily would implicate the validity of the judgment of conviction that he incurred on account of that guilty plea. The rule in <u>Heck</u> forbids the maintenance of such a damages action until the plaintiff can demonstrate his injury by establishing the invalidity of the underlying judgment. Accordingly, we conclude that [the plaintiff] has not established a basis for recovering any type of damage relief under § 1983.

<u>Id.</u> at 434–35.

> District courts in the Ninth Circuit have followed the reasoning of the Seventh Circuit and concluded pursuant to <u>Heck</u> that, until their conviction or sentence has been overturned, inmates cannot bring claims for damages for denial of access to legal materials or legal assistance to aid them in challenging some aspect of their conviction or sentence. <u>See</u>, <u>e.g.</u>, <u>Gregory v. County of San Diego</u>, No. 13-cv- 1016 WQH JMA, 2013 WL 5670928, at *5 (S.D.Cal. Oct.15, 2013); <u>Collins v. Corr. Corp. of Am.</u>, No. 3: 10-cv-0697 RCJ V, 2011 WL 768709, at *2 (D.Nev. Jan.26, 2011); <u>Cole v. Sisto</u>, Civ. No. S–09–0364 KJM P, 2009 WL 2230795, at *4 (E.D.Cal. July 24, 2009).

<u>Koch v. Jester</u>, 2014 WL 3783961 at * 5.

In the instant case, plaintiff seeks money damages on grounds that defendants thwarted his ability to raise a colorable claim challenging his 3 strikes sentence in his petition for review filed in the California Supreme Court by denying him adequate law library access, etc.

The undersigned agrees with the reasoning of the Seventh Circuit and the district courts, discussed above, that claims by prisoners for damages based on alleged denial of access to the law library, legal materials, etc., to aid them in challenging their some aspect of their conviction or sentence are <u>Heck</u> barred unless the conviction or sentence has been overturned.  Plaintiff's conviction and sentence have not been overturned.  Accordingly, plaintiff's claims alleging denial of access to the courts based on his claim that he was prevented from effectively litigating his state appeal based on inadequate law library access, etc., is <u>Heck</u> barred.

////

XI.  Retaliation

This action proceeds on the following retaliation claims, based on the allegations that the following defendants retaliated against plaintiff for filing administrative grievances:  1) defendants O'Brian and Grannis by further refusing to process administrative grievances; 2) defendant Morrow for further refusing plaintiff access to his legal property and to the law library, after plaintiff complained; 3) defendants Sclafani and Baker by failing to remedy adverse conditions of confinement in the ad seg and for denying plaintiff access to a religious advisor. (ECF No. 78 at 22.)

*Legal Standard*

A viable claim of First Amendment retaliation entails five basic elements:  (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).  Direct and tangible harm will support a First Amendment retaliation claim even without a demonstration of chilling effect on the further exercise of a prisoner's First Amendment rights.  Id. at 568, n.11.  "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing Rhodes, 408 F.3d at 568, n.11.  A plaintiff must plead facts which suggest that retaliation for exercise of protected conduct was the "substantial" or "motivating" factor behind the defendants' conduct. Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989.)  Mere conclusions of hypothetical retaliation will not suffice; rather, a prisoner must "allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights."  Frazier v. Dubois, 922 F.2d 560, 562, n.1 (10th Cir. 1990).

*Defendants Grannis and O'Brian*

As discussed above, plaintiff alleges that defendants Grannis and O'Brian retaliated against him for filing administrative grievances by refusing to process other administrative grievances he filed.

1    Defendants move for summary judgment as to defendant Grannis on grounds that she did

2    not engage in any adverse action against plaintiff.  Citing defendant Grannis' declaration quoted

3    above, defendants argue that defendant Grannis was not employed at CSP-Sac, did not supervise

4    the staff there, did not screen out plaintiff's grievances, and was not assigned to process or

5    respond to his grievances.  Defendants argue that defendant Grannis was not aware of any error in

6    the processing of plaintiff's grievances.

7    The undersigned has reviewed the relevant exhibits attached to plaintiff's opposition and

8    finds that plaintiff has not demonstrated that defendant Grannis took an adverse action against

9    him.  First, plaintiff has attached several correspondences from defendant Grannis which he

10   received well after he transferred away from CSP-Sac.  (See ECF No. 172 at 14, 15, 16, 17.)

11   Plaintiff cannot base his retaliation claim against defendant Grannis based on these

12   correspondences.

13   Plaintiff has also attached a letter dated March 9, 2006, returning a Director's Level

14   appeal because it was not completed through the second level of review.  (ECF No. 172-2 at 9.)

15   While this letter has defendant Grannis's typed signature, it appears that someone else signed this

16   letter on behalf of defendant Grannis.  (Id.)

17   Plaintiff alleges that defendant Grannis refused to process his grievances, which would not

18   necessarily be reflected in documentary evidence.  However, in her declaration, defendant

19   Grannis stated that she did not review letters received by her office from inmates.  (Grannis,

20   declaration, ¶ 11.)  Defendant Grannis also stated that she was not involved in screening

21   grievances.  (Id. at ¶ 4-8.)  Based on these statements, the undersigned finds that plaintiff's claim

22   that defendant Grannis refused to process his grievances is unsupported by any admissible

23   evidence.  Accordingly, defendant Grannis should be granted summary judgment as to plaintiff's

24   retaliation claim because there is no evidence that she took any adverse action against plaintiff.

25   With respect to O'Brian, defendants argue that defendant O'Brian did not harbor any

26   retaliatory animus toward plaintiff.   Defendants argue that defendant O'Brian never intentionally

27   delayed, screened out, or improperly process plaintiff's grievances.  In her declaration, defendant

28   O'Brian discusses her processing of plaintiff's grievances.  As discussed above, in her declaration

74

1    defendant O'Brian described the processing of grievance nos. 05-2084 and 05-2214.  (O'Brian

2    declaration, ¶¶ 23-29.)  While O'Brian admits that the processing of appeal no. 05-2214 was

3    delayed because the OT stamped the wrong date on the appeal and it was later misfiled, there is

4    no evidence that these actions were taken against plaintiff in retaliation for filing grievances.

5        In her declaration, defendant O'Brian addresses other grievances filed by plaintiff:

> 30.  **Appeals SAC-H-05-00546 and SAC H-05-0668.**  I have
> reviewed the prison's appeal tracking print out and the documents
> at pages 27-30 of the Complaint (ECF No. 24-1), and page 82 of
> Navarro's Request for Judicial Notice (ECF No. 120-1).  Based on
> these documents, I am able to tell that I was not assigned to or
> responsible for the substantive reviews or responses for these
> appeals.  The letter "H" in the appeal log indicates that the appeal
> was handled by the health-care-appeals office.  On occasion, I
> assisted with the screening of health care appeals, however, I was
> not employed in the health-care-appeals office. I had no authority
> over the people assigned there, and I did not have access to the
> medical files.  I did not intentionally delay, or fail to properly
> process, this appeal.
>
> 31,  **Appeal [no log number assigned].**  [Footnote:  Because
> copies of screened out appeals were not retained by the prison, I
> cannot verify whether this comprises the entire appeal.  Further, I
> relied on my attorney in this matter to identify the appeals that
> Navarro put at issue in this action.]
>
> I have reviewed the documents at page 16-21 of the Complaint
> (ECF No. 24-1) and pages 19, 36 of Navarro's Request for Judicial
> Notice (ECF No. 120-1.)  Based on these documents, I am able to
> tell that this appeal, dated November 20, 2005, was screened out by
> health-care-appeals office, and not by me. The appeal was not
> assigned a log number because it never was accepted for review.
> Because this was a health-care appeal, I would not have been
> responsible for any substantive review or response to the appeal.  I
> was not employed in the health-care appeals office, I had no
> authority over the people assigned there, and I did not have access
> to the medical files.  I did not intentionally delay, or fail to properly
> process, this appeal.
>
> 32.  **Appeal [no log number assigned].**  I have reviewed the
> documents at pages 22-24 of the Complaint (ECF No. 24-1) and
> pages 16-17, 20, 23-24, 26-27, 51, 66-67, and 82 of Navarro's
> Request for Judicial Notice (ECF No. 120-1).  Based on these
> documents, I am able to tell that I was involved only some of the
> screening of this appeal.  Navarro submitted this appeal on
> December 15, 2005, and it was stamped received on December 23,
> 2005.  On occasion I assisted with the screening of health care
> appeals, however I was not employed in the health care appeal
> office, I had no authority over the people assigned there, and I did
> not have access to the medical files. Because this is a health care
> appeal, I would not have been responsible for any substantive

75

review or response to the appeal.  This appeal requested Navarro's removal from CCCMS and copies of his medical records.  Navarros explained that he had unsuccessfully sought copies of his medical records from individual doctors and attempted to authorize the release of his medical and central file records so that I could provide copies to him. On an attached page, Navarro indicated that he was simultaneously submitting a request to medical records and that [he] did not want to be interviewed, and would not further explain his request.

33.  I screened out this appeal on January 13, 2006, because inmates were required to proceed through the proper channels by submitting requests to the medical records department rather than requesting records through an individual doctor or an appeal to me.  Then, if the request was denied, the inmate could file an appeal.  Navarro also did not show when, or to whom, he requested removal from CCCMS.  Thus, my screening letter instructed Navarro to show that he had gone through the designated channels.

34.   Navarro resubmitted the appeal and the OT stamped it as received on February 1, 2006.  The appeal was screened out by health care appeals staff on February 8, 2006, and not by me. Navarro had not complied with the first screening letter. He did not show any unsuccessful effort to obtain relief through the proper channels, except his statement that the medical records were not provided to him during the June 17, 2005 file review provided by SAC-H-05-0668.  The screening letter explained that the appeal regulations precluded inmates from filing a separate, duplicate appeal.  Navarro was again instructed to proceed through the proper channels by submitting a request to medical and to as his doctor to be removed from CCCMS.  The screening letter also clarified that if those efforts were denied, he could appeal the denial.

35.   Navarro resubmitted the appeal on February 26, 2006.   I screened out the appeal on March 3, 2006, because Navarro had not complied with the earlier screening letters by showing that he had unsuccessfully sought to obtain his medical records or his removal from CCCMS through the proper channels.  The June 17, 2005 file review provided by SAC-H-05-0668 could not be reconsidered in this appeal, because the appeal regulations do not permit duplicate appeals.  I explained that, under the regulations, if Navarro was not satisfied with the June 17 file review, he had 15 working days to appeal SAC-H-05-0668 to the next level of review.   Concerning Navarro's request for removal from CCCMS, I directed Navarro to file a new appeal and identify the medical staff whom he had requested removal from CCCMS, and the date of those requests. To facilitate the review of any such appeal, I waived the requirement that he provide supporting documentation and agreed to allow Navarro to submit only an explanation of his removal requests in support of the appeal.  I did not intentionally delay, or fail, to properly process this appeal.

36.   **Appeal [no log number assigned].**   I have reviewed the documents at pages 2-9 of the Complaint (ECF No. 24-2) and pages

31, 52, 62-63, and 82 of Navarro's Request for Judicial Notice (ECF No. 120-1). Based on these documents, I am able to tell how I processed this appeal. Navarro submitted this appeal on December 22, 2005, concerning the processing of his mail, and the OT stamped it received on December 27, 2005. I screened the appeal out on January 9, 2006, because it was unclear whether Navarro sought to submit the appeal as a staff complaint or as a legal-mail issue. He indicated an attempt to resolve informally with the mailroom (the informal review requirement is waived for staff complaints), but also requested a formal investigation into staff who handled mail (implicating a possible staff complaint). The January 9, 2006 screening letter directed Navarro to clarify the nature of his claim, and to submit the required CDC 1858 Form if he wished to proceed with a staff complaint. Navarro resubmitted the appeal and it was stamped received on February 1, 2005. I screened out the appeal on February 8, 2006, because it indicated that staff held Navarro's mail on three dates, but did not identify the dates or the staff involved. Navarro resubmitted the appeal and it was stamped received on March 2, 2006. I screened out this appeal again because Navarro's resubmission contained too much unnecessary verbiage, and still did not provide the required information. I directed Navarro to resubmit the appeal and "supply the information noted on the screening form 2/8/06. This will allow the appeal to be processed." I did not intentionally delay, or fail to properly process this appeal.

37. **Appeal [no log number assigned].** I have reviewed the documents at pages 16-20 of the Complaint (ECF No. 24-2.) Based on these documents, I am able to tell how this appeal was processed. Navarro noted he had previously submitted an appeal that was "lost" and dated the appeal December 28, 2005 and March 5, 2006. The OT date stamped the appeal as received on March 7, 2006. The appeal asserted that Navarro had submitted a trust-account statement on November 2, 2005 that was forwarded on November 18, 2005, and sought, as the action requested, a trust account statement or a signed statement explaining why one could not be provided. The attached form indicates that Navarro was seeking a "a second copy of the printout, so when the court inquires for further information I can proceed in a timely manner." The appeal was screened out on March 8, 2006 because Navarro had not completed the appeals process at the informal level of review, as he was required to do. I did not intentionally delay, or fail to process, this appeal.

(O'Brian declaration, ¶¶ 30-37.)

The undersigned finds that defendant O'Brian's declaration, quoted above, demonstrates that defendant O'Brian did not fail to process plaintiff's administrative grievances for improper reasons. In other words, defendants have demonstrated that defendant O'Brian did not retaliate against plaintiff.

The undersigned has reviewed plaintiff's opposition and finds that plaintiff has not demonstrated that defendant O'Brian retaliated against him for filing administrative grievances. Accordingly, the undersigned recommends that defendant O'Brian be granted summary judgment as to plaintiff's retaliation claim.

*Defendant Morrow*

As clarified in the order screening, plaintiff alleges that defendant Morrow retaliated against him by denying him access to his legal property and the law library after plaintiff complained to the May 11, 2005 classification committee that defendant Morrow told plaintiff that no legal property would be provided to him while he was housed at CSP-Sac.  (ECF No. 21 at 9; <u>see</u> <u>also</u> ECF No. 24 at 27 (amended complaint).)

Defendants move for summary judgment on the grounds that defendant Morrow harbored no retaliatory animus toward plaintiff.  In his declaration defendant Morrow states, in relevant part,

> 1.  I was assigned by the California Department of Corrections and Rehabilitation (CDCR) from August 1986 until my retirement in November 2010.  During 2005 and 2006, I was a Correctional Officer assigned as the Legal Officer for California State Prison, Sacramento's (CSP-Sacramento) A-Facility.
>
> 2.  As the Legal Officer, I was responsible for supervising both inmates attending the library and the inmate library clerks in the A Facility law library during second watch.  My duties included searching inmates for weapons and contraband, escorting inmates to the library and supervising inmates during the library sessions.  I was not responsible for supervising other officers or staff.  I was not the Law Librarian, and I had no authority over the Law Librarian.
>
> 3.  I am informed that Mario Luis Navarro (V-31698) was assigned to CSP-Sacramento's B-Facility, Building 1, Bed 106L, from May 4 through November 4, 2005; and to B Facility, Building 2, Bed 132L from November 14 through December 27, 2005.  B-Facility had a separate law library and its own Legal Officer.  I was not assigned to B Facility and my duties did not extend to the inmates housed there.
>
> 4.  I am informed that inmate Navarro was assigned to A Facility, Building 5, from December 27, 2005 through March 8, 2005.  As A Facility's Legal Officer, I was one of many people responsible for providing A Facility inmates with access to the law library and their legal property.

(Morrow declaration, ¶¶ 1-4.)

1    Plaintiff was housed in B Facility at the time he allegedly complained about defendant

2    Morrow to the May 11, 2005 classification committee.  However, at that time, defendant Morrow

3    was employed in A Facility.  According to defendant Morrow, his duties did not extend to B

4    Facility.

5    Plaintiff's retaliation claim against defendant Morrow is not supported by the record.

6    Plaintiff does not address how defendant Morrow, who was employed in A Facility, denied him

7    access to his legal property while he was housed in B Facility.  Plaintiff also does not address

8    how defendant Morrow denied him access to the law library while he was housed in B Facility.

9    Because defendants have presented uncontroverted evidence that defendant Morrow could not

10   have retaliated against plaintiff, as plaintiff alleges, defendant Morrow should be granted

11   summary judgment as to plaintiff's retaliation claim.

12       *Sclafani and Baker*

13   As discussed above, plaintiff alleges that defendants Sclafani and Baker denied plaintiff's

14   access to a religious advisor and ignored his complaints regarding unconstitutional conditions in

15   retaliation for plaintiff filing administrative grievances.  Defendants argue that there is no

16   evidence that these defendants harbored any retaliatory animus toward plaintiff.   In their

17   declarations, both defendanst Sclafani and Baker states that they took no adverse action against

18   plaintiff and did not treat him differently because he submitted administrative appeals.  (Sclafani

19   declaration, ¶ 27; Baker declaration, ¶ 33.)

20   In opposing defendants' summary judgment motion it is plaintiff's burden to raise a

21   genuine dispute of material fact as to whether his protected conduct, i.e., filing grievances, was a

22   substantial or motivating factor behind the defendants' conduct.  Brodheim v. Cry, 584 F.3d

23   1262, 1271 (9th Cir. 2009).

24   As discussed above, the undersigned above recommends that defendants Baker and

25   Sclafani be denied summary judgment as to some of plaintiff's Eighth and First Amendment

26   claims.  With respect to his retaliation claims, plaintiff has not demonstrated that either defendant

27   was motivated to commit the alleged Eighth and First Amendment violations in order to retaliate

28   against plaintiff for filing grievances.  In fact, at his deposition, plaintiff testified that defendant

79

1    Baker did not retaliate against him. (Plaintiff's deposition at 104.) Plaintiff testified that his

2    retaliation claim was against defendants O'Brian, Grannis and Morrow.[19] (Id.) Plaintiff did not

3    identify defendant Sclafani as a defendant against whom he was alleging retaliation.

4        Accordingly, defendants Sclafani and Baker should be granted summary judgment as to

5    plaintiff's retaliation claims.

6    XII.   Remaining Matters

7        *Plaintiff's Additional Request for Relief in Opposition*

8        In his opposition, plaintiff argues that the court should strike the portion of defendants'

9    summary judgment motion pertaining to defendants Baxter and Kernan because these defendants

10   did not personally submit declarations in support of the dispositive motion. The undersigned is

11   aware of no authority requiring a moving party to submit a personal declaration in support of a

12   motion for summary judgment. Accordingly, plaintiff's request to strike the motion for summary

13   judgment brought on behalf of defendants Baxter and Kernan on these grounds is denied.

14       In the opposition, plaintiff also requests that the court deem the responses to requests for

15   admissions by defendants Grannis and O'Brian admitted because they are not verified by

16   defendants. In the reply to plaintiff's opposition, defendants argue that plaintiff's request that the

17   responses be deemed admitted is untimely because discovery is closed. The undersigned agrees

18   that plaintiff's request regarding the request for admissions is untimely. In any event, as noted by

19   defense counsel, Federal Rule of Civil Procedure 36(a)(3) provides that requests for admission

20   may be signed by the party or the attorney for the party. Defense counsel signed the requests for

21   admission on defendants' behalf.

22       In the reply, defendants also note that plaintiff alleges that defendant Kernan's responses

23   to request for production of documents is unverified. To the extent plaintiff is requesting that the

24   court address a discovery matter, this request is untimely. In addition, as noted by defendants,

25   verification of responses to requests for production of documents is not required. See Bashkin v.

26

27   [19] Plaintiff also testified that his retaliation claim was against defendant Walker. (Plaintiff's
     deposition at 104.) However, the undersigned did not order service of a retaliation claim against
28   defendant Walker.

80

1  San Diego County, 2011 WL 1486313 at *7 (S.D. Cal. 2011).

2       *Objections*

3       The claims in this action have been extensively briefed by both parties.  Plaintiff's

4  amended complaint, including exhibits, is 488 pages.  Defendants' summary judgment motion,

5  including exhibits, is 307 pages.  Plaintiff's opposition, including exhibits, is 1474 pages.

6  Because of the extensive briefing, objections to these findings and recommendations may be no

7  longer than 20 pages (the page limit includes exhibits, if any).

8       Accordingly, IT IS HEREBY RECOMMENDED that :

9       1. Defendants' summary judgment motion (ECF No. 165) be denied as to the following

10  claims:  1) due process claims against defendant Walker; 2)  all Eighth Amendment conditions of

11  confinement claims against defendants Kernan and Walker; 3) the Eighth Amendment conditions

12  of confinement claims against defendant Baker alleging that plaintiff's cell was cold, he was

13  denied clean linen and clothing, he was denied adequate outdoor exercise, his cell had inadequate

14  lighting and he was served spoiled food; 4) the Eighth Amendment conditions of confinement

15  claims against defendant Sclafani alleging that plaintiff received inadequate cleaning supplies, he

16  was denied clean linen and clothing, his cell was cold and he was served spoiled food; 5) the First

17  Amendment claims against defendant Walker alleging denial of access to a sweat lodge, spiritual

18  advisor and religious property; 6) the First Amendment claims against defendant Kernan alleging

19  denial of access to a spiritual advisor; and 7) the First Amendment claims against defendant

20  Sclafani alleging denial of access to a spiritual advisor and religious property;

21       2. Defendants' summary judgment motion (ECF No. 165) be granted in all other respects.

22       These findings and recommendations are submitted to the United States District Judge

23  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

24  after being served with these findings and recommendations, plaintiff may file written objections

25  with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that

27  ////

28  ////

1   failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   Dated:  March 25, 2016

4

5   Na1878.sj(2)

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28